DAN RAYFIELD
Attorney General
COBY HOWELL #253434
LEANNE HARTMANN #T25070201, Mass. BBO #667852
BRIAN MARSHALL #196129
Senior Assistant Attorneys General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Coby.Howell@doj.oregon.gov
        Leanne.Hartmann@doj.oregon.gov
        Brian.S.Marshall@doj.oregon.gov

*Attorneys for State of Oregon*


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


| | |
|---|---|
| STATE OF MICHIGAN; STATE OF OREGON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF HAWAI'I; OFFICE OF THE GOVERNOR ex rel. ANDY BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky; STATE OF MAINE; STATE OF MARYLAND; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF WISCONSIN, | Case No.  6:25-cv-2053 COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| Plaintiffs, | |
| v. | |
| KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DAVID RICHARDSON, in his official capacity as Senior Official Performing the Duties of the Administrator of the Federal Emergency Management Agency; FEDERAL EMERGENCY MANAGEMENT AGENCY, | |
| Defendants. | |

## INTRODUCTION

1.      Disaster response in the United States has evolved over time.  In the early years of our Nation, individual "emergency managers reacted to each disaster, providing inconsistent assistance to those impacted."[1]  Realizing "the need for a more clearly defined approach to managing . . . disasters and providing consistent Federal support[,]" the federal government has taken numerous steps throughout its history to unify the country's approach to emergency management, ultimately leading to the now-statutorily established Federal Emergency Management Agency ("FEMA").[2]

2.      Yet, ignoring history's teachings, the Trump administration has repeatedly expressed a desire to diminish FEMA's role and shift the burden of emergency management to the States, thus reverting to an inconsistent patchwork of disaster response across the Nation. The Trump administration has taken numerous actions in furtherance of this goal—including denying or restricting requests for emergency declarations,[3] withholding grant funding,[4] and imposing irrelevant and unconstitutional terms on recipients of long-standing FEMA grants— many of which have been successfully challenged in court.[5]

3.      But the Trump administration runs into a persistent problem:  Congress has not acquiesced in or approved of scaling back FEMA.  To the contrary, in 2025, Congress

---

[1] *Publication 1*, FEMA, p. 15 (2019), available at https://www.fema.gov/sites/default/files/documents/fema_publication-one_english_2025.pdf.

[2] *Id.*

[3] Evan Casey, *FEMA Denies Wisconsin Request for Funds to Repair Infrastructure Damaged in August Floods*, Wisconsin Public Radio (Oct. 24, 2025), https://www.wpr.org/news/fema-denies-wisconsin-infrastructure-damaged-august-floods.

[4] *New York v. Trump*, 769 F. Supp. 3d 119, 127 (D.R.I.), *enforced*, 777 F. Supp. 3d 112 (D.R.I. 2025), *reconsideration denied*, No. 1:25-CV-39-JJM-PAS, 2025 WL 1098966 (D.R.I. Apr. 14, 2025), *and appeal dismissed*, No. 25-8010, 2025 WL 2523574 (1st Cir. May 12, 2025).

[5] *See, e.g.*, *Illinois v. FEMA*, No. 25-cv-206, 2025 WL 2716277 (D.R.I. Sept. 24, 2025); *New York v. Noem*, No. 25-cv-8106, 2025 WL 2939119, at *1 (S.D.N.Y. Oct. 16, 2025) (permanently enjoining FEMA's reallocation of transit security grant funds as arbitrary and capricious and contrary to law).

appropriated funds for FEMA programs without any substantial changes, recognizing the need for a centralized, national disaster-response network in the United States.

4.     Undeterred by court losses and congressional inaction, the Trump administration has continued its efforts to curtail FEMA's programs.  One recent attempt comprises the inclusion of unlawful terms—two of which are challenged here—in both the Emergency Management Performance Grant ("EMPG") program and the Homeland Security Grant Program ("HSGP") formula grants, each of which provides federal funding to States to assist with emergency management and disaster preparedness at all levels of government.  Both terms erect inappropriate barriers to Plaintiff States' access to the grant funds—functionally defunding state and local police agencies and emergency response personnel (the ultimate users of most of the grant funding) across the country.

5.     The first term at issue, which is contained within the EMPG award, places a hold on EMPG funding until the State provides FEMA with "a certification of the recipient state's population as of September 30, 2025," including an explanation of "the methodology it used to determine its population and certify that its reported population does not include individuals that have been removed from the State pursuant to the immigration laws of the United States" (the "Population Certification Hold").  The term further provides that FEMA will release the funding hold only "upon its review and approval of the State's methodology and population certification."

6.     Setting aside the fact that States do not keep such detailed, to-the-minute population counts (they primarily rely on the U.S. Census Bureau's data and estimates) and lack information to determine the precise number of recently removed individuals (Defendant Department of Homeland Security ("DHS"), which is responsible for immigration enforcement and removal proceedings, would maintain the most up-to-date counts), the Population Certification Hold is unlawful in at least four respects.  *First*, it exceeds Defendants' statutory authority, as no statute permits Defendants to impose such a hold.  *Second*, it is contrary to law because 13 U.S.C. § 183 requires federal agencies to use U.S. Census Bureau data to allocate

federal grant funding; a federal agency cannot require States to develop their own methodologies and data and provide their own population figures. *Third*, it is arbitrary and capricious in violation of the Administrative Procedure Act ("APA") because it is unexplained, does not reflect reasoned decision making, and ignores the States' reliance interests on receipt of the EMPG funds unimpeded. And *fourth*, it was issued without observance of procedural requirements, namely the requirements imposed by the Paperwork Reduction Act, which apply when a federal agency seeks to collect data.

7.      The second term at issue, contained in both the EMPG and HSGP awards, is a reduction of the period of performance, *i.e.*, the period in which grant recipients must complete all activities to be reimbursed, from three years to one year (the "Performance Period Change"). This unexplained change seriously disrupts the reasonable reliance interests of Plaintiff States and their localities (subrecipients of portions of both grants). At best, it imposes significant obstacles upon recipients' ability to utilize the funds for emergency management and security activities that fall within the scope of the grants; at worst, it makes the EMPG and HSGP funding largely unusable. The Performance Period Change is therefore arbitrary and capricious, in violation of the APA.

8.      Plaintiff States seek declaratory and injunctive relief and to set aside the Population Certification Hold and Performance Period Change, thereby allowing the Plaintiff States to receive and utilize the EMPG and HSGP funds as Congress intended.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction under 28 U.S.C. § 1331.

10.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202, and 5 U.S.C. §§ 705–706.

11.     Venue is proper in the District of Oregon under 28 U.S.C. §§ 1391(b)(2) and (e)(1). This is an action against an officer, employee, and/or agency of the United States. The capital of Oregon and the principal offices of the Oregon Department of Emergency

Management are in Marion County, and a substantial part of the events giving rise to this Complaint occurred and continue to occur within Marion County and the District of Oregon.

