DANA NESSEL
Attorney General for the State of Michigan
NEIL GIOVANATTI (P82305)
ADAM DE BEAR (P80242)
DANIEL PING (P81482)
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
Email:  GiovanattiN@michigan.gov
        deBearA@michigan.gov
        PingD@michigan.gov

*Attorneys for the State of Michigan*

[Additional counsel to appear on signature page]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| STATE OF MICHIGAN; STATE OF OREGON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF HAWAI'I; OFFICE OF THE GOVERNOR ex rel. ANDY BESHAR, in his official capacity as Governor of the Commonwealth of Kentucky; STATE OF MAINE; STATE OF MARYLAND; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF WISCONSIN, | Case No. 6:25-cv-2053-AP **PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT** **<u>EXPEDITED HEARING REQUESTED</u>** |
| *Plaintiffs*, | |
| v. | |
| KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DAVID RICHARDSON, in his official capacity as Senior Official Performing the Duties of the Administrator of the Federal Emergency Management Agency; FEDERAL EMERGENCY MANAGEMENT AGENCY, | |
| *Defendants*. | |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.................................................................................... iv

LR 7-1 CERTIFICATION.................................................................................... 1

MOTION.......................................................................................................... 1

MEMORANDUM OF LAW ............................................................................... 2

BACKGROUND .............................................................................................. 4

    I.   Congressionally mandated emergency-management and homeland-security grants ......... 4

       A.   The Emergency Management Performance Grant............................................ 4

       B.   The Homeland Security Grant Program ....................................................... 6

    II.   2025 EMPG and HSGP NOFOs ................................................................ 9

    III.  The 2025 Awards: The Population Certification Hold and Performance Period Change... 9

    IV.  Harms to Plaintiff States ........................................................................... 10

    V.   The Instant Action.................................................................................. 14

ARGUMENT .................................................................................................. 14

    I.   The Population Certification Hold and Performance Period Change are final agency actions subject to review under the APA. ..................................................................... 15

    II.   The Population Certification Hold violates the APA in several respects. .......................... 16

       A.   The Population Certification Hold exceeds Defendants' statutory authority................ 17

       B.   The Population Certification Hold is contrary to law. .................................................. 17

C.  The Population Certification Hold is arbitrary and capricious. ..................................... 18

D.  The Population Certification Hold was issued without observance of the Paperwork Reduction Act's applicable procedures. ......................................................... 24

III.  The Performance Period Change is arbitrary and capricious.............................................. 27

A.  Defendants failed to consider Plaintiff States' reliance interests. ................................ 27

B.  Defendants failed to contemporaneously explain the reason for the Performance Period Change. .................................................................................................... 28

C.  Defendants' post-hoc rationalizations are unreasoned.................................................. 29

D.  Defendants' treatment of other grant programs is inconsistent..................................... 30

IV.  Vacatur and Injunctive Relief are Appropriate Remedies under the APA. ....................... 30

A.  This Court should vacate the Population Certification Hold and Performance Period Change. .................................................................................................... 31

B.  This Court should enter permanent injunctive relief to effectuate its judgment........... 32

CONCLUSION....................................................................................................................... 35

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*AFL-CIO v. Chao*,

    496 F. Supp. 2d 76 (D.D.C. 2007) ........................................................................ 32

*All. for the Wild Rockies v. U.S. Forest Serv.*,

    907 F.3d 1105 (9th Cir. 2018) ............................................................................... 31

*Altera Corp. & Subsidiaries v. Comm'r*,

    926 F.3d 1061 (9th Cir. 2019) ............................................................................... 20

*Arrington v. Daniels*,

    516 F.3d 1106 (9th Cir. 2008) ............................................................................... 19

*Cal. Cmtys. Against Toxics v. Envt'l. Prot. Agency*,

    688 F.3d 989 (9th Cir. 2012) ................................................................................. 31

*California v. U.S. Bureau of Land Mgmt.*,

    277 F. Supp. 3d 1106 (N.D. Cal. 2017).................................................................. 31

*California v. U.S. Dep't of Transp.*,

    No. 25-cv-208, 2025 WL 3072541 (D.R.I. Nov. 4, 2025) ...................................... 16

*Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*,

    24 F.4th 640 (7th Cir. 2022)................................................................................... 34

*City of Arlington v. FCC*,

    569 U.S. 290 (2013)................................................................................................ 17

*City of Chicago v. Sessions*,

    888 F.3d 272 (7th Cir. 2018).................................................................................. 34

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,

    603 U.S. 799 (2024) ........................................................................................ 31

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,

    591 U.S. 1 (2020) .................................................................................... passim

*E. Bay Sanctuary Covenant v. Biden*,

    993 F.3d 640 (9th Cir. 2021) .................................................................... 14, 33

*eBay Inc. v. MercExchange, L.L.C.*,

    547 U.S. 388 (2006) ........................................................................................ 32

*FCC v. Fox Television Stations, Inc.*,

    556 U.S. 502 (2009) .................................................................................... passim

*FDA v. Wages & White Lion Invs., L.L.C.*,

    604 U.S. 542 (2025) .................................................................................... 21, 23

*Illinois v. FEMA*,

    No. 25-206, 2025 WL 2716277 (D.R.I. Sept. 24, 2025) ............................ 16, 33

*Illinois v. Noem*,

    No. 1:25-cv-00495 (D.R.I.) ............................................................................. 9

*Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Rels*,

    730 F.3d 1024 (9th Cir. 2013) ........................................................................ 32

*La. Pub. Serv. Comm'n v. FCC*,

    476 U.S. 355 (1986) ........................................................................................ 17

*League of Wilderness Defs. v. Marquis-Brong*,

    259 F. Supp. 2d 1115 (D. Or. 2003) ............................................................... 32

*Loper Bright Enters. v. Raimondo,*

    603 U.S. 369 (2024) ............................................................................................ 17

*Mont. Wildlife Fed'n v. Haaland,*

    127 F.4th 1 (9th Cir. 2025) .......................................................................... 29, 31

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,*

    463 U.S. 29 (1983) ......................................................................... 18, 22, 23, 29

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*

    545 U.S. 967 (2005) ............................................................................................ 30

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*

    145 F.3d 1399 (D.C. Cir. 1998) .......................................................................... 33

*News-Press v. U.S. DHS,*

    489 F.3d 1173 (11th Cir. 2007) .......................................................................... 34

*Ohio v. EPA,*

    603 U.S. 279 (2024) ............................................................................................ 18

*Or. Nat. Desert Ass'n v. Bushue,*

    644 F. Supp. 3d 813 (D. Or. 2022) .................................................................... 14

*Organized Vill. of Kake v. U.S. Dep't of Agric.,*

    795 F.3d 956 (9th Cir. 2015) ........................................................................ 23, 28

*Orr v. Trump,*

    778 F. Supp. 3d 394 (D. Mass. 2025) ............................................................ 24, 26

*Planned Parenthood of Greater Wash. & N. Idaho v. HHS,*

    328 F. Supp. 3d 1133 (E.D. Wash. 2018) ........................................................... 33

*Presidio Golf Club v. Nat'l Park Serv.*,

    155 F.3d 1153 (9th Cir. 1998) ................................................. 19

*Ritidian v. U.S. Dep't of Airforce*,

    128 F.4th 1089 (9th Cir. 2025) ................................................ 15

*Rodriguez v. Robbins*,

    715 F.3d 1127 (9th Cir. 2013) ................................................ 34

*Saliba v. U.S. Sec. & Exch. Comm'n*,

    47 F.4th 961 (9th Cir. 2022)..................................................... 15

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,

    578 U.S. 590 (2016)................................................................. 15

*Univ. of Texas M.D. Anderson Cancer Ctr. v. HHS*,

    985 F.3d 472 (5th Cir. 2021) ................................................... 30

*W. Oil & Gas Ass'n v. EPA*,

    633 F.2d 803 (9th Cir. 1980) ................................................... 31

*Washington v. HHS*,

    No. 6:25-cv-01748, 2025 WL 3002366, at *9–10 (D. Or. Oct. 27, 2025).......................... 15, 16

*Winter v. Nat. Res. Def. Council, Inc.*,

    555 U.S. 7 (2008)............................................................. 33, 34

**Statutes**

13 U.S.C. § 183(a) ......................................................... 5, 17, 18, 23

44 U.S.C. § 3501............................................................... 17

44 U.S.C. § 3501(1)–(2) ...................................................... 24

44 U.S.C. § 3501(8) .......................................................... 24

44 U.S.C. § 3502(3) ................................................................................... 25

44 U.S.C. § 3506(c)(1)(A)(i), (iv) ............................................................... 25

44 U.S.C. § 3506(c)(3)(A)–(C) ................................................................... 25

44 U.S.C. § 3507(a) ..................................................................................... 24

44 U.S.C. 3501(1) ........................................................................................ 26

5 U.S.C. § 703 ............................................................................................. 32

5 U.S.C. § 704 ............................................................................................. 15

5 U.S.C. § 706 ...................................................................................... 14, 16

5 U.S.C. § 706(2) ......................................................................................... 31

5 U.S.C. § 706(2)(A) ............................................................................. 17, 18

5 U.S.C. § 706(2)(C) .................................................................................... 17

5 U.S.C. § 706(2)(D) ............................................................................ 24, 26

6 U.S.C. § 604(a) ......................................................................................... 29

6 U.S.C. § 605(a) ......................................................................................... 29

6 U.S.C. § 608(a) .................................................................................... 7, 10

6 U.S.C. § 762(b) ......................................................................................... 29

6 U.S.C. § 762(c) ...................................................................................... 5, 6

6 U.S.C. § 762(d)(1) ...................................................................................... 4

6 U.S.C. § 762(d)(2) ................................................................................ 5, 18

Pub. L. 118-47, 138 Stat. 460 ....................................................................... 6