## PARTIES

*Plaintiffs*

12.    Plaintiff the State of Michigan is a sovereign state of the United States of America.  Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

13.    Plaintiff the State of Oregon is a sovereign state of the United States.  Oregon is represented by Attorney General Dan Rayfield.  The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

14.    Plaintiff the State of Arizona is a sovereign state of the United States of America.  Arizona is represented by Attorney General Kristin K. Mayes, the State's chief law enforcement officer.  *See* A.R.S. § 41-193(A)(3).

15.    Plaintiff the State of Colorado is a sovereign State in the United States of America.  Colorado is represented by Phil Weiser, the Attorney General of Colorado.  The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

16.    Plaintiff the State of Hawai'i, represented by and through its Attorney General Anne E. Lopez, is a sovereign state of the United States of America.  The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues § 28-1 to pursue this action.

17.    Plaintiff Office of the Governor, *ex rel.* Andy Beshear, brings this suit in his official capacity as Governor of the Commonwealth of Kentucky.  The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," Ky Const. § 81.  In taking office, Governor

Beshear swears an oath that he will support the Constitution of the United States and the Kentucky Constitution.  Ky. Const. § 228.

18.    Plaintiff the State of Maine is a sovereign state of the United States of America.  Maine is represented by Aaron M. Frey, the Attorney General of Maine.  The Attorney General is authorized to pursue this action pursuant to Me. Rev. Stat. Ann. tit., 5 § 191.

19.    Plaintiff the State of Maryland is a sovereign State of the United States of America.  Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

20.    Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America.  The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

21.    Plaintiff the State of New Mexico is a sovereign state of the United States of America.  New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico.

22.    The State of North Carolina is a sovereign state of the United States of America.  North Carolina is represented by Attorney General Jeff Jackson, who is the chief law enforcement officer of North Carolina.

23.    Plaintiff the State of Wisconsin is a sovereign state in the United States of America.  Wisconsin is represented by Joshua L. Kaul, the Attorney General of Wisconsin.  Attorney General Kaul is authorized under Wis. Stat. § 165.25(1m) to pursue this action on behalf of the State of Wisconsin.

***Defendants***

24.    Defendant Kristi Noem is the United States Secretary of Homeland Security and the federal official in charge of DHS.  Secretary Noem is sued in her official capacity.

25.     Defendant the Department of Homeland Security is an agency and executive department of the United States government and has responsibility for implementing the federal grant programs at issue in this action, including through FEMA and other subagencies.

26.     Defendant David Richardson is the Senior Official Performing the Duties of the Administrator of FEMA.  He is sued in his official capacity.

27.     Defendant Federal Emergency Management Agency is a federal agency within DHS that coordinates operational and logistical disaster response and oversees the administration of the federal grant programs at issue in this action.

## ALLEGATIONS

### I.     The Emergency Management Performance Grant Program

28.     The EMPG provides federal funding to States to assist state, local, tribal, and territorial emergency-management agencies in preparing for and managing emergencies resulting from natural disasters or accidental or man-made events.

29.     EMPG funds have been available to States since an initial appropriation for the program in 2003.  *See* Pub. L. 108-7, 117 Stat. 11, 516.  The program is now codified at 6 U.S.C. § 762 after being made permanent by the Post-Katrina Emergency Management Reform Act of 2006.

30.     FEMA's allocation of EMPG funds to recipients is set by statutory formula.  For each year's EMPG appropriation, FEMA must allocate to certain territories a baseline amount of 0.25 percent of the appropriated funds and to each of the remaining States a baseline amount of 0.75 percent of the appropriated funds.  *Id.* § 762(d)(1).  FEMA then allocates the remaining amount to the States on a population-share basis.  *Id.* § 762(d)(2).  Because the EMPG is a formula grant and not a competitive grant, each State is entitled to a specific allocation whenever a notice of funding opportunity is posted.

31.     States match the federal share received and must submit a work plan to FEMA that accounts for the matching state funds.

32.     States use EMPG funds to prepare for and respond to emergencies, which can include funding operations personnel who coordinate disaster response efforts, supporting emergency management training programs, conducting disaster response exercises, purchasing equipment and technology resources to support emergency management teams, and performing community outreach to educate residents on disaster preparedness and response.

33.     For example, the EMPG award directly funds a large portion of Michigan's state emergency response team.

34.     In Oregon, the EMPG award funds a large portion of Oregon's Emergency Coordination Center personnel, as well as planning, training, and exercise capabilities.

35.     The EMPG award funds 50% of Arizona's state emergency management functions and services.

36.     The EMPG award funds all of Colorado's field support to local and tribal jurisdictions to include response, recovery, training, planning, and exercise.

37.     The Kentucky Division of Emergency Management administers the EPMG in Kentucky and uses EMPG funds for a variety of preparedness activities and to support response and recovery operations for emergencies or disasters.  The grant is used at the state and local levels to develop and maintain all-hazards emergency plans, support emergency management training programs, conduct disaster response exercises, subsidize emergency management personnel, provide equipment and technology resources, and perform community outreach to educate residents regarding disaster preparedness and response.  The EMPG is crucial to Kentucky as it strengthens Kentucky's ability to prepare for, respond to, and recover from disasters.  Since 2020, Kentucky has received 15 Major Disaster Declarations involving severe storms, tornados, flooding, and the COVID-19 pandemic.  While not every incident rises to the level of a federal disaster declaration, Kentucky regularly experiences significant events requiring state and local response and recovery coordination.

38.     New Mexico uses EMPG award funds to support the state's emergency response team, fund core state capacity, and support local partners.  Over the last three years, New Mexico

has subgranted an average of nearly 40% of each EMPG award to local jurisdictions. New Mexico uses the remaining funds to support New Mexico Department of Homeland Security and Emergency Management operations, including Threat and Hazard Identification and Risk Assessment reviews that identify capability gaps in local and state resources and drive investments to close those gaps. New Mexico's state EMPG funds also cover personnel salaries, training, exercises, and exercise support. These state-level investments further support local jurisdictions by providing planning and technical assistance, statewide training and exercise delivery, exercise design and evaluation, and grants administration that keeps local subawardees compliant and audit-ready.

39.     In Wisconsin, the EMPG is used to fund the state incident management team. The EMPG also funds personnel who provide statewide communications and warnings, conduct emergency planning and training, and maintain the state emergency operations center.

40.     States also pass a portion of the EMPG funds through to localities to allow them to take similar preparedness measures, such as employing local emergency managers and support staff and purchasing software and communications equipment to assist with local emergency responses.

41.     For instance, in Michigan, EMPG funds are used at the local level to reimburse a portion of the emergency manager's salary and fringe benefits, based on compliance with federal and state program requirements.

42.     Oregon distributes the majority of its EMPG funding to local and tribal emergency management agencies. Without EMPG funding, the Oregon Department of Emergency Management estimates that approximately 66 percent of Oregon's counties will lose significant-to-all capacity to perform emergency management functions.

43.     Arizona distributes a significant portion of its EMPG funding to local emergency management agencies that use those funds for preparedness and training, community and environmental risk reduction, and capacity and capability-building activities to support Arizona overall and down to the local community level.