Pub. L. 119-4, § 1101(a)(6), 139 Stat. 9 ....................................................... 7

Pub. L. No. 107-296, § 430, 116 Stat. 2135 .................................................. 4

Pub. L. No. 107-56, § 1014(a), 115 Stat. 272 ............................................... 4

Pub. L. No. 108-7, 117 Stat. 11, 515 .............................................................. 4

Pub. L. No. 110-53, § 101, 121 Stat. 266 ...................................................... 4

Pub. L. No. 110–53, § 201, 121 Stat. 266 ...................................................... 4

**Other Authorities**

11A Wright & Miller's Fed. Practice & Procedure § 2944 (2d ed. 1995) ..................... 33

S. Rep. No. 94-1256 (1976) .......................................................................... 18

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................... 14

**Regulations**

5 C.F.R. § 1320.5(d) .................................................................................... 26

58 Fed. Reg. 69-02 (Jan. 4, 1993) ................................................................ 18

## **LR 7-1 CERTIFICATION**

Plaintiffs' counsel certify that the parties conferred via telephone conference on November 21, 2025, regarding this motion and have been unable to resolve the issue. The parties further conferred regarding Plaintiff States' request to expedite consideration of the motion; the parties agreed to the expedited briefing schedule that was so-ordered by the Court on November 6, 2025. (Doc. 20.)

## **MOTION**

Plaintiff States move under Rule 56(a) for entry of summary judgment in their favor on all Counts of their Complaint. This motion is supported by the following memorandum of law and the declarations and exhibits filed simultaneously with this motion.

Plaintiffs also request expedited consideration of this motion given the impacts of the challenged actions. Plaintiffs request resolution of this motion on or before December 31, 2025. Per the Stipulated Scheduling Order, entered November 6, 2025 (Doc. 20), the Court endorsed an expedited briefing schedule. The Court also set oral argument for this motion, and Defendants' forthcoming cross-motion on December 17, 2025.

## <u>MEMORANDUM OF LAW</u>

### Introduction

The disasters, terrorist attacks, and other emergencies our Nation has confronted share two common features:  Each was both unpredictable and devastating.  Recognizing that proactivity offers the best defense, the federal government has prioritized preparedness efforts, offering a variety of grants to state and local governments through the Federal Emergency Management Agency ("FEMA") that fund emergency-management, disaster-relief, and homeland-security activities.

Two of these grants—the Emergency Management Preparedness Grant ("EMPG") and the Homeland Security Grant Program ("HSGP"), both grants that Congress appropriated to the States to assist in preventing, preparing for, protecting against, and responding to emergencies and acts of terrorism—are at issue here.  For over 20 years, FEMA administered the EMPG and HSGP as Congress intended, allocating funding to States based solely on statutorily prescribed factors and allowing States to utilize such funding over multiple years to bolster their preparedness infrastructure.

That is, until this year.  Departing from decades of past practice and each awards' Notice of Funding Opportunity ("NOFO") issued two months prior, Defendants made last-minute, unreasoned changes to Plaintiff States' 2025 EMPG and HSGP awards, imposing two new and unlawful terms on the receipt and use of nearly $300 million in grant funding.

Specifically, as to the 2025 EMPG award, Defendants placed a hold on a State's EMPG funding until the State certifies its population as of September 30, 2025, excluding any individuals that the federal government removed under federal immigration law, using an undefined "methodology" that is satisfactory to FEMA (the "Population Certification Hold" or "PCH").  But

never before has the federal government—which is required by law to rely on U.S. Census Bureau data when allocating funding based on population—demanded that a State develop its own ad-hoc methodology to determine its population before receiving statutorily-entitled funding. Defendants did not offer any explanation, let alone a reasoned explanation, and, as the administrative record bears out, entirely disregarded Plaintiff States' reliance interest in changing the award terms to add the PCH to the 2025 EMPG awards. The PCH should be vacated under the Administrative Procedure Act ("APA") because it exceeds Defendants' statutory authority, is contrary to law, is arbitrary and capricious, and was issued without observance of procedures required by law.

Additionally, FEMA reduced the period of performance, *i.e.*, the period in which grant recipients must complete all activities to be reimbursed, from three years to one year in both the 2025 EMPG award and the 2025 HSGP award, and altered the effective date for the 2025 EMPG award to eliminate nearly a year of funding coverage (collectively, the "Performance Period Change" or "PPC"). The PPC makes it practically impossible for a recipient to use the funds effectively. Defendants provided no reasoned explanation (or, indeed, any explanation) for the PPC, which is contrary to past practice and the periods of performance listed in each awards' NOFO, and seriously disrupts Plaintiff States' reliance interests in operating under a multi-year period of performance. The PPC should be vacated as arbitrary and capricious under the APA.

Defendants' imposition of these unlawful terms—representing just one step in the Trump Administration's campaign to dismantle our country's robust disaster-response network—effectively defunds state and local police agencies and emergency response personnel (the ultimate users of most of the grant funding). This Court should grant Plaintiff States' motion for summary judgment and order the relief necessary to allow them unimpeded access to, and multi-year use of, their 2025 EMPG and HSGP awards.

**BACKGROUND**

**I.     Congressionally mandated emergency-management and homeland-security grants**

For over 70 years, Congress has funded a complex infrastructure of emergency preparedness and response, anchored by FEMA, but administered in the first instance by the States. After the September 11 terrorist attacks, Congress added funding programs to support States and localities in counterterrorism measures, with the goal of ensuring that a disaster of that sort never happens again.  In October 2001, Congress passed the USA PATRIOT Act, establishing grant programs to States "to prepare for and respond to terrorist acts."  Pub. L. No. 107-56, § 1014(a), 115 Stat. 272, 399.  Congress went on to pass the Homeland Security Act of 2002, Pub. L. No. 107-296, § 430, 116 Stat. 2135, 2191–92, which increased support for state preparedness measures.

Congress established EMPG and HSGP—the grant programs at issue here—soon after. *See* Pub. L. No. 108-7, 117 Stat. 11, 515–16; *see also* Pub. L. No. 110–53, § 201, 121 Stat. 266, 294–295 (codified as amended at 6 U.S.C. § 762) (EMPG); Pub. L. No. 110-53, § 101, 121 Stat. 266, 273–85 (codified as amended at 6 U.S.C. §§ 603–609) (HSGP).  As described in detail below, EMPG and HSGP provide federal funding to States to assist with emergency management and disaster preparedness.

**A.  The Emergency Management Performance Grant**

Congress created the EMPG to provide federal funding to States to assist state, local, tribal, and territorial emergency-management agencies in preparing for and managing emergencies resulting from natural disasters or accidental or man-made events.  FEMA's allocation of EMPG funds to recipients is set by statutory formula.  From each year's EMPG appropriation, FEMA must allocate to certain territories a baseline amount of 0.25 percent of the appropriated funds and to each of the remaining States a baseline amount of 0.75 percent of the appropriated funds.  6 U.S.C. § 762(d)(1).  FEMA then allocates the remaining amount to the States on a population-

share basis, utilizing U.S. Census Bureau data.  *Id.* § 762(d)(2); 13 U.S.C. § 183(a).  Because

EMPG is a formula grant, each State is entitled to a specific allocation whenever a NOFO is posted.

States match the federal share received and must submit a work plan to FEMA that accounts for

the matching state funds.  6 U.S.C. § 762(c).

> States use EMPG funds to support their statewide emergency response teams in preparing
for and responding to emergencies, which includes maintaining state operations centers,
developing and maintaining all-hazards emergency plans, funding operations personnel who
coordinate disaster response efforts, supporting emergency management training programs,
conducting disaster response exercises, purchasing equipment and technology resources to support
emergency management teams, and performing community outreach to educate residents on
disaster preparedness and response.  (Sweeney Decl. ¶¶ 12, 16; Lavine Decl. ¶ 13; Haney Decl. ¶
13; Mark Decl. ¶ 13; Gibson Decl. ¶ 15; Rogers Decl. ¶ 13; Strickland Decl. ¶ 16; Compston Decl.
¶ 12; Rye Decl. ¶ 13; Ray Decl. ¶ 16; McMahon Decl. ¶ 13; Engle Decl. ¶ 13.)  States also pass a
portion of the EMPG funding to localities to allow them to take similar preparedness measures,
such as employing local emergency managers and support staff and purchasing software and
communications equipment to assist with local emergency responses.  (Sweeny Decl. ¶ 17; Lavine
Decl. ¶ 14; Haney Decl. ¶ 14; Mark Decl. ¶ 14; Gibson Decl. ¶ 16; Rogers Decl. ¶ 14; Strickland
Decl. ¶ 17; Compston Decl. ¶ 13; Rye Decl. ¶ 14; Ray Decl. ¶ 17; McMahon Decl. ¶ 14.)