Page 9 -     COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

44.     Colorado passes through 51 percent of its EMPG award to local governments—including 64 counties, two tribes, and one large municipality—to support the salaries of local emergency managers.  Local governments have also used this funding to build emergency operation centers, enhance radio communication capability, and support training programs.

45.     About 50 percent of EPMG funds are allocated to local emergency management agencies in Kentucky.  Many of Kentucky's 120 counties would not have an effective emergency management program without the assistance of EMPG funding.

46.     New Mexico issues EMPG subawards to city, county, and tribal governments so that they can staff local emergency management teams as well as programs related to disaster prevention, response planning, management training, and recovery operations.  For many small and rural jurisdictions, the EMPG is the only dedicated funding for emergency-management personnel, meeting a critical need in some of New Mexico's most vulnerable communities and sustaining local readiness and continuity of operations.

47.     Wisconsin distributes two-thirds of its state EMPG allocation to each of Wisconsin's 72 counties and 11 Tribes, funding 140 emergency management positions across the state.

48.     In short, EMPG funds allow States to prepare for emergencies in ways they otherwise could not.  Without EMPG funds, States' ability to employ specialized emergency management staff would be undermined, severely diminishing their ability to coordinate disaster response at both the state and local level.

49.     Since the program's initiation, EMPG funds have been awarded with either a two- or a three-year period of performance.  A multi-year period of performance for the EMPG helps provide States and subgrantees with the flexibility needed to utilize the grant funds when they are needed.  It also allows grantees to engage in long-term projects that take more than a year to complete.  And multi-year performance periods have proven workable over the lifetime of the EMPG program.

50.     Additionally, for more than a decade, FEMA has backdated the EMPG period of performance by one year.  Because of this, States can (and typically do) use part of their funding to reimburse localities for salaries and other emergency management expenses previously incurred during the backdated award period.

51.     To illustrate, FEMA backdated Michigan's 2024 EMPG award, which was issued on September 13, 2024, to run from October 1, 2023, through September 30, 2026.  Michigan therefore utilized funding from the 2024 EMPG awards to reimburse localities for expenses incurred between October 1, 2023 (the backdated award effective date) and September 13, 2024 (the actual award issuance date).  Absent FEMA's backdating, Michigan could not have used the 2024 award to reimburse localities for these previously incurred expenses.

52.     Similarly, FEMA backdated Oregon's 2024 EMPG award, which was issued on September 9, 2024, to run from October 1, 2023, through September 30, 2026.  Oregon therefore utilized funding from the 2024 EMPG awards to reimburse localities for expenses incurred between July 1, 2024, and June 30, 2025.  Absent FEMA's backdating, Oregon could not have used the 2024 award to reimburse localities for these previously incurred expenses.

53.     New Mexico regularly uses EMPG funds to reimburse for costs incurred during the performance period which, under the grant terms, has been defined to begin one year prior to the date of issuance.  Thus, the changed performance period condition not only truncates the performance period, but also excludes, based on date of occurrence, costs that the State and local jurisdictions have understood to be covered.

54.     And FEMA backdated Wisconsin's 2024 EMPG award, which was issued on September 13, 2024, to run from October 1, 2023, through September 30, 2026.   Wisconsin used funding from the 2024 EMPG awards to reimburse localities for expenses incurred between January 1, 2024, and December 31, 2024, to align with the local fiscal year.  Absent FEMA's backdating, Wisconsin could not have used the 2024 award to reimburse localities for these previously incurred expenses.

55.     Because the EMPG program has consistently operated in this manner, Plaintiff States and their localities reasonably rely on multi-year periods of performance and FEMA's standard one-year backdating in planning for and utilizing the grant funding.

## II.     The Homeland Security Grant Program

56.     The HSGP is crucial to the States' efforts to protect public health and safety, and requires the continuation of the tried-and-true multi-year period of performance to function effectively.

57.     The HSGP is divided into three subcomponents: (a) the State Homeland Security Program; (b) the Urban Area Security Initiative; and (c) Operation Stonegarden.  Each State receives an HSGP award, though not all States receive each subcomponent.

### A.     State Homeland Security Program ("SHSP")

58.     The SHSP exists to provide federal funding to States to build the necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism.

59.     SHSP funds have been available to States since the first version of the program was created by the USA PATRIOT Act in 2001.  The program is codified at 6 U.S.C. §§ 603 and 605–09.

60.     SHSP grants are formula grants allocated based on a statutory risk formula. FEMA must allocate SHSP funds pursuant to a risk assessment, which determines each State's "relative threat, vulnerability, and consequences from acts of terrorism," considering factors such as population density and history of threats.  *Id*. § 608(a)(1).  Recipients may then use SHSP funds as permitted by statute, such as to enhance homeland security, conduct training exercises, upgrade equipment, or pay salaries for personnel to conduct allowable homeland-security-related activities.  *Id*. § 609(a).  Each State is entitled to a minimum and specific allocation based on the risk assessment whenever a notice of funding opportunity is posted.

61.     States must pass through at least 80% of their SHSP awards to local or tribal governments and may retain up to 20% of the award funding for state-level needs, such as grant administration costs.

62.     Plaintiff States and their localities use SHSP funds for an array of counterterrorism and emergency preparedness purposes, including developing emergency response plans, conducting risk assessments, funding specialized training for first responders, and purchasing equipment for specialized teams, such as bomb squads and tactical units.

63.     For example, in Michigan, SHSP funding is used, in part, to fund active shooter and active assailant response training for law enforcement and school officials.  The funding also initially helped establish, and continues to support, Michigan's primary fusion center, the Michigan Intelligence Operations Center ("MIOC"), which is a collaborative environment where public safety agencies and intelligence analysts from all levels of government share and analyze information to detect and prevent threats to public safety.  MIOC allows for monitoring and coordinating responses to threats across Michigan.

64.     In Oregon, SHSP funding is used, in part, to fund continuity of operations planning software statewide to local, tribal, and state agencies to provide a singular platform for developing Oregon Continuity of Government.  Continuity planning and continuity of government are critical functions to ensuring continued services during emergencies and disasters.

65.     In Arizona, SHSP funds support preventing, protecting, responding to, and recovering from acts of terrorism and hazards. For example, SHSP funds support the following types of projects on a statewide basis: intelligence analyst personnel, threat liaison officer training, communications equipment, regional training and exercise programs, bomb squad equipment and training, CERT team equipment and training, SWAT team equipment and training, license plate reader systems, regional camera systems, cybersecurity tools, and ballistic equipment for fire departments and law enforcement special operations teams.

66.     In Colorado, SHSP funding supports projects within the Combating Domestic Violent Extremism priority area.  Specifically, Colorado funds an analytical software that collates real time intelligence to law enforcement and regional intelligence agencies, reducing the time from threat identification to actionable intelligence from days or hours to minutes to

help with prevention, protection, and response. This software is used to support Special Security events, special events, as well as large community events looking for threats utilizing key words and other indicators via social media, and on the deep and dark web.