> Since the program's inception, EMPG awards have included a three-year period of
performance.  (Sweeney Decl. ¶ 54; Haney Decl. ¶ 44; Mark Decl. ¶ 25; Gibson Decl. ¶ 26; Rogers
Decl. ¶ 43; Strickland Decl. ¶ 44; Rye Decl. ¶ 43; Ray Decl. ¶ 45; McMahon Decl. ¶ 44; Engle
Decl. ¶ 38.)  Additionally, since at least 2007, FEMA has "backdated" the EMPG period of
performance by one year, which allows States to fund emergency-management-related expenses

incurred during the backdated award period. (Sweeney Decl. ¶¶ 55, 57, 62; Lavine Decl. ¶ 26; Haney Decl. ¶¶ 45, 49; Mark Decl. ¶¶ 26–27; Gibson Decl. ¶¶ 27–28; Strickland Decl. ¶¶ 45–47; Compston Decl. ¶ 30; Rye Decl. ¶¶ 44, 46–47; Ray Decl. ¶¶ 46, 48; McMahon Decl. ¶¶ 45, 47; Engle Decl. ¶¶ 39, 41.) To illustrate, FEMA backdated Michigan's 2024 EMPG award, to run from October 1, 2023, through September 30, 2026. (Sweeney Decl. ¶ 59.) Michigan therefore utilized funding from the 2024 EMPG awards to reimburse localities for expenses incurred starting on October 1, 2023 (the backdated award effective date). (*Id.*) Other States are similarly situated. (Haney Decl. ¶ 49; Strickland Decl. ¶ 49; Compston Decl. ¶ 33; Rye Decl. ¶ 48; Ray Decl. ¶ 50; McMahon Decl. ¶ 49; Engle Decl. ¶ 43.)

### B. The Homeland Security Grant Program

The HSGP was created to support one of Defendant Department of Homeland Security's ("DHS") five basic missions: "[S]trengthening national preparedness and resilience." (Doc. 1-6, p. 25.) To do so, HSGP is separated into "three key grant programs designed to enhance the capabilities of state, local, tribal, and territorial governments, as well as nonprofits, in preventing, protecting against, and responding to terrorist attacks." (Doc. 1-3, p. 11.) These include: (1) the State Homeland Security Program ("SHSP"), which "[s]upports the implementation of risk-driven, capabilities-based State Homeland Security Strategies to address capability targets"; (2) the Urban Area Security Initiative ("UASI"), which "[f]ocuses on high-risk Urban Area efforts to address their unique security needs"; and (3) Operation Stonegarden ("OPSG"), which "[e]nhances cooperation and coordination among state, local, tribal, territorial, and federal law enforcement agencies to jointly enhance security along the United States land and water borders." (*Id.*) SHSP and UASI are codified in 6 U.S.C. §§ 604 and 605, respectively, whereas OPSG has been included in numerous appropriation acts, *see, e.g.*, Pub. L. 118-47, 138 Stat. 460, 607 (appropriating $81

million for OPSG); Pub. L. 119-4, § 1101(a)(6), 139 Stat. 9, 11 (continuing appropriations from previous fiscal year).

For SHSP and UASI, FEMA allocates funding among the States and their high-risk urban areas utilizing a statutory risk-based formula that mandates consideration of certain factors—such as population density, degree of threat, and the "anticipated effectiveness of the proposed use of the grant by the State or high-risk urban area." 6 U.S.C. § 608(a). States must pass at least 80 percent of SHSP and UASI funding to local or tribal governments and may retain up to 20 percent of the funding for state-level needs, including up to 5 percent for management and administrative purposes. (Doc. 1-3, pp. 26, 41.).

For OPSG, FEMA allocates funds "based on two main factors: the risk to border security and the anticipated effectiveness of proposed projects." (Doc. 1-3, p. 56.) States must pass through 97.5 percent of OPSG awards to local law enforcement agencies and may retain only 2.5 percent of the OPSG award for management and administrative purposes. (Doc. 1-3, p. 41.)

States and local governments put SHSP, UASI, and OPSG funding to good work.

*SHSP Funding Examples*. State agencies and their local subgrantees use SHSP funding for an array of counterterrorism and emergency preparedness purposes, including developing emergency response plans, conducting risk assessments, funding specialized training for first responders, and purchasing equipment for specialized teams, such as bomb squads and tactical units. (Sweeney Decl. ¶¶ 28–31; Dzbanko Decl. ¶ 21; Haney Decl. ¶¶ 25-29; Pace Decl. ¶¶ 18–20; Rogers Decl. ¶¶ 25–26; Strickland Decl. ¶¶ 28–30; Compston Decl. ¶¶ 22–24; Rye Decl. ¶¶ 24–25; Ray Decl. ¶¶ 30–31; McMahon Decl. ¶¶ 26–28.) States also utilize SHSP funding to establish fusion centers, which are collaborative environments where public safety agencies and intelligence analysts from all levels of government share and analyze information to detect and

prevent threats to public safety.  (Sweeney Decl. ¶ 32; Haney Decl. ¶¶ 25, 28; Keats Decl. ¶ 15;
Rogers Decl. ¶ 24; Strickland Decl. ¶ 31; Ray Decl. ¶ 32; McMahon Decl. ¶ 29; Engle Decl. ¶ 27.)

*UASI Funding Examples*.  To align with the UASI's goal of "enhance[ing] the security and
resilience of high-risk urban areas by building, sustaining, and improving capabilities to prevent,
prepare for, protect against, and respond to acts of terrorism[,]" (Doc 1-3, p. 12), States with
identified "high-risk urban areas" use UASI funds to build and sustain such capabilities.  This
includes strengthening security measures, securing critical infrastructure and cyber infrastructure,
equipping responders, offering trainings, and supporting initiatives that help communities respond
effectively to threats and emergencies.  (Sweeney Decl. ¶ 33; Dzbanko Decl. ¶ 22; Haney Decl. ¶¶
30–34; Pace Decl. ¶ 21; Strickland Decl. ¶¶ 32–33; Compston Decl. ¶¶ 25-27; Ray Decl. ¶¶ 33–
35; McMahon Decl. ¶¶ 31–32.)  States also use UASI funds to support jurisdictions providing
enhanced security and an increased law enforcement presence during high-profile events.
(Sweeney Decl. ¶ 36; McMahon Decl. ¶ 33.)  UASI funds also subsidize local fusion centers.
(Sweeney Decl. ¶ 37; Haney Decl. ¶ 34; McMahon Decl. ¶ 34.)

*OPSG Funding Examples*.  For the 2025 OPSG award, FEMA identified certain example
project types that would constitute permissible uses of OPSG funds, including enhancing
collaboration and coordination among federal, state, local, tribal, and territorial law enforcement
agencies to strengthen border security; supporting joint efforts to secure borders, including land
and water routes, and critical travel corridors; and improving information and intelligence sharing
to address border-related threats effectively.  (Doc. 1-3, p. 23.)  In recent fiscal years, eligible
States and their subrecipients have used OPSG funds to support activities such as operational
overtime for law enforcement and the purchase of license plate readers, marine vessels, and all-

terrain vehicles to assist with patrols in a variety of environments.  (Sweeney Decl. ¶ 43; Dzbanko Decl. ¶ 27; Rogers Decl. ¶ 32; Rye Decl. ¶ 33.)

## II.    2025 EMPG and HSGP NOFOs

FEMA published the Notices of Funding Opportunity ("NOFOs") for the 2025 EMPG and HSGP awards in summer 2025.  (Doc. 1-2 (2025 EMPG NOFO); Doc. 1-3 (2025 HSGP NOFO).) Both NOFOs reflected a three-year period of performance for the awards.  (Doc. 1-2, p. 4; Doc. 1-3, p. 4.)  Specific to the EMPG, and consistent with past practice, FEMA also included a backdated period of performance within the NOFO, beginning on October 1, 2024.   (Doc. 1-2, p. 4.) Additionally, the EMPG NOFO makes no mention of the PCH, or any similar requirement of grantees to provide population data prior to receiving funding.

## III.   The 2025 Awards: The Population Certification Hold and Performance Period Change

FEMA issued HSGP and EMPG award notices to Plaintiff States on September 27, 2025.[1] (See, e.g., Doc. 1-4 (MI's Sept. 2025 EMPG Award Notice); Doc. 1-5, (MI's HSGP Award Notice).)  As detailed below, both awards differ from their respective NOFOs and deviate from decades of past practice in two important respects:  (1) the imposition of PCH upon the EMPG award, and (2) the PPC within the EMPG and HSGP awards.

*The Population Certification Hold*.  Three days after issuing the initial EMPG award notice, FEMA issued amended EMPG awards to Plaintiff States, solely to add the PCH.  (E.g., Doc. 1-6, p. 31.)  The PCH states:

---

[1] FEMA awarded Plaintiff States' more HSGP funding than the allocations indicated in the HSGP NOFO.  Other States received significantly less funding.  In late September, Illinois and several other states filed suit in the District of Rhode Island contesting the reallocation of the 2025 HSGP awards.  *See Illinois v. Noem*, No. 1:25-cv-00495 (D.R.I.).  Plaintiff States do not contest the allocation or reallocation of the HSGP awards through this litigation.

**Funding Hold: Verification of State's Population**

FEMA has placed a funding hold on this award, and the full amount of the award is on hold in the FEMA financial systems. The recipient is prohibited from obligating, expending, or drawing down the funds associated with the award.

To release the funding hold, the [State Administering Agency] must provide a certification of the recipient state's population as of September 30, 2025. In so doing, the State will explain the methodology it used to determine its population and certify that its reported population does not include individuals that have been removed from the State pursuant to the immigration laws of the United States.