67.     New Mexico relies on SHSP funds to train first responders statewide and, critically, to operate the State's fusion center housed within the Department of Homeland Security and Emergency Management (DHSEM). The fusion center serves as New Mexico's statewide liaison with local, tribal, state, and federal law enforcement and public-safety partners to collect, analyze, and disseminate threat information and to coordinate information sharing consistent with DHSEM's statutory duties. NMSA 1978, Section 9-28-5.

68.     In Wisconsin, SHSP funding is used to provide equipment and training to regional law enforcement tactical, bomb, and dive teams. The grant also helped establish and maintain the state cyber response team and the state urban search and rescue team.

69.     SHSP funds allow States to advance counterterrorism and emergency preparedness efforts in ways they otherwise could not. The effectiveness of the multijurisdictional emergency response organizations that SHSP funds would be significantly reduced absent federal funding, resulting in compromised public safety.

70.     Historically, the period of performance for SHSP grants—as part of the umbrella HSGP grants—has been between two or three years. Because of this, an award in one fiscal year usually allows States to continue to support program activities for one or two years thereafter.

71.     Moreover, a multi-year period of performance allows for any required subgranting, approval, waiver, and procurement procedures to be completed, some of which can take several months.

72.     SHSP recipients reasonably rely on a multi-year period of performance for utilizing the funding. Indeed, organizing and maintaining an effective multijurisdictional emergency response is a complicated endeavor that functionally requires more than a year to accomplish, and a truncated performance period will render SHSP ineffectual.

B.    **Urban Area Security Initiative ("UASI")**

73.    Similar to SHSP, States use UASI grants to enhance the security and resilience of their high-risk urban areas by building, sustaining, and improving their capabilities to prevent, prepare for, and respond to acts of terrorism.

74.    UASI funds have been available to States since the first version of the program was created by appropriations statute in 2003.  *See* Pub. L. 108-90, 117 Stat. 1137, 1146.  The program is codified at 6 U.S.C. §§ 603–04 and 606–09.

75.    UASI grants are formula grants awarded to States based on a statutory risk formula tied to a FEMA-designated "high-risk urban area" in that State.  Each eligible State is entitled to a specific allocation based on the statutory risk assessment for its high-risk urban area(s).

76.    States that receive UASI funds must pass through at least 80% of the grant funds to the designated high-risk urban area.  *Id*. § 604(d)(2)(A).  States must expend any retained funds on items, services, or activities that benefit that high-risk urban area.  *Id*.

77.    States and their subgrantees use UASI funds to strengthen security measures, secure critical and cyber infrastructure, equip responders, and support initiatives that help communities respond effectively to threats and emergencies.

78.    For example, Michigan has one FEMA-designated high-risk urban area (the "Detroit-Warren-Dearborn" area) that has utilized UASI funds for specialized training for hazmat teams and search and rescue teams; overtime and backfill for emergency response personnel to participate in planning, training, and exercise activities; and the purchase of equipment such as license plate readers, unmanned aerial system technology, and tactical gear for specialized law enforcement teams.

79.    Oregon has one FEMA-designated high-risk urban area (the "Portland Metro" area) that has utilized UASI funds for terrorism prevention projects including purchase of regional rescue vehicles, explosive containment vessels, and training and equipment for law enforcement personnel in breach operations.

Page 15 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

80.    In Arizona, the "Phoenix Urban Area" utilizes UASI funds to support preventing, protecting against, responding to, and recovering from acts of terrorism and all hazards.  For example, UASI funds support for things like intelligence analyst personnel; software that promotes intelligence and information sharing; equipment and training for regional response teams, including for bomb, SWAT, HazMat, and technical rescue teams; specialized all hazards incident management training; threat liaison officer training and equipment; regional camera systems to support intelligence and information sharing at SEAR rated events; cybersecurity tools; and CERT training and equipment.

81.    In Colorado, UASI funding was used to procure a rapid DNA identification system for the Denver medical examiner's office.  This is the first system in Colorado that will allow the medical examiner to identify and match DNA of decedents in 90 minutes.  In the event of a large-scale attack, where facial recognition may not be possible, this system can process DNA results from a sample, compare them with potential family member DNA, and allow for identification.  Additionally, UASI funding is contributing to a multi-year project that will secure the core network and increase physical security of the Denver Department of Transportation and Infrastructure. Securing and enabling this network will improve capabilities such as: Chemical, Biological, Radiological, Nuclear, and Explosives detection and sensor nets; emergency mass communication and alerting; and increased real-time connectivity for information sharing and emergency service communications within Denver and with Colorado's regional partners.  This project is significantly reducing cyber vulnerabilities; removing system/capabilities, complexities and redundancies; and creating efficiencies moving forward in Colorado's systems.

82.    UASI funds allow States and local government entities to advance counterterrorism and emergency preparedness efforts in ways they otherwise could not.

83.    Historically, the period of performance for UASI grants—as part of the umbrella HSGP grants—has been between two and three years, with the past 10 awards being three years. Because each UASI grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support program activities in the two years thereafter.  States

and their subgrantees reasonably rely on this multi-year period of performance in planning for and utilizing UASI funding.

### C.    Operation Stonegarden ("OPSG")

84.    OPSG supports enhanced cooperation and coordination between Customs and Border Protection and federal, state, local, tribal, and territorial law enforcement agencies to strengthen border security.

85.    OPSG funds are grants awarded to States that share a border with Mexico, Canada, or international waters, and are allocated based on the risk to border security and the anticipated effectiveness of the proposed projects.  The funds have been available to eligible States since the program was created by appropriations statute.  *See, e.g.*, Pub. L. 110-161, 121 Stat. 2061.

86.    The following Plaintiff States received OPSG funding within their 2025 HSGP awards:  Arizona, Maine, Michigan, and New Mexico.

87.    OPSG funding is almost entirely passed through to local law enforcement agencies who operate in border communities, with States maintaining 2.5% of the awards for administrative costs associated with the grant process.

88.    OPSG funds are typically used by local police departments to conduct training, purchase equipment, and fund overtime hours for officers patrolling border areas.

89.    For example, in Arizona, OPSG funds are utilized by state, local, and tribal law enforcement to enhance border security.  This includes equipment purchases (for instance, 4x4 vehicles and interdiction equipment) and staffing overtime.

90.    Historically, the period of performance for OPSG grants—as part of the umbrella HSGP grants—has been between two and three years.  Because each OPSG grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support program activities in the two years thereafter.  States and their subgrantees reasonably rely on this multi-year period of performance in planning for and utilizing OPSG funding.

III.    THE 2025 AWARDS

91.    On July 28, 2025, FEMA released a Notice of Funding Opportunity ("NOFO")[6]

for the EMPG (the "EMPG NOFO") with a response deadline of August 11, 2025.  (Ex. 1, 2025

EMPG NOFO.)  On August, 1, 2025, FEMA released a NOFO for the HSGP (the "HSGP

NOFO") with a response deadline of August 15, 2025.[7]  (Ex. 2, 2025 HSGP NOFO.)