FEMA will rescind the funding hold upon its review and approval of the State's methodology and population certification.

(*Id.*)

Defendants provided no explanation for imposing the PCH. They also offered no guidance or direction to States as to how to comply.

*The Performance Period Change.* Plaintiff States' 2025 EMPG and 2025 HSGP awards also include a *one-year* period of performance—contrary to the NOFOs' express indication of a *three-year* period of performance and decades of past practice allowing for multi-year periods of performance. (*See, e.g.*, Doc. 1-4, p. 32; Doc. 1-5, p. 33; Doc. 1-6, p. 32; Sweeney Decl. ¶¶ 52, 54, 56, 60, 66.) Additionally, and also contrary to the NOFO and past practice, FEMA failed to backdate the 2025 EMPG award. (Sweeney Decl. ¶ 60; Haney Decl. ¶ 50; Engle Decl. ¶ 44.) Defendants provided no explanation for their decision to implement any aspect of the PPC.

## IV.    Harms to Plaintiff States

Both the PCH and the PPC work immediate and substantial harms upon Plaintiff States.

*The Population Certification Hold.* The PCH erects an immediate and indefinite barrier to Plaintiff States' receipt of funding to which they are otherwise statutorily entitled. Plaintiff States cannot comply with this term; they have no capability of certifying their population in the manner requested as none of the Plaintiff States keeps population data as current as Defendants demand

(*i.e.*, as of September 30, 2025), nor is keeping such data feasible. (Sweeney Decl. ¶ 48; Haney Decl. ¶ 39; Mark Decl. ¶ 20; Gibson Decl. ¶ 22; Rogers Decl. ¶ 37; Strickland Decl. ¶ 40; Olmstead Decl. ¶ 8; Rye Decl. ¶ 38; Ray Decl. ¶ 40; McMahon Decl. ¶ 39; Engle Decl. ¶ 33.) And, considering that the removal of individuals pursuant to federal immigration law is exclusively a federal function, Plaintiff States have no means of verifying the number of individuals that the federal government has removed from their borders. In fact, when Michigan attempted to obtain such information from the federal government, DHS could offer only an *approximate number* of recently removed individuals. (Sweeney Decl. ¶ 49; see also Ray Decl. ¶ 41 (North Carolina's requests went unanswered).)

Further, Defendants have provided no guidance to Plaintiff States to assist them in calculating their populations as the PCH requires. (Sweeney Decl. ¶ 49; Haney Decl. ¶ 40; Mark Decl. 21; Gibson Decl. ¶ 23; Rogers Decl. ¶ 38; Strickland Decl. ¶ 41; Olmstead Decl. ¶ 10; Rye Decl. ¶ 39; Ray Decl. ¶ 40; McMahon Decl. ¶ 40; Engle Decl. ¶ 34.) FEMA admits it did not— and still has not—developed *any* guidance to assist the States in complying with the PCH. (Doc. 27-2, Arnold Decl. ¶ 9, DHS/FEMA_00002–03.) And FEMA has still given no indication of what will constitute compliance with this requirement.

Given FEMA's lack of guidance, Plaintiff States must report their own methodologies and cannot access the funds unless and until FEMA approves their methodologies. (Doc. 1-5, p. 31.) Because this is the first time FEMA has required such a certification, States cannot estimate how long it will take FEMA to consider each State's certification and methodology (which, when coupled with the shortened performance period, imposes substantial uncertainty for Plaintiff States). And with the 2025 EMPG funding on hold, and a lack of clarity as to whether and when the funds will be released, activities funded by EMPG in the Plaintiff States are at risk of

shuttering.  (Sweeney Decl. ¶ 51; Haney Decl. ¶ 42; Mark Decl. ¶ 23; Gibson Decl. ¶ 24; Rogers Decl. ¶ 40; Strickland Decl. ¶ 42; Rye Decl. ¶ 41; Ray Decl. ¶ 43; McMahon Decl. ¶ 42; Engle Decl. ¶ 36.)

*Performance Period Change.*  The PPC likewise considerably impairs Plaintiff States' use of EMPG and HSGP funding, frustrating Plaintiff States' ability to achieve the purposes of the programs.  Without the three-year period to expend grant funding, portions of Plaintiff States' 2025 EMPG and HSGP awards will go unused, reducing emergency preparedness and law enforcement efficacy.  (Sweeney Decl. ¶¶ 63–65, 69–71; Dzbanko Decl. ¶ 38; Lavine Decl. ¶ 34; Haney Decl. ¶ 53; Mark Decl. ¶ 33; Gibson Decl. ¶ 34; Rogers Decl. ¶¶ 46, 56; Rye Decl. ¶¶ 51, 60; Ray Decl. ¶ 53; McMahon Decl. ¶¶ 53, 56, 62–63.)

The one-year period of performance has left Plaintiff States scrambling to cram three years of proposed projects into a period of (at this point) only a few months.  (Sweeney Decl. ¶¶ 61–64, 67, 70; Dzbanko Decl. ¶ 36.)  It also limits Plaintiff States' ability to fund multi-year trainings, purchase equipment subject to multi-year procurement processes, fund multi-year capital projects, and maintain staff for positions that rely on annual federal funding—all of which were possible under every prior iteration of the EMPG and HSGP awards given their multi-year periods of performance.  (Sweeney Decl. ¶¶ 62–64, 67–68; Dzbanko Decl. ¶ 31; Mark Decl. ¶¶ 35–36; Rogers Decl. ¶ 47; Strickland Decl. ¶ 57; Compston Decl. ¶ 38; Engle Decl. ¶ 51.)  As a result of this rushed and condensed process, critical funding may be misallocated or fail to reach the communities and capabilities that need it most.  (Sweeney Decl. ¶ 69; Haney Decl. ¶ 60; Pace Decl. ¶ 28; Keats Decl. ¶ 7; Rogers Decl. ¶ 54; Rye Decl. ¶ 58; Ray Decl. ¶ 60; McMahon Decl. ¶ 61; Engle Decl. ¶ 52.)  The inability to tailor investments to real-world threats and vulnerabilities is not just a procedural problem; it is a direct harm to the communities these funds are intended to

protect.  (Sweeney Decl. ¶ 69; Haney Decl. ¶ 60; Pace Decl. ¶ 28; Keats Decl. ¶ 7; Rogers Decl. ¶ 54; Strickland Decl. ¶ 61; Rye Decl. ¶ 58; Ray Decl. ¶ 60; McMahon Decl. ¶ 61; Engle Decl. ¶ 52.)

Notably, even with the one-year period of performance, States do not have a full year in which to spend the funds.  Procedural matters, such as subgranting processes (which often do not start until the funds are awarded) and seeking any necessary FEMA approvals (which can take upwards of six months), further reduce the time States may incur reimbursable expenses.  (Sweeney Decl. ¶¶ 67–68; Dzbanko Decl. ¶ 32; Haney Decl. ¶ 57; Pace Decl. ¶ 25; Compston Decl. ¶ 29; Ray Decl. ¶¶ 57, 59; Engle Decl. ¶¶ 49, 52.)  Moreover, because of the change from the NOFO to the award, these subgranting and approval processes are further delayed, as projects that States and subgrantees had planned to submit for FEMA approval can no longer be completed and must be reconsidered or reconceived.  (Dzbanko Decl. ¶ 32; Rogers Decl. ¶ 53; Compston Decl. ¶ 29; Rye Decl. ¶ 55.)  Realistically, Plaintiff States may have less than six months to actually expend their awards.  (Sweeney Decl. ¶ 67; Dzbanko Decl. ¶ 35; Haney Decl. ¶ 57; Pace Decl. ¶ 25; Keats Decl. ¶ 4; Rogers Decl. ¶ 51; Compston Decl. ¶ 38; McMahon Decl. ¶ 58.)

These harms are especially severe in the context of the 2025 EMPG award, given the additional impacts of the PCH and FEMA's failure to backdate the award.  The PCH prevents Plaintiff States from accessing their EMPG funding; and every day that passes while the EMPG funds are illegally withheld reduces the already-limited period of performance.  Moreover, FEMA's failure to backdate the award functionally skips twelve months of funding, as expenses that were incurred between October 1, 2024, and September 30, 2025, are now ineligible for reimbursement under the 2025 EMPG award.  (Sweeney Decl. ¶¶ 60, 62; Compston ¶ 34.)  Without the ability to reimburse expenditures *already* incurred prior to September 30, 2025, emergency

management functions at the local level have been thrown into disarray. (Sweeney Decl. ¶¶ 60, 62; Lavine Decl. ¶ 33; Haney Decl. ¶¶ 50, 52; Gibson Decl. ¶ 33; Strickland Decl. ¶ 52; Ray Decl. ¶ 50, 52; McMahon Decl. ¶¶ 50, 52; Engle Decl. ¶ 45.)

## V.     The Instant Action

Due to these harms and the illegality of the PCH and the PPC, Plaintiff States filed the instant action. A looming award acceptance deadline of December 31, 2025, creates exigency for the States; therefore, the parties agreed to expedited briefing, and Plaintiffs request resolution of the instant motion before December 31, 2025. (Doc. 20.)

## ARGUMENT

Plaintiff States are entitled to summary judgment on their claims that the PCH and PPC violate the APA. In non-APA cases, summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When reviewing the merits under the APA, however, the Court does not ask whether there is a genuine dispute of any material fact"; rather, the standards of review are prescribed by the APA itself. *See Or. Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 822 (D. Or. 2022). Section 706 of the APA states, "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. Courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." *Id.* § 706(2)(A); *e.g.*, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 679–81 (9th Cir. 2021) (ordering injunction and vacatur for APA violations).