92.    On September 27, 2025, FEMA issued the 2025 EMPG and HSGP award notices[8]

to the States, including each Plaintiff State. (*See, e.g.*, Ex. 3, Michigan's Sept. 2025 EMPG

Award Notice.; Ex. 5, Michigan's Sept. 2025 HSGP Award Notice.)  The award notices included

an award letter, an award summary, grant agreement articles, and an obligation document.  (*See*

*id.*)

93.    Plaintiff States were awarded the following amounts for the 2025 EMPG award:

| | |
|---|---|
| Michigan | $ 8,052,915 |
| Oregon | $ 4,779,512 |
| Arizona | $ 6,625,941 |
| Colorado | $ 5,719,526 |
| Hawaii | $ 3,202,955 |
| Kentucky | $ 4,955,787 |
| Maine | $ 3,180,010 |
| Maryland | $ 5,890,070 |
| Nevada | $ 4,218,945 |
| New Mexico | $ 3,584,573 |
| North Carolina | $ 8,558,068 |
| Wisconsin | $ 5,721,468 |

---

[6] A NOFO is a document that alerts potential grant recipients of opportunities to obtain grant awards.

[7] FEMA issued three separate NOFOs for the 2025 HSGP.  Plaintiff States refer herein to the final NOFO, dated August 1, 2025, which is attached as Exhibit 2.

[8] As noted below, FEMA issued an amended award notice for 2025 EMPG grants on October 1, 2025; however, the amended notice did not change the allocated amount for Plaintiff States.

94.     Plaintiff States were awarded the following amounts for the 2025 HSGP award (broken down by program subcomponent):[9]

|  | SHSP | UASI | OPSG | Total HSGP |
|---|---|---|---|---|
| Arizona | $    7,362,750.00 | $   21,938,710.00 | $ 12,220,000.00 | $  41,521,460.00 |
| Colorado | $    4,362,750.00 | $   18,726,869.00 | $                    - | $  23,089,619.00 |
| Hawaii | $    6,000,629.00 | $   16,694,331.00 | $                    - | $  22,694,960.00 |
| Kentucky | $    6,000,629.00 | $                    - | $                    - | $    6,000,629.00 |
| Maine | $    4,362,750.00 | $                    - | $    1,410,000.00 | $    5,772,750.00 |
| Maryland | $    6,000,629.00 | $     9,328,784.00 | $                    - | $  15,329,413.00 |
| Michigan | $    6,000,629.00 | $   14,114,393.00 | $    2,286,000.00 | $  22,401,022.00 |
| Nevada | $    4,362,750.00 | $   10,954,761.00 | $                    - | $  15,317,511.00 |
| New Mexico | $    8,362,750.00 | $                    - | $    2,675,000.00 | $  11,037,750.00 |
| North Carolina | $    6,862,750.00 | $   14,200,846.00 | $                    - | $  21,063,596.00 |
| Oregon | $    4,362,750.00 | $     8,841,357.00 | $                    - | $  13,204,107.00 |
| Wisconsin | $    6,000,629.00 | $   13,353,970.00 | $                    - | $  19,354,599.00 |

95.     However, as detailed below, the 2025 EMPG award and the 2025 HSGP award both contain unlawful terms—i.e., the Population Certification Hold (EMPG) and the Performance Period Change (EMPG and HSGP).  Due, in part, to these terms, as of the date of this filing, no Plaintiff State has accepted the 2025 EMPG award containing the Population Certification Hold, and no Plaintiff State has executed its 2025 HSGP award.

---

[9] The amount of these awards differed from the amounts listed in the HSGP NOFO, with all of the Plaintiff States receiving more funding than indicated in the NOFO.  Other States received significantly less funding than indicated in the NOFO.  In late September, Illinois and several other states filed suit in the District of Rhode Island contesting the reallocation of the 2025 HSGP awards.  *See Illinois, et al. v. Noem, et al.*, No. 1:25-cv-00495 (D.R.I.).  The court preliminarily reverted all HSGP awards to the amounts listed in the HSGP NOFO.  (*Id.* at Docs. 14, 31.)  Plaintiff States do not contest the allocation of the HSGP awards through this litigation.

A.    **The Population Certification Hold**

96.    The EMPG enabling statute does not authorize Defendants to impose a requirement (like the Population Certification Hold) that States certify their population as of a date certain prior to receiving awarded EMPG funding.

97.    The EMPG NOFO contained no term or provision indicating that FEMA would require States to provide information related to their populations prior to FEMA's releasing any EMPG funding.

98.    Similarly, none of the Plaintiff States' initial 2025 EMPG award notices, issued September 27, 2025, contained any language indicating that a funding hold was being placed on the EMPG awards until States provided information related to their populations.

99.    Yet, on October 1, 2025, FEMA issued amended 2025 EMPG award notices to Plaintiff States, which included—for the first time—the Population Certification Hold.  (*See, e.g.*, Ex. 4, Michigan's Oct. 2025 EMPG Award Notice.)  The Population Certification Hold states:

> **Funding Hold: Verification of State's Population**
>
> FEMA has placed a funding hold on this award, and the full amount of the award is on hold in the FEMA financial systems. The recipient is prohibited from obligating, expending, or drawing down the funds associated with the award.
>
> To release the funding hold, the [State Administering Agency] must provide a certification of the recipient state's population as of September 30, 2025. In so doing, the State will explain the methodology it used to determine its population and certify that its reported population does not include individuals that have been removed from the State pursuant to the immigration laws of the United States.
>
> FEMA will rescind the funding hold upon its review and approval of the State's methodology and population certification.

100.    Defendants provided no reasoned explanation (or, indeed, any explanation) for why they added this hold, no legal basis for adding the hold, and no guidance for States to use in attempting to comply.

101.    Title 13 U.S.C. § 183(a) requires federal agencies to rely on the Census Bureau's population data where "population characteristics are used to determine the amount of benefit received by a State."  The EMPG statute is one such federal law that requires the amount of benefit awarded to the States to be determined based on "population."  6 U.S.C. § 762(d)(2).

102.    Consistent with this requirement, for all prior EMPG awards, FEMA allocated the appropriated EMPG funds using data from the U.S. Census Bureau.  Even in the initial 2025 award, FEMA utilized this data to make population-based allocations.  Accordingly, ignoring the fact that FEMA lacks any legal basis to impose the hold, there is no practical need to demand Plaintiff States certify their populations at all, let alone the total population, excluding any immigrants that the federal government has removed, as of September 30, 2025.  The only relevant data is the population data produced by the U.S. Census Bureau, and the federal government possesses that data.

### B.    The Performance Period Change

103.    Both the EMPG NOFO and the HSGP NOFO contained multi-year periods of performance, consistent with decades of past awards.  Specifically, FEMA provided a backdated three-year period, running from October 1, 2024, through September 30, 2027, in the EMPG NOFO.  (Ex. 1, 2025 EMPG NOFO, p. 4.)  And FEMA provided a standard three-year period, running from September 1, 2025, through August 30, 2028, in the HSGP NOFO.  (Ex. 2, 2025 HSGP NOFO, p. 4.)