I.     **The Population Certification Hold and Performance Period Change are final agency actions subject to review under the APA.**

The imposition of the PCH upon the 2025 EMPG award and the PPC in the 2025 EMPG and HSGP awards are "final agency actions" subject to review under the APA.  5 U.S.C. § 704.

For agency action to qualify as "final" under the APA the action must (1) "mark the consummation" of agency decision-making, and (2) determine "rights or obligations" or engender "legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quotation omitted).  Under this test, courts consider "factors such as whether the action amounts to a definitive statement of the agency's position, whether it has a direct and immediate effect on the day-to-day operations of the subject party, and if immediate compliance is expected." *Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1109 (9th Cir. 2025) (cleaned up).  Finality is "interpreted in a pragmatic and flexible manner," "focus[ing] on the practical and legal effects of the agency action." *Saliba v. U.S. Sec. & Exch. Comm'n*, 47 F.4th 961, 967 (9th Cir. 2022) (cleaned up); *see also Hawkes Co.*, 578 U.S. at 599 (endorsing "pragmatic" approach to finality).

Here, both challenged actions meet these conditions.  As to the first condition, there is nothing "tentative or interlocutory" about the PCH or PPC.  In fact, "[u]nlike agency action that is of a 'merely tentative or interlocutory nature,' the imposition of a new term to an agreement, by its very nature, changes the parties' legal obligations and rights." *Washington v. HHS*, No. 6:25-cv-01748, 2025 WL 3002366, at *9–10 (D. Or. Oct. 27, 2025) (Aiken, J.) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).  And "[w]here an agency establishes conditions on grant eligibility,"— like the PCH—"the agency has taken action that marks the consummation of the agency's decision-making process." *Id.* (quoting *San Francisco Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 740 (N.D. Cal. 2025)) (cleaned up).  Similarly, the PPC reduces the period of

performance and modifies the start date for EMPG: new terms that impact Plaintiff States' ability to utilize funding as anticipated.

As to the second condition, "legal consequences [immediately] flow" from the PCH because it immediately imposes a precondition to receiving an award. *Id.* The same is true for the PPC; 2025 EMPG funds now cannot be used to reimburse expenses from October 1, 2024, through September 30, 2025 (the backdated performance period), and grantees must plan to utilize both grants' funding immediately—and somehow expend the entire awards over the next few months— or else risk losing funding on which they reasonably expected to rely for a much longer period.

Because the PCH and PPC both meet each condition, each represents final agency action subject to review under 5 U.S.C. § 706. *E.g.*, *Illinois v. FEMA*, No. 25-206, 2025 WL 2716277, at *8 & n.6 (D.R.I. Sept. 24, 2025) (finding imposition of terms and conditions upon grant awards constitutes final agency action, and collecting cases holding same); *California v. U.S. Dep't of Transp.*, No. 25-cv-208, 2025 WL 3072541, at *6 (D.R.I. Nov. 4, 2025) (same); *Washington*, 2025 WL 3002366, at *9–11 (same).

## II.     The Population Certification Hold violates the APA in several respects.

Defendants' decision to withhold awarded EMPG funds until Plaintiff States certify their populations as of September 30, 2025, is unlawful on multiple grounds. First, the PCH exceeds Defendants' statutory authority because EMPG's implementing statute nowhere authorizes FEMA to condition funding on States submitting population data. In addition, the PCH is contrary to law as statute requires FEMA to rely on population data held by the U.S. Census Bureau to calculate award amounts. Further, the PCH is arbitrary and capricious because Defendants' decision to include the term is unsupported by any reasoned decision-making or consideration of States' reliance interests. And finally, Defendants purport to impose the PCH without observance of

procedures required by law, *i.e.*, the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*, which prohibits collecting information from States absent Defendants meeting several prerequisites not completed here.

### A. The Population Certification Hold exceeds Defendants' statutory authority.

No law authorizes Defendants to impose the PCH; therefore, the term exceeds Defendants' statutory authority, in violation of 5 U.S.C. § 706(2)(C).

When an executive agency administers a federal statute, its power to act is "authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Here, no statute authorizes Defendants to impose the PCH or any similar funding hold as a prerequisite to receiving EMPG funds. Therefore, Defendants' demand that States produce their own population estimates exceeds their authority under federal law, in violation of 5 U.S.C. § 706(2)(C).

### B. The Population Certification Hold is contrary to law.

Beyond being simply unauthorized, the PCH is contrary to law because it ignores Defendants' statutory obligation to consult a particular source—the U.S. Census Bureau—for population data when issuing grant awards. 5 U.S.C. § 706(2)(A).

When a State's population is a factor in issuing grant awards, federal agencies must calculate such population using *only* U.S. Census Bureau data. 13 U.S.C. § 183(a). When "administering any law of the United States in which population" is "used to determine the amount of benefit received by State, county, or local" governments, the Secretary of Commerce "*shall* transmit to the President for use by the appropriate departments and agencies of the executive

branch the data most recently produced and published" by the U.S. Census Bureau. 13 U.S.C. § 183(a) (emphasis added). As the Commerce Department has explained, this statute "*requires* use of the current population estimate" produced by the Census Bureau for federal "formula program funds" unless "the formula has been specifically tied to the decennial census." 58 Fed. Reg. 69-02, 72 (Jan. 4, 1993) (emphasis added); *see* S. Rep. No. 94-1256, at 1 (1976) ("The purposes of this legislation are: . . . (2) to *require* the use of current population data . . . for the determination of the amount of benefit to be received by State and local government from any Federal program administered on the basis of population." (emphasis added)).

EMPG's authorizing statute requires FEMA to allocate EMPG funds according a "ratio" comparing "the population of each State" to "the population of all States." 6 U.S.C. § 762(d)(2). Accordingly, Defendants must use official Census Bureau data—not individual population estimates that States produce—to allocate EMPG funds. Defendants' demand that States produce their own population estimates is thus contrary to this express congressional directive, 13 U.S.C. § 183(a), thereby violating 5 U.S.C. § 706(2)(A).

### C. The Population Certification Hold is arbitrary and capricious.

The PCH is also arbitrary and capricious under 5 U.S.C. § 706(2)(A), which serves as an independent basis for summary judgment.

An agency acts arbitrarily and capriciously when it "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or [that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Ohio v. EPA*, 603 U.S. 279, 292 (2024). When changing positions, an agency must "display awareness that it is changing position" and may not "depart from a prior policy sub

silentio." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The agency "must show that there are good reasons for the new policy," *id.*, and the record must reflect that, in making the change, the agency considered any "serious reliance interests" engendered by the status quo, *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020).

When evaluating whether an agency action is arbitrary and capricious, courts may consider only the facts that the agency had before it during its decision-making process and the grounds the agency invoked when it took the challenged action. *Id.* at 20, 23. In other words, post-hoc rationalizations cannot justify an agency's actions, *id.*, and courts may not "infer an agency's reasoning from mere silence," *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (quotation omitted). Litigation affidavits—*i.e.*, affidavits prepared *after* the decision is challenged in an APA action—generally are irrelevant in evaluating the agency's decision-making, even if the affidavits are executed by agency personnel. *Regents*, 591 U.S. at 20–22. If a litigation affidavit is ever relevant, it is only when it is supplemental in character, anchored to "the grounds that the agency invoked when it took the action." *Id.* at 20 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)); *see*, *e.g.*, *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1165 (9th Cir. 1998).

Here, the PCH is arbitrary and capricious for at least four reasons.

### 1. Defendants failed to consider States' reliance interests.

It is *per se* arbitrary and capricious to ignore reliance interests that a policy change might upset. *See Regents*, 591 U.S. at 30. Here, Defendants wholly failed to account for Plaintiff States' reliance interests, rendering the PCH arbitrary and capricious.

Plaintiff States reasonably expected to draw down EMPG funds upon award and did not anticipate an apparently indefinite and insurmountable funding hold. This expectation was based on (1) the EMPG NOFO, which did not reflect any population data request or hold and provided expected "target allocations" based on "population-share" (Doc. 1-2, p. 64); (2) past EMPG grants,

which have never included anything resembling the PCH (Sweeney Decl. ¶ 47; McMahon Decl. ¶ 38; Rye Decl. ¶ 37); and (3) the original EMPG awards, which did not include the PCH (Doc. 1-4).

Defendants' sudden decision to include the PCH in the amended EMPG awards did not consider Plaintiffs' States reasonable reliance in any respect.  The awards themselves reflect no analysis of the States' interests and the harm a hold on EMPG funds would inflict.  Likewise, Defendants' post-hoc explanation for inclusion of the PCH reflects no consideration of the States' reliance interests.  (Arnold Decl. ¶¶ 6–7, DHS/FEMA_00002.)

Based on Defendants' complete ignorance of the States' interests, the PCH is *per se* arbitrary and capricious.