104.    The NOFOs for both programs made clear that States' applications should reflect projects that could be completed in the anticipated three-year periods of performance.  The EMPG NOFO required applicants to select at least one performance goal and counseled that "[e]ach goal must be specific, measurable, and *achievable within the period of performance*." (Ex. 1, 2025 EMPG NOFO, p. 50 (emphasis added).)  The HSGP NOFO stated that projects must be "able to be fully completed *within the three-year period of performance*."  (Ex. 2, 2025 HSGP NOFO, p. 38 (emphasis added).)

105.    Since at least 2011, the periods of performance for the EMPG award and the HSGP award have substantially aligned with the periods of performance outlined in the respective NOFO.

106.    Notwithstanding the express indication of a three-year period of performance in the NOFOs, the 2025 EMPG award and the 2025 HSGP award for each Plaintiff State included a *one-year* period of performance, running from October 1, 2025, through September 30, 2026. (*See, e.g.*, Ex. 4, Michigan's Oct. 2025 EMPG Award Notice, Obligating Document; Ex. 5, Michigan's Sept. 2025 HSGP Award, Obligating Document.)

107.    Plaintiff States' 2025 EMPG awards also included the following article:

> **Period of Performance and Budget Period.**
> Notwithstanding language in the Obligating Document or in the other terms of this award package, the Period of Performance and the Budget Period for this grant award is October 1, 2025 to September 30, 2026. The Period of Performance and Budget Period stated in the Obligating Document shall not apply.

(*See, e.g.*, Ex. 4, Michigan's Oct. 2025 EMPG Award Notice, Article 61.) The purpose of this provision is unknown as the Obligating Document also sets the Period of Performance and the Budget Period for the award as October 1, 2025, to September 30, 2026. (Ex. 4, Michigan's Oct. 2025 EMPG Award Notice, Obligating Document.)

108.    Despite it representing a significant departure from decades of past practice and the terms listed in the NOFOs, Defendants provided no explanation—let alone a reasoned explanation—for their decision to reduce the periods of performance for the 2025 EMPG award and 2025 HSGP award. Nor did Defendants explain why they declined to backdate the 2025 EMPG award.

## IV.    Harm to plaintiff states

109.    Both the Population Certification Hold and the Performance Period Change work substantial harms upon Plaintiff States and their subgrantees.

### A.     The Population Certification Hold

110.     Plaintiff States are unable to comply with the terms of the Population Certification Hold.  Plaintiff States do not collect population data as the term requests.  Plaintiff States have no way of determining their populations as of September 30, 2025, little more than one month ago.  And Plaintiff States likewise have no means of verifying the number of immigrants that the federal government has removed from their State.  The most likely source for such data, if it exists at all, is Defendant DHS—the entity responsible for immigration enforcement across the country.  But when Michigan asked, DHS offered an *unofficial* number of recently deported individuals.

111.     Further, Defendants have provided no guidance to Plaintiff States to assist them in calculating their populations as the Population Certification Hold requires.  Rather, Plaintiff States must report (and receive approval of) their own methodologies.

112.     By declining to set forth an acceptable methodology for making this calculation, and by requiring precise data that Defendants know or should know that Plaintiff States do not possess, Defendants have used the Population Certification Hold to vest themselves with near-unlimited discretion to reject Plaintiff States' attempts to obtain the EMPG funding to which they are otherwise entitled.

113.     Given Defendants' indefinite funding hold on the 2025 EMPG award, and lacking a feasible means by which to ensure compliance with the Population Certification Hold's terms, Plaintiff States will be unable to use the EMPG funding as designed for emergency management services.

### B.     The Performance Period Change

114.     Defendants' decision to reduce the period of performance for both the 2025 EMPG and 2025 HSGP awards makes the grant awards largely unusable in Plaintiff States and frustrates Plaintiff States' ability to achieve the purposes of the EMPG and HSGP grants.

115.     Any program activity supported with the awarded funds must be completed within the period of performance.  The EMPG and the HSGP typically take several years to fully

disburse—a fact recognized in the typical multi-year period of performance for those grants.  In fact, because all recent EMPG and HSGP awards were subject to a three-year period of performance, each Plaintiff State has funding remaining for at least one prior-year EMPG award and one prior-year HSGP award, reflecting that the States' use of this funding tends to take longer than one year.  History has shown that effectively using EMPG and HSGP funding requires the full three-year period of performance.  The deliberate pace of planning, procurement, training, and project execution necessary for these programs cannot be achieved within a single-year performance window.

116.    The periods of performance for the EMPG award and the HSGP award have substantially aligned with their respective NOFOs in recent years; therefore, Plaintiff States reasonably relied on the EMPG NOFO and the HSGP NOFO—both of which indicated the grant awards would have a three-year period of performance—as well as years of past practice in anticipating a three-year period of performance for the 2025 EMPG and HSGP awards, with FEMA backdating the EMPG award one year.

117.    Indeed, States and local law enforcement agencies structured their budgets for the 2025 EMPG award and the 2025 HSGP award around anticipated three-year funding streams. Without the three-year period to expend grant funding, portions of Plaintiff States' 2025 EMPG and HSGP awards will go unused, reducing emergency preparedness and law enforcement efficacy.  That is directly contrary to congressional intent.

118.    Additionally, FEMA's historical practice of backdating the EMPG award, along with the EMPG NOFO's indication that FEMA would once again backdate the 2025 award, created a reasonable reliance interest in Plaintiff States and the localities that receive pass-through EMPG funding.  Several Plaintiff States and local subgrantees will be unable to seek reimbursement for expenses already incurred—despite operating under the reasonable belief that the expenses could be reimbursed with the 2025 EMPG funds.

119.    For example, in Michigan, Colorado, and New Mexico, the portion of the 2024 EMPG award set aside for local emergency management agencies has been expended in its

entirety to reimburse costs incurred between October 1, 2023, and September 30, 2024, because, as it has for years, Michigan and Colorado reasonably relied on the expectation that the 2025 EMPG award would be available to reimburse costs incurred between October 1, 2024, and September 30, 2025.  However, with the 2025 EMPG award's period limited to activities that occur between October 1, 2025, and September 30, 2026, the local emergency management agencies will be unable to seek reimbursement for any costs incurred during the prior fiscal year, creating a one-year funding gap.  This raises serious budgetary concerns in the immediate future as no alternative source of funding is available to serve as a replacement.

120.    In Oregon, the portion of the 2024 EMPG award set aside for local emergency management agencies has been expended in its entirety to reimburse costs incurred between July 1, 2024 and June 30, 2025, because, as it has for years, Oregon reasonably relied on the expectation that the 2025 EMPG award would be available to reimburse costs incurred between October 1, 2024, and September 30, 2025.  However, with the 2025 EMPG award's period limited to activities that occur between October 1, 2025, and September 30, 2026, the local emergency management agencies will be unable to seek reimbursement for any costs incurred during the prior fiscal year, creating a three-month funding gap.