## 2. Defendants failed to explain their addition of the Population Certification Hold.

An agency's action can survive arbitrary-and-capricious review only where it "articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1080 (9th Cir. 2019).  And the timing of this explanation matters.  "The basic rule here is clear:  An agency must defend its actions based on the reasons it gave *when it acted*."  *Regents*, 591 U.S. at 23 (emphasis added).  Thus, the Court may only consider "contemporaneous explanations for agency action."  *Id.*

Here, the amended EMPG awards include no explanation for the inclusion of the PCH.  And the administrative record contains no document—prepared before or contemporaneous with the decision to add the PCH to the amended EMPG award letters—that illuminates FEMA's reason for adding the PCH.  The only document that purports to relate to Defendants' decision is the

Arnold Declaration—a "litigation affidavit" offering only post-hoc rationalizations, which is strongly disfavored. *Id.* at 20–22.

Without a contemporaneous explanation for the addition of the PCH, Defendants' inclusion of same is arbitrary and capricious.

### 3.  Defendants' post-hoc explanations do not suffice.

Even considering Defendants' post-hoc explanation for the PCH, it is unreasoned.

An agency action is arbitrary and capricious when the agency changes positions without "good reasons for the new policy." *Fox Television*, 556 U.S. at 515.  Under the "change-in-position doctrine . . . agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (cleaned up).

In the Arnold Declaration, Defendants contend they included the PCH in the amended EMPG awards to "confirm FEMA's calculations of state populations and ensure the accuracy of the final allocation of the EPMG funding, taking into account the number of illegal aliens who have been removed from the country since the collection of the most recent federal census data." (Arnold Decl. ¶ 6, DHS/FEMA_00002.)  This explanation is senseless for numerous reasons.

First, as explained in Part II.B, Defendants must use U.S. Census data to make allocations based on population.  Arnold confirms that "the EMPG award allocations were based on census data *as a starting point*."  (*Id.* ¶ 5 (emphasis added).)  In other words, "FEMA's calculations of state populations" were not "calculations" in need of confirmation, but final allocations using the proper source for the data.  No additional information was needed—or permitted—in determining allocations.

Second, even if Defendants could consider separate population data to account for "removed" individuals, Arnold fails to explain why Defendants needed the States to provide this data. Defendant DHS is the entity responsible for federal immigration law and removals. Thus, if any entity has data on removals, it is DHS.[2]

Third, and related, Defendants do not explain why the States' self-reported population data would provide more "accura[te]" data. (Arnold Decl. ¶ 6, DHS/FEMA_00002.) In fact, as explained above, States have no way of determining their populations as of September 30, 2025. Under no circumstances would self-reported population data "confirm FEMA's calculations of state populations." (*Id.*)

Fourth, FEMA failed to explain why the PCH requires States to expressly certify only immigration-related population changes. Arnold claims that immigration-removal data helps FEMA obtain up-to-date numbers "since the collection of the most recent federal census data." (Arnold Decl. ¶ 6, DHS/FEMA_00002.) But the PCH does not require a State to certify that its reported population excludes *all* individuals who have left the State; rather, it requires a State to certify that it has subtracted only a *subset* of such individuals, suggesting that Defendants do not care, or did not consider, whether a State might include in its population a U.S. citizen or lawfully-present resident who recently relocated out of the State. This fatally undermines Arnold's post-hoc explanation; suggesting the PCH will improve the quality of the population data is "so implausible that it [can] not be ascribed to a difference in view or the product of agency expertise," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, rendering it arbitrary and capricious.

---

[2] When Michigan asked its local Customs and Border Patrol office for data on removals, they could not provide a specific number. (Sweeney Decl. ¶ 49.) Thus, it is inexplicable how Defendants believed the States could accurately determine the number of individuals removed from their borders.

Fifth, the administrative record is completely silent regarding the fact that the PCH represents a change in policy. Again, explaining the PCH requires not only explaining the policy in isolation, but explaining why a *change* was made. *Fox Television*, 556, U.S. at 515. Yet the administrative record does not even "display awareness that [Defendants] are changing position," *Wages & White Lion Invs.*, 604 U.S. at 568, let alone explain the change relative to prior policy. To satisfy their burden, Defendants needed to evaluate their prior practice of relying on the U.S. Census population data, conclude that the practice could be improved (and explain why), conclude that the PCH was an improvement (and explain why), and conclude that the benefits of the change were not outweighed by States' reliance interests (and explain why). *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966–67 (9th Cir. 2015) (en banc). The administrative record does not suggest FEMA took even a single step along this decisional pathway. Without a record of that deliberation, imposing the PCH was, by definition, arbitrary and capricious.

### 4. The Population Certification Hold seeks data on which Congress did not intend Defendants to rely.

Finally, the PCH is arbitrary and capricious because Defendants "relied on factors which Congress has not intended [them] to consider." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. As explained in Part II.B, Congress definitively established that agencies must rely on population data provided by the U.S. Census Bureau whenever "population or population characteristics are used to determine the amount of benefit received by State, county, or local units of . . . government[.]" 13 U.S.C. § 183(a). Defendants contend they imposed the PCH so they could "confirm" and "ensure the accuracy of the final allocation of EMPG funding, taking into account the" undocumented individuals "who have been removed from the country since the collection of the most recent federal census data." (Arnold Decl. ¶ 6, DHS/FEMA_00002.) It logically follows that FEMA intended to reallocate the EMPG awards based on States' certifications. By seeking

data from the States to reallocate the awards, Defendants sought to rely on population data Congress did not intend them to consider.

For these reasons, the decision to impose the PCH was arbitrary and capricious.

**D. The Population Certification Hold was issued without observance of the Paperwork Reduction Act's applicable procedures.**

Finally, by imposing the PCH, Defendants violated the procedures required to collect information under Paperwork Reduction Act ("PRA"), thereby failing to observe procedures required by law in violation of 5 U.S.C. § 706(2)(D). *See Orr v. Trump*, 778 F. Supp. 3d 394, 425–26 (D. Mass. 2025) (recognizing "[t]he APA permits suits for violations of" the PRA and collecting cases).

The PRA was enacted, in part, to "minimize the paperwork burden for . . . State, local, and tribal governments . . . resulting from the collection of information by or for the Federal Government" and to "maximize the utility of information created, collected, maintained, used, shared and disseminated by . . . the Federal Government." 44 U.S.C. § 3501(1)–(2). It also exists to "ensure that the creation, collection, . . . [and] use . . . of information by or for the Federal Government is consistent with applicable laws." 44 U.S.C. § 3501(8).

Under the PRA, an agency must satisfy numerous preconditions prior to any "collection of information." 44 U.S.C. § 3507(a). Specifically, "an agency *shall not* conduct or sponsor the collection of information unless in advance of the adoption or revision of the collection of information[,]" (1) the agency has complied with § 3506, (2) the Director of OMB "has approved the proposed collection of information or approval has been inferred," and (3) the agency obtains a "control number" to be displayed upon the collection of information. *Id.* (emphasis added). For example, an agency must "review each collection of information," including, among other things, "an evaluation of the need for the collection of information," as well as "a specific, objectively

supported estimate of burden." *Id.* § 3506(c)(1)(A)(i), (iv).  And an agency must certify to the Director of the Office of Management and Budget that each collection of information is (1) "necessary for the proper performance of the functions of the agency," (2) "not unnecessarily duplicative of information otherwise reasonably accessible to the agency," and (3) "reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency." *Id.* § 3506(c)(3)(A)–(C).

Here, Defendants' attempt to collect population information from the States via the PCH falls comfortably within the meaning of a "collection of information" under the PRA.  The PRA defines "collection of information" to include "obtaining" or "soliciting" "facts or opinions by or for an agency, regardless of form or format," if requested in identical "requirements imposed on [ ] ten or more persons."  44 U.S.C. § 3502(3).  And a "person" includes a "State" or its "political subdivision." *Id.* § 3502(10).  Thus, Defendants needed to comply with the PRA when they demanded that States report their populations as provided in the PCH.

But in attempting to collect information, Defendants wholly failed to comply—or even attempt to comply—with any of the PRA's procedural requirements.  For instance, Defendants did not provide notice in the Federal Register before imposing the PCH.  Instead, Defendants imposed the term with no notice and after issuing the respective NOFOs (which utilized U.S. Census Bureau to make the funding allocations).

Within the administrative record, Defendants included two documents that appear to relate to Plaintiff States' PRA allegations: an "OMB-Approved FEMA Information Collection Request" and the "Supporting Statement" for that request.  (*See* Docs. 27-13, 27-14.)  However, these documents do not demonstrate that Defendants complied with the PRA in issuing the PCH.  First, the "Supporting Statement" recognizes that information collected pursuant to the OMB-approved

"Generic Clearance for FEMA's Preparedness Programs" is "not collected through other avenues and is not duplicated elsewhere," (Doc. 27-14, DHS/FEMA_01323)—which is not the case for the PCH. Additionally, Arnold declared under penalty of perjury that FEMA considered the PCH no earlier than July 2025 (Doc. 27-2, DHS/FEMA_00002), so it is unclear how OMB's approval of a "Generic Clearance" in March 2024 could relate to the PCH.[3] (Doc. 27-13, DHS/FEMA_01315.) In any event, the "Generic Clearance" applies only where FEMA "needs to collect necessary information to perform" grant-related activities. (Doc. 27-14, DHS/FEMA_01319.) As noted above, FEMA does not "need[] to collect" the information sought through the PCH (it already has it); nor is it "necessary information to perform" grant-related activities (FEMA already performed them based on U.S. Census Bureau data). Thus, as the "Supporting Statement" recognizes, Defendants were required to "submit an information collection request to OMB for approval through the normal PRA process" to impose the PCH (*id.*), but they did not do so.