121.    In Arizona, based on the published NOFO and historical precedence, local emergency management agencies expected that the 2025 EMPG award would be able to reimburse costs—like salaries for staff working on preparedness initiatives—incurred between October 1, 2024, and September 30, 2027. However, with the 2025 EMPG award period limited to activities that occur between October 1, 2025, and September 30, 2026, the local emergency management agencies will be unable to seek reimbursement for any costs incurred during the prior fiscal year, creating a funding gap from approximately July 1 through September 30, 2025, as well as cutting off the administrative window to disburse funds to subrecipients for the anticipated following two years.

122.    Likewise, in Wisconsin, the portion of the 2024 EMPG award set aside for local emergency management agencies has been expended in its entirety to reimburse costs incurred

between January 1, 2023, and December 31, 2024, because, as it has for years, Wisconsin also reasonably relied on the expectation that the 2025 EMPG award would be available to reimburse costs incurred between January 1, 2025, and September 30, 2025.  However, with the 2025 EMPG award's period limited to activities that occur between October 1, 2025, and September 30, 2026, the local emergency management agencies will be unable to seek reimbursement for any costs incurred during the prior fiscal year, creating a nine-month funding gap.  To date, local emergency management agencies have already expended at least $2.7 million in 2025, in anticipation of FEMA providing funds to cover the 2025 expenditures. This raises serious budgetary concerns in the immediate future as no alternative source of funding is available to serve as a replacement.

## CAUSES OF ACTION

### Count I

### Administrative Procedure Act, 5 U.S.C. § 706(2)(B)

### Excess of Statutory Authority (Population Certification Hold)

123.    Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

124.    Defendants' inclusion of the Population Certification Hold in the 2025 EMPG award is a final agency action subject to judicial review.  *See* 5 U.S.C. § 704.

125.    The APA requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

126.    No statute authorizes Defendants to impose the Population Certification Hold or any similar funding hold as a prerequisite to receiving the EMPG funds.  The Population Certification Hold is accordingly unlawful and must be set aside.

127.    Defendants' violations of the Administrative Procedure Act have caused and will continue to cause ongoing harm to Plaintiff States and their residents, for which there is no adequate remedy at law.

**Count II**

**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**

**Agency Action Contrary to Law (Population Certification Hold)**

128.    Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

129.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is not in accordance with the law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent with the statute's text, structure, and purpose.

130.    Defendants' inclusion of the Population Certification Hold in the 2025 EMPG award is a final agency action subject to judicial review. *See* 5 U.S.C. § 704.

131.    This action is contrary to law because it violates statutory requirements. 13 U.S.C. § 183(a) requires federal agencies to rely on the U.S. Census Bureau's population data where "population characteristics are used to determine the amount of benefit received by a State." The EMPG statute is one such federal law that requires the amount of benefit awarded to the States to be determined based on "population." 6 U.S.C. § 762(d)(2). Accordingly, Defendants cannot require Plaintiff States to calculate and submit alternative population data as a precondition to receiving grant funds.

132.    Defendants' violations of the Administrative Procedure Act have caused and will continue to cause ongoing harm to Plaintiff States and their residents for which there is no adequate remedy at law.

**Count III**

**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**

**Arbitrary and Capricious (Population Certification Hold)**

133.    Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

134.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 52 (1983) (agency action must be supported by a "rational connection between the facts found and the choice made"); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account"); *accord FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567 (2025).

135.    Defendants' inclusion of the Population Certification Hold in the 2025 EMPG award is a final agency action subject to judicial review.  *See* 5 U.S.C. § 704.  This action is arbitrary and capricious for multiple reasons.

136.    First, Defendants failed to explain why they included the hold.  Agencies may not keep the reasons for their decisions secret.  *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

137.    Second, Defendants failed to account for Plaintiff States' reliance on EMPG funds' availability after the grant was awarded without an apparent indefinite funding hold. Before an agency adopts a new policy, it must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30, 33 (2020).  The EMPG NOFO did not include the Population Certification Hold.  And the NOFO reflected that Defendants had already considered States' populations in determining the anticipated allocations.  (*See* Ex. 1, 2025 EMPG NOFO.)  Thus, Plaintiff States reasonably understood that the EMPG awards would not be held pending an unforeseeable requirement related to population certification.  Plaintiff States' reasonable reliance based on the NOFO was not considered by Defendants.

138.     Third, the imposition of the Population Certification Hold does not reflect reasoned decision making.  This is proved by the lack of any affirmative explanation from Defendants.  And it is confirmed by the fact that Plaintiffs States cannot comply with the Population Certification Hold.  Had Defendants engaged in reasoned decision making, they would have understood that they—not the States—are obligated to obtain population data, and that data must come from the U.S. Census Bureau.  The Population Certification Hold, therefore, is in clear conflict with EMPG's enabling statute and Congress's appropriations of funding for the program.

139.     Fourth, in imposing the Population Certification Hold, Defendants relied on factors which Congress "has not intended [them] to consider."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  The allocation formula in the EMPG statute requires a uniform system of calculating state population consistent with the methodology of calculating national population—not an ad hoc, state-by-state methodology.  *See* 6 U.S.C. § 762(d)(2).

140.     Defendants' violations of the Administrative Procedure Act have caused and will continue to cause ongoing harm to Plaintiff States and their residents for which there is no adequate remedy at law.

**Count IV**

**Administrative Procedure Act, 5 U.S.C. § 706(2)(D)**

**Agency Action Without Observance of Required Procedure (Population Certification Hold)**

141.     Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

142.     The APA requires that a court set aside agency action that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

143.     Defendants' inclusion of the Population Certification Hold in the 2025 EMPG award is a final agency action subject to judicial review.  *See* 5 U.S.C. § 704.

144.     By conditioning the release of EMPG funds on Plaintiff States' reporting and certification of their populations on September 30, 2025, Defendants are engaging in a "collection of information" as defined by the Paperwork Reduction Act.  44 U.S.C. § 3502(3). In order to engage in a "collection of information" under the Paperwork Reduction Act, defendants must follow certain procedures, including providing notice of the proposed collection in the Federal Register, soliciting and evaluating public comments, and certifying to the Office of Management and Budget that the collection of information is "not unnecessarily duplicative of information otherwise reasonably accessible to the agency," among other requirements. *Id.* § 3506(c). Defendants have not followed any of these requirements in imposing the Population Certification Hold.

145.     Defendants' violations of the Administrative Procedure Act have caused and will continue to cause ongoing harm to Plaintiff States and their residents for which there is no adequate remedy at law.

### Count V

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

### Arbitrary and Capricious (Performance Period Change)

146.     Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

147.     The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52; *Fox Television Station*, 556 U.S. at 515; *accord Wages & White Lion Invs.*, 145 S. Ct. 898, 917 (2025).

148.     Defendants' decision to change the period of performance from three years to one year for the 2025 EMPG and HSGP awards, and to not backdate the period of performance for EMPG awards by one fiscal year, are final agency actions subject to judicial review.  *See* 5 U.S.C. § 704.  These actions are arbitrary and capricious for several reasons.