In short, Defendants failed to comport with the PRA. The PCH increases the "paperwork burden" for the States, requiring them to devote time and resources to collect information Defendants already possess and, in fact, already utilized. *See* 44 U.S.C. 3501(1); 5 C.F.R. § 1320.5(d) (requiring agency to demonstrate proposed collection "[i]s not duplicative of information otherwise accessible to the agency"). Because Defendants failed to comply with the PRA in imposing the PCH, they acted "without observance of procedure required by law" and therefore violated the APA, 5 U.S.C. § 706(2)(D). *Orr*, 778 F. Supp. 3d at 426.

---

[3] If it does apply, the "Supporting Statement" contemplates that new information collections conducted under the "Generic Clearance" still require submission of "a standardized form . . . along with Privacy and supporting documentation" to OMB—something that did not occur here. (Doc. 27-14, DHS/FEMA_01319.)

III.    **The Performance Period Change is arbitrary and capricious.**

The PPC is arbitrary and capricious in at least four respects.

A.  **Defendants failed to consider Plaintiff States' reliance interests.**

First, Defendants entirely failed to account for Plaintiff States' reliance on the 2025 NOFOs and years of previous practice. Again, when an agency changes positions, it must show that it considered any "serious reliance interests" engendered by the existing policy. *Regents*, 591 U.S. at 30. Plaintiff States reasonably anticipated that FEMA would continue to use three-year performance periods—not only because that was the agency's "longstanding" policy, *id.*, but also because the NOFOs for both programs explicitly stated as much. (Doc. 1-2, p. 4; Doc. 1-3, p. 4.) Indeed, FEMA instructed applicants to plan around a three-year performance period: The HSGP NOFO specified that projects must be "able to be fully completed within the three-year period of performance," (Doc. 1-3, p. 38), and the EMPG NOFO stated that "[e]ach goal must be specific, measurable, and achievable within the period of performance," (Doc. 1-2, p. 50).

Likewise, the States reasonably relied on the 2025 EMPG NOFO and past practice in anticipating the EMPG award would be backdated. The NOFO specifically set the start date for the period of performance as October 1, 2024, and States and their localities accordingly anticipated utilizing EMPG funds to support emergency management operations for expenses incurred from October 1, 2024, forward. (Doc. 1-2, p. 4; Sweeney Decl. ¶ 59; Engle Decl. ¶ 43; Compston Decl. ¶ 33.)

The administrative record confirms Defendants did not consider the States' reliance on the 2025 NOFOs and decades-long practices of providing a multi-year performance periods for both awards and backdating the EMPG award. The record bears no indication that Defendants weighed the States' reliance interests at all, let alone "against competing policy concerns." *See Regents*, 591 U.S. at 33. Consideration of States' reliance interests would have revealed that States cannot

effectively use these funds within a one-year period of performance, and that localities already had conducted grant-related activities during the expected backdated period, reasonably expecting reimbursement for expenses incurred during such period. (Sweeney Decl. ¶¶ 59, 62–63; Engle Decl. ¶¶ 43, 45.) Defendants' failure to consider the States' interests in, and reasonable reliance on, past practice and the NOFOs renders the PPC arbitrary and capricious. *Regents*, 591 U.S. at 33.

### B. Defendants failed to contemporaneously explain the reason for the Performance Period Change.

Second, the EMPG and HSGP awards did not acknowledge or explain the PPC. As discussed *supra*, "a policy change complies with the APA only if the agency (1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy, which, if the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' must include 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.' " *Organized Vill. of Kake*, 795 F.3d at 966 (quoting *Fox Television*, 556 U.S. at 515–16). And the APA requires a "contemporaneous explanations for agency action." *Regents*, 591 U.S. at 23.

As with the PCH, Defendants provided no contemporaneous rationale for the PPC in either the EMPG or the HSGP awards. These significant policy changes from the 2025 NOFOs and over a decade of past practice are not acknowledged in the grant awards, nor otherwise explained or supported. Thus, Defendants' sub silentio changes are arbitrary and capricious. *See Fox Television*, 556 U.S. at 515; *Regents*, 591 U.S. at 23.

**C. Defendants' post-hoc rationalizations are unreasoned.**

Third, even if Defendants' post-hoc rationalizations are considered, Defendants' rationale does not reflect reasoned decision-making. As addressed above, an agency must "articulate a satisfactory explanation" for a policy change. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Fox Television*, 556 U.S. at 515; *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 41 (9th Cir. 2025). Here, FEMA admits that it abruptly decided—about ten days before issuing award letters—to deviate from the NOFOs by slashing the period of performance for both grants by two-thirds and not backdating the EMPG award. (Arnold Decl. ¶ 12.)

As to not backdating EMPG award, Defendants provide no explanation for their decision. The Arnold Declaration does not even reference this decision. Plainly, an explanation cannot be satisfactory or reasoned if it does not exist.

As to the reduced period of performance, Defendants centrally contends this change was made "to align with the President's vision of shifting responsibility and authority for preparedness back to the states." (*Id.*) But the purpose of both the EMPG and HSGP programs is to do just that: to provide States resources to assist with *their* preparedness responsibilities. 6 U.S.C. §§ 604(a), 605(a), 762(b). Cutting the performance period does not "shift responsibility." To the contrary, it decimates States' ability to utilize congressionally allocated funding to take on preparedness responsibilities. Thus, the PPC conflicts with both Defendants' post-hoc explanation and the purpose of these statutory programs. *See Mont. Wildlife Fed'n*, 127 F.4th at 39.

Moreover, even Defendants' most colorable post-hoc rationalization—that the shortened period of performance encourages States to complete projects quickly (Arnold Decl. ¶ 12, DHS/FEMA_00003)—is not credible for two reasons. One, it conflicts with FEMA's recognition elsewhere in the administrative record that "both regional and state-level priorities may vary to address specific risks, gaps, or opportunities within their jurisdictions." (Doc. 27-5,

DHS/FEMA_00183; *see also* Sweeney Decl. ¶ 67 (explaining Michigan's need for three-year period of performance).)  Two, by elevating speed over acknowledged, locality-specific needs, Defendants' justification undermines the very purpose of these programs: to enable the federal government to *assist* States—not pull back from them—in their joint effort "to address the increasing range and complexity of disasters and complement the nation's growing expectations of the emergency management community." (Doc. 27-5, DHS/FEMA_00182.) Thus, Defendants' explanations for its decision to change to a one-year period of performance are not "good reasons" to support the change. *Fox Television*, 556 U.S. at 515.

### D.  Defendants' treatment of other grant programs is inconsistent.

Fourth, the PPC is inconsistent with Defendants' treatment of other FEMA preparedness grants.  Other preparedness programs retain three- and even four-year periods of performance for their 2025 awards.  (Sweeney Decl. ¶ 53.)  Such inconsistency between grant programs both discredits FEMA's explanations and, independently, renders the PPC arbitrary and capricious. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("Unexplained inconsistency is . . . a reason for holding an interpretation to be an arbitrary and capricious change from agency practice[.]"); *Univ. of Texas M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 479 (5th Cir. 2021) ("It is a bedrock principle of administrative law that an agency must treat like cases alike." (quotation omitted)).

For each of these independent reasons, the PPC is arbitrary and capricious in violation of the APA.

### IV.  Vacatur and Injunctive Relief are Appropriate Remedies under the APA.

Declaratory relief, vacatur of the challenged agency actions, and a permanent injunction against any future implementation or enforcement of the same actions against Plaintiff States are appropriate remedies in this case.

**A. This Court should vacate the Population Certification Hold and Performance Period Change.**

Under the APA, courts "shall hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of unlawful agency actions. *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). "When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an appellate court vacates the judgment of a trial court." *Id.* at 830; *see also All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) (observing vacatur is presumptive remedy under the APA).

"Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys. Against Toxics v. Envt'l Prot. Agenc*y, 688 F.3d 989, 992 (9th Cir. 2012) (quotation omitted)). "Courts generally only remand without vacatur when the errors are minor procedural mistakes[.]" *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1125 (N.D. Cal. 2017) (citing *Cal. Cmtys.*, 688 F.3d at 992. The appropriateness of vacatur can hinge on whether such a remedy will thwart the operation of the underlying legislative goal, based on the facts of the case. *Cal. Cmtys.*, 688 F.3d at 992 (citing *W. Oil & Gas Ass'n v. EPA,* 633 F.2d 803, 813 (9th Cir. 1980)).

As a violation of law, not a mere procedural misstep, the PCH should be vacated. It is impossible for Defendants to impose the PCH on remand, because Defendants must rely on U.S. Census Bureau data—not State-supplied data—to allocate the EMPG awards. *Mont. Wildlife Fed'n*, 127 F.4th at 51 (deeming error sufficiently serious to support vacatur because "[t]here is no serious possibility that the government will be able to substantiate its decision . . . on remand"

(quotation omitted)).  Vacatur of the PCH will remove the unlawful demand from the 2025 EMPG awards, permitting EMPG grantees to accept those awards without delay.

Likewise, vacatur of the PPC is appropriate.  Nothing Defendants could do on remand feasibly could support the decision to drastically change the periods of performance and change the start of the period for the EMPG at the eleventh hour.  *Id.*  Remand would also be particularly disruptive, given Plaintiff States' reliance interests and the practical realities of preparedness activities.  This Court should therefore vacate the PPC.  *See AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 85 (D.D.C. 2007) ("[T]he effect [of vacatur] is to take the rule off the books and reinstate the prior regulatory regime." (cleaned up)).