149.    First, Defendants failed to explain why they reduced the performance period for the 2025 EMPG and HSGP grants from three years to one year after initially announcing a three-year period of performance in the NOFOs.  Similarly, Defendants provided no explanation why they did not backdate the period of performance by one fiscal year for the 2025 EMPG award after the NOFO identified that the period of performance would begin October 1, 2024.  Agencies may not keep the reasons for their decisions secret.  *Dep't of Commerce*, 588 U.S. at 785.

150.    Second, Defendants entirely failed to account for the Plaintiff States' reliance on the periods of performance announced in the EMPG NOFO and the HSGP NOFO, as well as the history of these grants, which included three-year periods of performance and backdating of the EMPG award.  Before an agency adopts a new policy, it must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *Regents*, 591 U.S. at 30, 33.  Plaintiff States planned and budgeted to use the 2025 EMPG and HSGP awards based on the periods of performance contained in the NOFOs.  Defendants did not consider the Plaintiff States' reliance interests when they reduced the period of performance to one year for these grants.

151.    Third, Defendants' actions do not reflect reasoned decision-making.  It is well known that EMPG and HSGP grants typically require several years to be spent.  Defendants' actions all but assure that the entirety of the grant funding will not be able to be used during the periods of performance, thus frustrating the purpose of the EMPG and HSGP: to prepare for hazards and disasters, natural or man-made.  *See* 6 U.S.C. § 762(b); *see also* 42 U.S.C. § 5195.

152.    Defendants' violations of the Administrative Procedure Act have caused and will continue to cause ongoing harm to Plaintiff States and their residents for which there is no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States pray that this Court:

    a.  Enter judgment for the Plaintiff States against Defendants;

    b.  Enter an order pursuant to 5 U.S.C. § 706(2) holding unlawful and vacating the Population Certification Hold;

    c.  Enter a declaratory judgment finding that the Population Certification Hold is invalid, exceeds Defendants' authority, is contrary to law, is arbitrary and capricious, and was imposed without observance of procedure required by law;

    d.  Issue permanent injunctive relief barring implementation of the Population Certification Hold in the EMPG awards for Plaintiff States, including by holding the EMPG awards pending submission by the Plaintiff States of population data or any similar requirement;

    e.  Enter an order pursuant to 5 U.S.C. § 706(2) holding unlawful and vacating the Performance Period Change for the 2025 EMPG and HSGP grant awards;

    f.  Enter a declaratory judgment finding that the Performance Period Change is arbitrary and capricious;

    g.  Issue permanent injunctive relief barring Defendants from rejecting Plaintiff States' drawdown requests for funds from their 2025 EMPG awards for expenses incurred between October 1, 2024, and September 30, 2027, by the Plaintiff State grantee or a subgrantee due to the unlawful Performance Period Change;

    h.  Issue permanent injunctive relief barring FEMA from rejecting Plaintiff States's drawdown requests for funds from their 2025 HSGP awards for expenses incurred between October 1, 2025, and September 30, 2028, by the Plaintiff State grantee or a subgrantee due to the Performance Period Change;

    i.  Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

    j.  Award Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

    k.  Award such other relief as this Court may deem just and proper.

DATED: November 5, 2025

Respectfully submitted,

DANA NESSEL
Attorney General of Michigan

By: *s/ Neil Giovanatti*
NEIL GIOVANATTI (P82305)
ADAM R. DE BEAR (P80242)
DANIEL J. PING (P81482)
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
deBearA@michigan.gov
PingD@michigan.gov

*Attorneys for the State of Michigan*

KRISTIN K. MAYES
Attorney General Of Arizona

By: *s/ Joshua G. Nomkin*
JOSHUA G. NOMKIN
Office of the Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Nomkin@azag.gov

*Attorney for the State of Arizona*

ANNE E. LOPEZ
Attorney General for the State of Hawaiʻi

By: *s/ Kalikoʻonālani D. Fernandes*
DAVID D. DAY
Special Assistant to the Attorney General
KALIKOʻONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaii*

DAN RAYFIELD
Attorney General For State of Oregon

*s/ Coby Howell*
COBY HOWELL #25434
LEANNE HARTMANN #T25070201,
Mass. BBO #667852
BRIAN MARSHALL #196129
Senior Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
971-673-1880
Coby.Howell@doj.oregon.gov
Leanne.Hartmann@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov

*Counsel for Plaintiff State of Oregon*

PHILIP J. WEISER
Attorney General for the State of Colorado

By: *s/ Sarah H. Weiss*
Senior Assistant Attorney General
FINNUALA K. TESSIER
Assistant Attorney General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Sarah.Weiss@coag.gov

*Attorneys for the State of Colorado*

S. TRAVIS MAYO
General Counsel Office of the Governor of
Kentucky

By: *s/ S. Travis Mayo*
S. TRAVIS MAYO
General Counsel
TAYLOR PAYNE
Chief Deputy General Counsel
LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611

travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Attorneys for Plaintiff Office of the Governor*
ex rel. *Andy Beshear, in his official capacity as*
*Governor of the Commonwealth of Kentucky*

AARON M. FREY
Attorney General for the State of Maine

By: *s/ John E. Belisle*
JOHN E. BELISLE
Assistant Attorney General
Office of Maine Attorney General
6 State House Station
Augusta, Maine 04333-006
(207) 626-8800
john.belisle@maine.gov

*Attorney for the State of Maine*

AARON D. FORD
Attorney General

By: *s/ K. Brunetti Ireland*
K. BRUNETTI IRELAND
Chief of Special Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Attorney for the State of Nevada*

ANTHONY G. BROWN
Attorney General for the State of Maryland

By: *s/ James C. Luh*
JAMES C. LUH
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us

*Attorney for the State of Maryland*

JEFF JACKSON
Attorney General of North Carolina

LAURA HOWARD
Chief Deputy Attorney General

By *s/ Daniel T. Wilkes*
*Assistant Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6415
dwilkes@ncdoj.gov

*Attorney for State of North Carolina*

JOSHUA L. KAUL
Attorney General of Wisconsin

By: *s/ Frances Reynolds Colbert*
FRANCES REYNOLDS COLBERT
Assistant Attorney General
State Bar #1050435
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-9226
(608) 294-2907 (Fax)
frances.colbert@wisdoj.gov

*Attorney for State of Wisconsin*

Page 34 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**<u>Index Of Exhibits</u>**

| | |
|---|---|
| 1 | U.S. Dep't of Homeland Sec., *Notice of Funding Opportunity (NOFO): Fiscal Year 2025 Emergency Management Performance Grant* (July 28, 2025) |
| 2 | U.S. Dep't of Homeland Sec., *Notice of Funding Opportunity (NOFO): Fiscal Year 2025 Homeland Security Grant Program* (August 1, 2025) |
| 3 | Michigan's EMPG Award Notice (dated September 26, 2025, received September 28, 2025) |
| 4 | Michigan's EMPG Award Notice (dated September 26, 2025, received October 1, 2025) |
| 5 | Michigan's HSGP Award Notice (dated September 26, 2025, received September 28, 2025) |