### B.  This Court should enter permanent injunctive relief to effectuate its judgment.

Plaintiff States are also entitled to permanent injunctive relief to effectuate the vacatur of the PCH and PPC.  The APA expressly authorizes "actions for . . . prohibitory or mandatory injunction" in addition to vacatur.  5 U.S.C. § 703; *e.g.*, *League of Wilderness Defs. v. Marquis-Brong*, 259 F. Supp. 2d 1115, 1128 (D. Or. 2003).  To obtain an injunction, a plaintiff must demonstrate: (1) success on the merits; (2) irreparable injury; (3) that remedies at law are inadequate; (4) that an equitable remedy is warranted in light of the balance of hardships; and (5) that a permanent injunction would not disserve the public interest.  *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Rels*, 730 F.3d 1024, 1032 (9th Cir. 2013).  "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts," and "such discretion must be exercised consistent with traditional principles of equity."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006).

In the APA context, "once the court reache[s] the conclusion that the rule was indeed illegal (*i.e.*, not merely that the plaintiffs had a reasonable probability of success on the merits, as would be necessary for a preliminary injunction), there [is] no separate need to show irreparable injury,

as that is merely one possible 'basis for showing the inadequacy of the legal remedy.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting 11A Wright & Miller's Fed. Practice & Procedure § 2944 (2d ed. 1995)).  This principle alone suffices to support injunctive relief here.  Regardless, as discussed below, examining the equitable factors in greater detail leads to the same result for each of Defendants' unlawful actions.

### 1. Plaintiff States have demonstrated irreparable harm.

Plaintiff States have demonstrated irreparable harm as to both the PCH and the PPC.  The EMPG grant is completely frozen due to the PCH and States have no plausible means of complying with this requirement.  (See Sweeney Decl. ¶ 50; Haney Decl. ¶ 41; Rogers Decl. ¶ 39; Strickland Decl. ¶ 41; Ray Decl. ¶ 42.)  As a result, States have no choice but to reduce state and local emergency management capacity—at worst, shuttering emergency management agencies entirely. (See, e.g., Sweeney Decl. ¶ 51; Engle Decl. ¶ 36.)  Such harms to public services are irreparable and warrant injunctive relief.  *See, e.g.*, *Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 328 F. Supp. 3d 1133, 1138–39, 1150 (E.D. Wash. 2018); *Illinois*, 2025 WL 2716277, at *16.

Likewise, as described above, the PPC provides Plaintiff States mere months to spend EMPG and HSGP funds—a practically impossible task—risking lapse of the funding leading to less emergency management and homeland security capacities.  In addition, Defendants' decision not to backdate the EMPG award costs the States and their localities a year of available funding for expenses many agencies already incurred.

### 2. The balance of equities favors injunctive relief.

Finally, "the balance of equities tips in [Plaintiff States'] favor," and "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The public has an important interest in "ensuring that statutes enacted by their representatives are not imperiled by executive fiat." *E. Bay Sanctuary Covenant*, 932 F.3d at 779 (quotations omitted).  For EMPG,

Congress chose to base its allocation formula on data held by the U.S. Census Bureau. The public interest favors enforcing this decision. In contrast, Defendants cannot suffer harm "from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Furthermore, Plaintiff States rely extensively on both EMPG and HSGP to fund their responses to terrorist risks and natural emergencies. Both agency actions imperil these legislative goals. The public interest weighs heavily against "jeopardizing national security." *Winter*, 555 U.S. at 33.

The public interest also "takes into account the effects of a decision on non-parties." *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 24 F.4th 640, 644 (7th Cir. 2022). Allowing Defendants to reduce or even eliminate Plaintiff States' capacity to fund counterterrorism readiness and emergency-management programming risks potential catastrophe befalling Plaintiff States' residents.

Defendants suffer no harm by simply maintaining the status quo, in which (1) the EMPG is not subject to an unworkable population certification requirement and (2) States are not hamstrung by a severely constrained period in which to spend the EMPG and HSGP awards. *See City of Chicago v. Sessions*, 888 F.3d 272, 291 (7th Cir. 2018) (finding no harm to government where it can "distribute the funds without mandating the conditions—as has been done for over a decade"). Defendants have the "awesome statutory responsibility to prepare the nation for, and respond to, all national incidents, including natural disasters and terrorist attacks." *News-Press v. U.S. DHS*, 489 F.3d 1173, 1178 (11th Cir. 2007). Until now, Defendants have lived up to that responsibility, and continuing that status quo will work no irreparable harm on Defendants.

Accordingly, the Court should issue permanent injunctive relief to effectuate the vacatur of the PCH and PPC.

**CONCLUSION**

For the foregoing reasons, Plaintiff States respectfully request that the Court grant their motion for summary judgment and enter an order pursuant to 5 U.S.C. § 706(2) holding unlawful and vacating the PCH and the PPC for the 2025 EMPG and HSGP grant awards; issue permanent injunctive relief barring implementation of the PCH in Plaintiff States' 2025 EMPG grants; enjoin Defendants from issuing 2025 EMPG and HSPG award letters with periods of performance that deviate from the NOFOs; reform the awards for both the EMPG and HSGP to restore the performance period from the NOFOs; permanently enjoin Defendants from rejecting Plaintiff States' drawdown requests for funds from their 2025 EMPG awards for expenses incurred between October 1, 2024, and September 30, 2027, by the Plaintiff State grantee or a subgrantee due to the Performance Period Change; permanently enjoin Defendants from rejecting Plaintiff States' drawdown requests for funds from their 2025 HSGP awards for expenses incurred between October 1, 2025, and September 30, 2028, by the Plaintiff State grantee or a subgrantee due to the Performance Period Change; and award such other relief as this Court may deem just and proper.

[signatures on page to follow]

Dated: November 24, 2025

Respectfully submitted,

DANA NESSEL
Attorney General of Michigan

By: *s/ Neil Giovanatti*
NEIL GIOVANATTI (P82305)
ADAM R. DE BEAR (P80242)
DANIEL J. PING (P81482)
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
deBearA@michigan.gov
PingD@michigan.gov

*Attorneys for the State of Michigan*

KRISTIN K. MAYES
Attorney General of Arizona

By: *s/ Joshua G. Nomkin*
JOSHUA G. NOMKIN
Office of the Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Nomkin@azag.gov

*Attorney for the State of Arizona*

DAN RAYFIELD
Attorney General for State of Oregon

*s/ Coby Howell*
COBY HOWELL #25434
LEANNE HARTMANN #T25070201,
Mass. BBO #667852
BRIAN MARSHALL #196129
Senior Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
971-673-1880
Coby.Howell@doj.oregon.gov
Leanne.Hartmann@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov

*Counsel for Plaintiff State of Oregon*

PHILIP J. WEISER
Attorney General for the State of Colorado

By: *s/ Sarah H. Weiss*
SARAH H.WEISS
FINNUALA K. TESSIER
Senior Assistant Attorneys General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Sarah.Weiss@coag.gov

*Attorneys for the State of Colorado*

ANNE E. LOPEZ
Attorney General for the State of Hawaiʻi

By: *s/ Kalikoʻonālani D. Fernandes*
DAVID D. DAY
Special Assistant to the Attorney General
KALIKOʻONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaii*

S. TRAVIS MAYO
General Counsel Office of the Governor of Kentucky

By: *s/ S. Travis Mayo*
S. TRAVIS MAYO
General Counsel
TAYLOR PAYNE
Chief Deputy General Counsel
LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Attorneys for Plaintiff Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky*

AARON M. FREY
Attorney General for the State of Maine

By: *s/ John E. Belisle*
JOHN E. BELISLE
Assistant Attorney General
Office of Maine Attorney General
6 State House Station
Augusta, Maine 04333-006
(207) 626-8800
john.belisle@maine.gov

*Attorney for the State of Maine*

ANTHONY G. BROWN
Attorney General for the State of Maryland

By: *s/ James C. Luh*
JAMES C. LUH
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6411
jluh@oag.state.md.us

*Attorney for the State of Maryland*

AARON D. FORD
Attorney General of Nevada

By: *s/ K. Brunetti Ireland*
K. BRUNETTI IRELAND
Chief of Special Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Attorney for the State of Nevada*

RAÚL TORREZ
Attorney General of the State of New Mexico

By: *s/ Lauren Perry*
Lauren Perry
Assistant Attorney General
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 270-4332
lperry@nmdoj.gov

*Attorneys for the State of New Mexico*

JEFF JACKSON
Attorney General of North Carolina

LAURA HOWARD
Chief Deputy Attorney General

By *s/ Daniel T. Wilkes*
DANIEL T. WILKES
Assistant Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6415
dwilkes@ncdoj.gov

*Attorney for State of North Carolina*

JOSHUA L. KAUL
Attorney General of Wisconsin

By: *s/ Frances Reynolds Colbert*
FRANCES REYNOLDS COLBERT
Assistant Attorney General
State Bar #1050435
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-9226
(608) 294-2907 (Fax)
frances.colbert@wisdoj.gov

*Attorney for State of Wisconsin*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,868 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

                              /s/ Neil Giovanatti
                              Neil Giovanatti (P82305)
                              Attorney for Plaintiff State of Michigan

**CERTIFICATE OF SERVICE**

I hereby certify that on November 24, 2025, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

                              /s/ Neil Giovanatti
                              Neil Giovanatti (P82305)
                              Attorney for Plaintiff State of Michigan