BRETT A. SHUMATE
Assistant Attorney General
ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch
ANDREW WARDEN
Assistant Branch Director
ALEXANDRA L. YEATTS
Trial Attorney
U.S. Department of Justice,
Civil Division, Federal Programs
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 353-5677
Email: Alexandra.Yeatts@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| STATE OF MICHIGAN, *et al.*, <br><br>                 *Plaintiffs*, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, *et al.*, <br><br>                 *Defendants*. | Case No. 6:25-cv-2053-AP <br><br> **DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

CROSS-MOTION ................................................................................................................ 1

MEMORANDUM OF LAW ............................................................................................... 1

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

I.     Statutory Background ................................................................................................ 2

       A. Homeland Security Grant Program ("HSGP") ................................................... 2

       B. Emergency Management Performance Grant ("EMPG") .................................... 3

       C. The Paperwork Reduction Act ("PRA") ............................................................ 4

       D. 13 U.S.C. § 183(a) ............................................................................................. 5

II.    Factual Background ................................................................................................... 5

       A. Fiscal Year 2025 HSGP Funding ....................................................................... 5

       B. Fiscal Year 2025 EMPG Funding ...................................................................... 6

III.   Procedural History .................................................................................................... 7

STANDARD FOR JUDICIAL REVIEW .......................................................................... 8

ARGUMENT ...................................................................................................................... 8

I.     The Court Lacks Subject-Matter Jurisdiction Where Plaintiffs Seek to Modify
       the Terms of Federal Grants. ..................................................................................... 8

II.    Plaintiffs' Claims are Unreviewable Under the APA Because Outlining Grant
       Terms and Conditions is Committed to Agency Discretion by Law. ...................... 12

III.   Plaintiffs' Claims that the Population Verification Requirement Cannot Be
       Satisfied are Not Ripe. ............................................................................................ 13

IV.    The Population Verification Requirement is Lawful. ............................................... 15

       A. The Population Verification Requirement is Consistent with Statutory
          Authority and in Observance of Procedures Required by Law. ......................... 15

          1.     Consistent with 13 U.S.C. § 183(a), Defendants Used Federal
                 Census Data to Allocate EMPG Funding. .............................................. 16

2.    The Population Verification Requirement is Permitted Under the Paperwork Reduction Act. ........................................................ 17

3.    The Population Verification Requirement is Consistent with the Commands of the EMPG Statute. ............................................. 18

B. The Population Verification Condition Survives Arbitrary and Capricious Review. ...................................................................................... 19

1.    The Population Verification Requirement is Not a Change in Policy. ........................................................................................ 19

2.    Plaintiffs' Reliance Interests are Unreasonable. ...................... 19

3.    The Population Verification Requirement is Well-Reasoned.................. 22

V.  The Period of Performance Term Survives Arbitrary and Capricious Review. .................... 24

A.    The Period of Performance Term is Not a Change in Policy. ............................. 24

B.    Plaintiffs' Reliance Interests are Unreasonable. .................................................. 25

C.    The One-Year Period of Performance Term is Well-Reasoned. ......................... 25

VI.   Vacatur and Injunctive Relief are Not Appropriate Remedies Under the APA, and Any Relief Should be Narrowly Tailored to Plaintiff States. .................................... 27

A.    Vacatur is Not Appropriate Under the APA. ....................................................... 27

B.    Should the Court Find Further Explanation of Either Contested Term is Necessary, Remand Without Vacatur is the Only Appropriate Remedy............. 28

C.    Injunctive Relief is Inappropriate. ...................................................................... 30

1.    Plaintiffs Have Failed to Establish Irreparable Harm. ............................. 30

2.    The Balance of the Equities and the Public Interest Tip in Defendants' Favor..................................................................... 32

3.    Any Injunctive Relief Should be Limited to Plaintiff States. .................. 33

VII.   Any Relief Should be Stayed Pending Appeal. .............................................................. 34

CONCLUSION.................................................................................................................... 34

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967), overruled on other grounds in Califano v. Sanders, 430 U.S. 99, 105
(1977) ............................................................................................................................... 13

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........................................................................................................... 31

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
357 F.3d 62 (D.C. Cir. 2004) ............................................................................................... 9

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
988 F.2d 146 (D.C.Cir.1993) ............................................................................................. 29

*Am. Great Lakes Ports Ass'n v. Zukunft*,
301 F. Supp. 3d 99 (D.D.C. 2018), aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz,
962 F.3d 510 (D.C. Cir. 2020) ........................................................................................... 29

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012) ........................................................................................... 14

*Anderson v. United States*,
612 F.2d 1112 (9th Cir. 1980).............................................................................................. 32

*Association of Flight Attendants v. Federal Aviation Administration*,
595 F.2d 887 (D.C. Cir. 1979) ........................................................................................... 20

*Boaz Hous. Auth. v. United States*,
994 F.3d 1359 (Fed. Cir. 2021) ............................................................................................ 9

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ............................................................................................................. 8

*Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*,
622 F.3d 36 (1st Cir. 2010) ............................................................................................... 31

*Cal. Cmtys. Against Toxics v. Envt'l Prot. Agency*,
688 F.3d 989 (9th Cir. 2012)............................................................................................... 29

*California v. Texas*,
141 S. Ct. 2104 (2021) ....................................................................................................... 28

*Chevron U.S.A. Inc. v. Echazabal*,
536 U.S. 73 (2002) ............................................................................................................. 16

*Citizens Alert Regarding Env't v. EPA,*
  102 F. App'x 167 (D.C. Cir. 2004) ....................................................................... 20

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 105
  (1977) ...................................................................................................................... 22, 23

*Citrus HMA, LLC v. Becerra,*
  No. 20cv707, 2022 WL 1062990 (D.D.C. Apr. 8, 2022)......................................... 29

*City of Sausalito v. O'Neill,*
  386 F.3d 1186 (9th Cir. 2004)................................................................................... 8

*Climate United Fund v. Citibank, N.A.,*
  --- F.4th ----, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025)...................................... 9

*Dep't of Homeland Security v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) ........................................................................................... 21, 22, 23

*Doe v. Snyder,*
  28 F.4th 103 (9th Cir. 2022)...................................................................................... 32

*Doran v. Salem Inn, Inc.,*
  422 U.S. 922 (1975) .................................................................................................. 27

*eBay Inc v. MercExchange, L.L.C.,*
  *547 U.S. 388 (2006)* ................................................................................................. 31

*Esso Standard Oil Co. v. Lopez-Freytes,*
  522 F.3d 136 (1st Cir. 2008) ..................................................................................... 31

*F.C.C. v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ....................................................................................... 22, 25, 26

*Forest Serv. Emps. for Env't Ethics v. United States Forest Serv.,*
  796 F. App'x 390 (9th Cir. 2020) .............................................................................. 23

*Friends of the Earth v. Hintz,*
  800 F.2d 822 (9th Cir. 1986)..................................................................................... 8

*Garcia v. Google, Inc.,*
  786 F.3d 733 (9th Cir. 2015)..................................................................................... 32

*Gill v. Whitford,*
  585 U.S. 48 (2018) .................................................................................................... 28

*Global Van Lines, Inc. v. I.C.C.,*
  804 F.2d 1293 (D.C. Cir. 1986) ................................................................................ 30

*Good Samaritan Hosp. v. Shalala*,
    508 U.S. 402 (1993) ........................................................................... 29

*Heartland Reg'l Med. Ctr. v. Sebelius*,
    566 F.3d 193 (D.C.Cir.2009) ............................................................ 29

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ........................................................................... 13

*Humane Soc'y v. Locke*,
    626 F.3d 1040 (9th Cir.2010) ........................................................... 28

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir.1995) .............................................................. 29

*Indep. Min. Co. v. Babbitt*,
    105 F.3d 502 (9th Cir. 1997) ............................................................. 23

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985) .............................................................. 9

*Kidwell v. Dep't of Army*,
    56 F.3d 279 (D.C. Cir. 1995) .............................................................. 11

*Libby Welding Co. v. United States*,
    444 F. Supp. 987 (D.D.C. 1977) ................................................. 19, 25

*Lincoln v. Vigil*,
    508 U.S.  (1993) ........................................................................... 12, 13

*Local 814, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen v. N. L. R. B.*,
    546 F.2d 989 (D.C. Cir. 1976) .................................................... 23, 24

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ........................................................................... 28

*Medina v. Planned Parenthood S. Atl.*,
    145 S. Ct. 2219 (2025) ......................................................................... 9

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ............................................................. 9

*Midwater Trawlers Coop. v. Dep't of Commerce*,
    393 F.3d 994 (9th Cir. 2004) ............................................................. 23

*Miller v. Gammie*,
    335 F.3d 889 (9th Cir. 2003) ............................................................. 11

*N. Carolina Fisheries Ass'n, Inc. v. Gutierrez,*
 550 F.3d 16 (D.C. Cir. 2008) .......................................................... 30

*National Insts. of Health v. American Pub. Health Ass'n,*
 (NIH), 145 S. Ct. 2658 (2025) ................................................... 10, 11

*Nat'l Oilseed Processors Ass'n v. Occupational Safety & Health Admin.,*
 769 F.3d 1173 (D.C. Cir. 2014) ...................................................... 14

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,*
 538 U.S. 803, 811-12 (2003) ..................................................... 13, 14

*Nken v. Holder,*
 556 U.S. 418 (2009) ................................................................. 32, 34

*Perry Cap. LLC v. Mnuchin,*
 864 F.3d 591 (D.C. Cir. 2017) ...................................................... 9, 11

*Planned Parenthood v. Azar,*
 316 F. Supp.3d 291 (D.D.C. 2018) ................................................... 21

*Rattlesnake Coal. v. EPA,*
 509 F.3d 1095 (9th Cir. 2007) ........................................................ 20

*Rhode Island v. Mass.,*
 37 U.S. 657 (1838) ................................................................. 27, 28

*Sampson v. Murray,*
 415 U.S. 61 (1974) ..................................................................... 31

*Shands Jacksonville Med. Ctr. v. Burwell,*
 139 F. Supp. 3d 240 (D.D.C. 2015) ................................................... 29

*Smilry v. Citibank,*
 517 U.S. 735 (1996) ................................................................... 20

*Spectrum Leasing Corp. v. United States,*
 764 F.2d 891 (D.C. Cir. 1985) ........................................................ 10

*Stanley v. Univ. of S. Cal.,*
 13 F.3d 1313 (9th Cir. 1994) ......................................................... 32

*Thakur v. Trump,*
 2025 WL 2414835 (9th Cir. Aug. 21, 2025) ........................................... 11

*Tri-Valley CAREs v. U.S. Dep't of Energy,*
 671 F.3d 1113 (9th Cir. 2012) ......................................................... 8

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ............................................................................. 28, 32, 33

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,
   ---F. Supp. 3d---, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ................................... 11

*U.S. Department of Education v. California*,
   145 S. Ct. 966 (2025) ............................................................................. 10

*United Aeronautical Corp. v. U.S. Air Force*,
   80 F.4th 1017 (9th Cir. 2023) ...................................................................... 9

*United States v. Texas*,
   599 U.S. 670 (2023) ............................................................................ 27, 33

*Up State Fed. Credit Union v. Walker*,
   198 F.3d 372 (2d Cir. 1999) ....................................................................... 10

*W. Oil and Gas Ass'n v. EPA*,
   633 F.2d 803 (9th Cir.1980) ...................................................................... 29

*Wildlife Fed'n v. Haaland*,
   127 F.4th 1 (9th Cir. 2025) ....................................................................... 27

**Statutes**

5 U.S.C. § 701(a)(2) ............................................................................. 12, 13

5 U.S.C. § 706(2)(A) .................................................................................. 8

5 U.S.C. §§ 702 ...................................................................................... 12

6 U.S.C. § 608(a)(1)-(2) ............................................................................... 3

6 U.S.C. § 762 .................................................................................. 3, 4, 16

6 U.S.C. §§ 603–609 .......................................................................... 2, 3, 13, 33

6 U.S.C § 762(d)(2) ............................................................................... 16, 18

13 U.S.C. § 183(a) ............................................................................. *passim*

28 U.S.C. § 1491(a)(1) ............................................................................... 10

44 U.S.C. § 3501 ...................................................................................... 4

44 U.S.C. §§ 3506(c) .................................................................................. 5

Pub. L. 108-7 ......................................................................................... 3

Pub. L. No. 107-296 ................................................................................................ 2

Pub. L. No. 110-53 .................................................................................................. 2

U.S.C. § 704 ........................................................................................................... 21

U.S.C. § 1491(a)(1) ............................................................................................ 8, 10

## **Rules**

Fed. R. App. P. 8(a) ............................................................................................... 34

## **Other Authorities**

DHS, *Agency Information Collection Activities: Proposed Collection; Comment Request; Generic Clearance for FEMA's Preparedness Grant Programs,* 88 Fed. Reg. 86141 (December 12, 2024) .............................................................. 17

FEMA, *FY 2025 Emergency Management Performance Grant Program Fact Sheet*, (July 28, 2025), https://perma.cc/K948-48K4 ................................................................................... 2

HHS, *Agency Information Collection Activities: Proposed Collection; Comment Request,* 89 Fed. Reg. 21532 (March 28, 2024) .................................................................... 17

**CROSS-MOTION**

Defendants file this cross-motion for summary judgment against Plaintiffs' claims. This cross-motion is supported by the following memorandum of law and the administrative record filed on November 19, 2025 (ECF No. 27). The following memorandum also responds to Plaintiffs' motion for summary judgment (ECF No. 30). Pursuant to LR 7-1(a), the parties conferred but were not able to resolve the need for this cross-motion.

**MEMORANDUM OF LAW**

## INTRODUCTION

Plaintiffs—twelve States—bring this action under the Administrative Procedure Act ("APA") challenging the Federal Emergency Management Agency's ("FEMA") inclusion of terms in emergency preparedness grants that Plaintiffs do not prefer. Because Plaintiffs seek to modify the terms of their grant agreements, their claims belong in the Court of Federal Claims and this Court lacks jurisdiction to hear each challenge.

Plaintiffs challenge two terms in the fiscal year 2025 Homeland Security Grant Program ("HSGP") and Emergency Management Performance Grant ("EMPG"). First, Plaintiffs seek to amend the terms of their final awards to reflect their preferred period of performance (3 years instead of 1 year). Second, they seek the removal of a term conditioning the receipt of EMPG funds on the submission of population information by grantees. Even if Plaintiffs could establish jurisdiction in this Court, their challenges to these grant terms are not subject to APA review because the federal government's decisions about how long to contract with grantees and what information to seek from them are committed to agency discretion by law. Plaintiffs' challenge to the population verification term also fails for the separate reason that it is not ripe for judicial review because FEMA intends to provide guidance to the states about compliance with that provision. And, even if Plaintiffs could establish jurisdiction *and* a cognizable APA claim, Plaintiffs fail to show that the period of performance and population verification terms are unlawful under the APA.

Page 1     Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment

As to the equities, Plaintiffs cannot show that being presented with grant terms they do not prefer causes them to suffer irreparable harm. They also have not established that the balance of the equities and public interest mandate the extraordinary permanent injunctive relief they seek. And vacatur of the challenged terms is not appropriate under the APA or the circumstance of this case.

For these reasons, and the additional reasons explained herein, this Court should deny Plaintiffs' motion for summary judgment, grant Defendants' cross-motion, and enter judgment for Defendants.

## BACKGROUND

### I.    Statutory Background

This suit concerns two federal grant programs created by Congress to strengthen the Nation's preparedness and its ability to respond to major disasters and emergencies: the Homeland Security Grant Program ("HSGP") and the Emergency Management Performance Grant ("EMPG"). "These grant programs are part of a comprehensive set of measures authorized by Congress and implemented by the Department of Homeland Security ("DHS") and FEMA to assist state, local, tribal and territorial emergency management agencies to implement the National Preparedness System and the National Preparedness Goal of a secure and resilient nation." FY 2025 EMPG Program Fact Sheet at https://perma.cc/K948-48K4.

### A.  Homeland Security Grant Program ("HSGP")

The Homeland Security Grant Program was created in 2003. The authorizing section is Section 2002 of The Homeland Security Act of 2002, Pub. L. No. 107-296, § 430, 116 Stat. 2135, 2191–92. The program was codified in its current form by the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, § 101, 121 Stat. 266, 273–85 (codified as amended at 6 U.S.C. §§ 603–609). HSGP includes three key grant programs designed to enhance the capabilities of state, local, tribal, and territorial governments, as well as nonprofits, in preventing, protecting against, and responding to terrorist attacks: the

State Homeland Security Grant Program ("SHSP"), the Urban Area Security Initiative ("UASI"), and Operation Stonegarden ("OPSG"). These programs are part of a comprehensive set of measures authorized by Congress and implemented by DHS to strengthen the nation's communities against potential terrorist threats. Ex. 3, FY 2025 HSGP NOFO at 11.

The State Homeland Security Grant Program and Urban Area Security Initiative are relevant to this case. The goal of the SHSP is to support statewide and state, local, tribal, and territorial ("SLTT") governments in building, enhancing, and sustaining the capabilities needed to prevent, prepare for, protect against, and respond to acts of terrorism. *Id*. at 12. The aim for the UASI is to enhance the security and resilience of high-risk urban areas by building, sustaining, and improving capabilities to prevent, prepare for, protect against, and respond to acts of terrorism. *Id*. Together, these grants aim to build a cohesive and collaborative approach to homeland security by promoting national preparedness and resilience. *Id*.

In allocating HSGP funds among States applying for SHSP grants and eligible high-risk urban areas applying for UASI grants, the FEMA "Administrator shall consider, for each State or high-risk urban area, [the jurisdiction's] relative threat, vulnerability, and consequences from acts of terrorism" (or "relative risk"), and "the anticipated effectiveness of the [jurisdiction's] proposed use of the grant. . . .in increasing the [jurisdiction's ability] to prevent, prepare for, protect against, and respond to acts of terrorism" and "otherwise reduce the overall risk to the [jurisdiction] or the Nation." 6 U.S.C. § 608(a)(1)-(2).

## B. Emergency Management Performance Grant ("EMPG")

Emergency Management Performance Grant funds have been available to States since an initial appropriation for the program in 2003. *See* Pub. L. 108-7, 117 Stat. 11, 515-516. The program is codified at 6 U.S.C. § 762 after being made permanent by the Post-Katrina Emergency Management Reform Act of 2006. The EMPG provides federal funding to States to assist state, local, tribal, and territorial emergency-management agencies in preparing for and managing emergencies resulting from natural disasters or accidental or man-made events. Ex. 2,

FY 2025 EMPG NOFO at 18.

Because the EMPG is a formula grant and not a competitive grant, each State is entitled to a specific allocation, set by statutory formula. FEMA must allocate to each State a baseline amount of 0.75 percent of the fiscal year's appropriated EMPG funds, and to territories a baseline amount of 0.25 percent of the appropriated funds. *Id*. § 762(d)(1). FEMA must then apportion the remaining funds "in the ration that the population of each State bears[] to the population of all States." *Id*. § 762(d)(2). In other words, the remaining funding is allocated based on each State's relative population.

**C. The Paperwork Reduction Act ("PRA")**

The Paperwork Reduction Act ("PRA") was enacted in 1980. 44 U.S.C. § 3501. Its purposes include to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government," "minimize the cost to the Federal Government of the creation, collection, maintenance, use, dissemination, and disposition of information," and "provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public and makes effective use of information technology." *Id*. at § 3501(2), (5), (7). The PRA provides that "consistent with applicable law," the OMB Director is to "oversee the use of information resources to improve the efficiency and effectiveness of governmental operations to serve agency missions, including burden reduction and service delivery to the public." *Id*. § 3504(a)(1)–(2).

Before an agency can conduct a "collection of information," the PRA requires the agency to: (1) review the proposed collection; (2) provide notice of the proposed collection in the Federal Register and evaluate public comments; (3) submit the proposed collection to the Office of Management and Budget ("OMB") for approval or disapproval; (4) certify in the submission that each collection of information is, among other things, "not unnecessarily duplicative of information otherwise reasonably accessible to the agency"; (5) publish another notice in the

Federal Register stating that the agency has made such submission to the OMB; and (6) if approved by OMB, obtain "a control number to be displayed upon the collection of information." 44 U.S.C. §§ 3506(c), 3507(a).

### D.  13 U.S.C. § 183(a)

13 U.S.C. § 183(a) requires that, when "administering any law of the United States in which population or other population characteristics are used to determine the amount of benefit received by State, county, or local" governments, "the Secretary [of Commerce] shall transmit to the President for use by the appropriate departments and agencies of the executive branch the [census] data most recently produced and published under [Title 13]."

## II.    Factual Background

### A.  Fiscal Year 2025 HSGP Funding

In fiscal year 2025, $373,500,000 was allocated to the State Homeland Security Program ("SHSP") and $553,500,000 to the Urban Area Security Initiative ("UASI"). Ex. 3, FY HSGP NOFO at 53.[1]

On July 28, 2025, Defendants released the final Fiscal Year 2025 HSGP Notice of Funding Opportunity ("FY 2025 HSGP NOFO" or "HSGP NOFO"), attached as Exhibit 3. The HSGP NOFO solicited SHSP applications from States and UASI applications from eligible urban areas for a "projected" three-year period of performance.  Exhibit 3, FY 2025 HSGP NOFO at 4. Additionally, the HSGP NOFO announced target allocations for grantees under both programs. *Id*. at 53-57.

On September 26, 2025, FY 2025 HSGP Final Award Notifications were issued, attached as Exhibit 8. The award notifications included a one-year period of performance, from October 1, 2025 to September 30, 2026. Ex. 8, FY 2025 Final HSGP Award Letters at 27.

Pursuant to a stipulation between the parties, ECF No. 18, the HSGP award acceptance deadline is now December 31, 2025.

---

[1] All exhibit cites are in reference to the exhibits contained in the Administrative Record filed by Defendants on November 19, 2025, ECF No. 27.

### B. Fiscal Year 2025 EMPG Funding

On July 28, 2025, the Fiscal Year 2025 EMPG Notice of Funding Opportunity ("FY 2025 EMPG NOFO" or "EMPG NOFO"), attached as Exhibit 2, was issued soliciting project applications for a "projected" three-year period of performance. Exhibit 2, FY 2025 EMPG NOFO at 7. In mid-September, after the EMPG NOFO was issued, a decision was made to include a population verification requirement in the final EMPG awards that would condition a state's drawdown of its awarded EMPG funds on the state's submission of: (1) a certification with the state's population as of September 30, 2025, (2) an explanation of how the state determined its population, and (3) a certification that the reported population does not include illegal aliens who have been removed. Ex. 6, Final Amended EMPG Awards at 39. Submitted numbers will be used to ensure states received the appropriate amount of funding based on their true population totals, accounting for factors, like removals, that have led to state population swings. *See* Ex. 1, Arnold Decl. ¶ 6.

On September 26, 2025, FEMA issued the FY 2025 Final EMPG Award Notifications. *See* Ex. 1, Arnold Decl. ¶ 6. The award notifications included a one-year period of performance, from October 1, 2025 to September 30, 2026. *Id*. ¶12. Due to an administrative oversight, the population verification requirement was not included in the award letters. *Id*. ¶ 7. On September 30, 2025, once this mistake was realized, Defendants issued amended EMPG awards, attached as Exhibit 6, with an Agreement Article entitled "Funding Hold: Verification of State's Population." *Id*. The Agreement Article outlines that "the full amount of the award is on hold in the FEMA financial systems" and "[t]he recipient is prohibited from obligating, expending, or drawing down the funds associated with the award" until the State "provide[s] a certification of the recipient state's population as of September 30, 2025, "explain[s] the methodology it used to determine its population," and "certifie[s] that its reported population does not include individuals that have been removed." Ex. 6, Final Amended EMPG Awards at 30. Further, FEMA must review and approve "the State's methodology and population certification" before

the agency will rescind the State's EMPG funding hold. *Id*.

FEMA was in the process of developing guidance for states regarding the EMPG population verification requirement before Government-wide funding expired on October 1, 2025. Ex. 1, Arnold Decl. ¶ 9. Following the recent restoration of appropriations, FEMA restarted work on the guidance and remains committed to addressing any questions or concerns that grantees may have about this provision. *Id.*

Pursuant to a stipulation between the parties, ECF No. 18, the EMPG award acceptance deadline is now December 31, 2025.

## III.    Procedural History

Plaintiffs filed a complaint on November 4, 2025, and subsequently moved for summary judgment on November 24, 2025. *See* ECF Nos. 1, 30. Plaintiffs' motion for summary judgment challenges two aspects of the fiscal year 2025 HSGP and EMPG awards. First, Plaintiffs challenge FEMA and DHS's decision to require States receiving EMPG awards to provide updated population information before funding is dispersed. Plaintiffs assert that the "Population Certification Hold" is agency action in excess of statutory authority (Count I), contrary to law (Count II), arbitrary and capricious (Count III), and without observance of required procedure (Count IV). *See* Comp. at 26-30. Second, Plaintiffs challenge FEMA and DHS's decision to make the period of performance for the fiscal year 2025 HSGP and EMPG awards one year rather than three years, and the agency decision not to backdate the period of performance for EMPG awards. *See id*. at 30-31. Plaintiffs assert that the "Performance Period Change" is arbitrary and capricious agency action (Count V).

To facilitate prompt resolution of this case, Defendants agreed to extend the deadline for Plaintiffs to accept their HSGP and EMPG awards to December 31, 2025. Per the Stipulated Scheduling Order, entered November 6, 2025 (ECF No. 20), the Court endorsed an expedited briefing schedule. The Court also set oral argument for December 17, 2025 (ECF No. 28).

## STANDARD FOR JUDICIAL REVIEW

None of the statutes at issue in this action contain a provision for judicial review, so review here proceeds under the Administrative Procedure Act ("APA"). *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205 (9th Cir. 2004); 5 U.S.C. § 706(2)(A). Under the APA, "[a]n agency will have acted arbitrarily and capriciously only when the record plainly demonstrates that [the agency] made a clear error in judgment." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012) (cleaned up); *see also Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986) ("The court may not set aside agency action as arbitrary or capricious unless there is no rational basis for the action."). Courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974) (citation omitted).

## ARGUMENT

### I.    The Court Lacks Subject-Matter Jurisdiction Where Plaintiffs Seek to Modify the Terms of Federal Grants.

The Court lacks jurisdiction over each of Plaintiffs' claims because Congress has specifically divested federal courts of jurisdiction over matters arising from Government contracts. Here, Plaintiffs ask the Court to "set aside" grant terms they dislike and permanently enjoin Defendants from including similar grant terms. Pls.' Mot. at 26, 30, 32. In other words, Plaintiffs seek to require the United States to make grant payments to Plaintiffs on Plaintiffs' preferred terms. Such relief is beyond the jurisdiction of this Court to provide; rather, to the extent Plaintiffs assert claims arising from their grant agreements with the federal government, those claims can only be heard in the Court of Federal Claims.

The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over "any claim against the United States founded" on "any express or implied contract with the United States" involving amounts over ten thousand dollars. 28 U.S.C. § 1491(a)(1). That court may hear "claim[s] against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract

with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Id.*

Regardless of how a claim is styled, a case must proceed only in the Court of Federal claims if a case "is in 'its essence' contractual[.]" *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)); *see also Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004). The Tucker Act's prohibition on district court jurisdiction extends to claims founded on grants that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021); *see also Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2231 (2025) (explaining that courts have historically described federal grants as contracts); *Climate United Fund v. Citibank, N.A.*, --- F.4th ----, 2025 WL 2502881, at *9 (D.C. Cir. Sept. 2, 2025) ("grant agreements are 'contracts' within the meaning of the Tucker Act because they include the traditional contract elements of offer, acceptance, and consideration"). This jurisdictional barrier ensures that contract claims against the United States are channeled into a court that has "unique expertise." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).

Determining whether "a particular action" is "at its essence a contract action" outside the jurisdiction of district courts requires looking at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968 (citation omitted); *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (applying *Megapulse*). Here, both prongs point toward a lack of district court jurisdiction. "[I]f rights and remedies are *contractually* based then only the Court of Federal Claims [has jurisdiction], even if the plaintiff formally seeks injunctive relief." *Id.* (emphases in original).

Here, Plaintiffs point to the FY 2025 EMPG and HSGP NOFOs—documents with no definitive legal effect—and past HSGP and EMPG final award letters—contracts with the

Federal Government—in an attempt to establish their right to FY 2025 HSGP and EMPG awards with a three-year period of performance term, and final FY 2025 EMPG awards absent a population verification condition. Pls.' Mot. at 36, 28-29.

While Plaintiffs challenge the one-year period of performance under various theories, all ultimately stem from past contracts without which their claims would not exist. Plaintiffs do not and cannot point to any regulation or statute to support their asserted right to a longer contractual performance period. In other words, "it is likely that no cause of action would exist at all" in the absence of the NOFO documents and grant awards from prior fiscal years. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 377 (2d Cir. 1999) (citation omitted). That Plaintiffs' claims could not "exist[] prior to and apart from rights created under the [agreements]" weighs sharply against district court jurisdiction. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985).

The relief prong likewise weighs against jurisdiction. On multiple recent occasions, the Supreme Court has emphasized the preclusive scope of the Tucker Act in litigation brought by the recipients of federal grants. The Supreme Court in *U.S. Department of Education v. California* recently explained that an injunction barring termination of various federal grants was effectively an order "to enforce a contractual obligation to pay money," and was not covered by the APA's limited waiver of sovereign immunity. 145 S. Ct. 966, 968 (2025) (citation omitted). Thus, the Tucker Act governed the suit—not the APA—and the district court exceeded its jurisdiction. *Id.* ("Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.' 28 U.S.C. § 1491(a)(1)."). In *National Insts. of Health v. American Pub. Health Ass'n* (*NIH*), 145 S. Ct. 2658 (2025), the Supreme Court reiterated *California*'s reasoning that the APA "does not provide [district courts] with jurisdiction to adjudicate claims based on [federal] grants or to order relief designed to enforce any obligation to pay money pursuant to those grants."

Page 10     Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs'
             Motion for Summary Judgment

This Court should follow the Supreme Court's stay rulings[2] in *California* and *NIH* to the extent Plaintiffs are seeking payment of federal funds via grant instruments absent the terms they assert form the basis of their injuries. *See* Pls.' Mot. at 19-23, 44. Although Plaintiffs purport to seek equitable relief against the inclusion of unwanted terms in their grant agreements, the relief Plaintiffs request is fundamentally contractual. Indeed, Plaintiffs' primary basis for irreparable harm is they will lose federal funding and be forced to curtail or eliminate certain programs based on a dispute with the Government about what the terms of their grant agreements should be. *See* Pls.' Mot. at 42. Because their theories of standing, relief, and irreparable harm hinge entirely on contractual routing of funding to them under terms in their grant agreements, the fact that they cloak their claims as seeking equitable relief under the APA is irrelevant. *See, e.g.*, *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995) (courts must look to claims' "substance, not merely [their] form"); *Perry Cap. LLC*, 864 F.3d at 619 (district court lacks jurisdiction over any case that "is in 'its essence contractual'").

At bottom, Plaintiffs seek to amend the terms of their final grant instruments to ensure that "the Government [will] keep paying up" under their preferred terms. *See U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, ---F. Supp. 3d---, 2025 WL 763738, at *5-6 (D.D.C. Mar. 11, 2025). Thus, their claims are "founded upon a contract," and they "must be heard in Claims Court." *Id.*

---

[2] On August 21, 2025, the Ninth Circuit issued a decision denying the federal government's application for a stay in *Thakur v. Trump*, 2025 WL 2414835 (9th Cir. Aug. 21, 2025). Although that decision rejected the government's Tucker Act argument, its reasoning is overridden by the Supreme Court's *NIH* decision, issued hours later. "[W]here intervening Supreme Court authority is clearly irreconcilable" with an opinion of the Circuit "district courts should consider themselves bound by the intervening higher authority" and must "reject the prior opinion." *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc). Further, "circuit precedent, authoritative at the time it issued, can be effectively overruled by subsequent Supreme Court decisions that are closely on point, even though those decisions do not expressly overrule the prior circuit precedent." *Id.* at 899 (citation omitted). As Justice Gorsuch emphasized, "regardless of a decision's procedural posture, its 'reasoning—its *ratio decidendi*'—carries precedential weight in 'future cases.'" *NIH*, 2025 WL 2415669, at *4 (Gorsuch, J., concurring in part and dissenting in part); *see also id.* (confirming that the "reasoning" from *California*—that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on any express or implied contract with the United States"—"binds lower courts a matter of vertical *stare decisis*").

**II.    Plaintiffs' Claims are Unreviewable Under the APA Because Outlining Grant Terms and Conditions is Committed to Agency Discretion by Law.**

Even assuming Plaintiffs could establish jurisdiction (which they cannot), Plaintiffs' claims fail because they seek to challenge decisions quintessentially "committed to agency discretion by law[,]" for which the APA provides no avenue for review. 5 U.S.C. § 701(a)(2). An agency's determination of how best to condition appropriated funds to fulfill its legal mandates is classic discretionary agency action.

While the APA establishes a waiver of sovereign immunity and a cause of action for injunctive relief for parties adversely affected by either final agency action or an agency's failure to act, 5 U.S.C. §§ 702, 706(1)-(2), the waiver of sovereign immunity is limited. It does not apply in circumstances where "agency action is committed to agency discretion by law," *id.* § 701(a)(2). FEMA's decisions to include lawful terms and conditions in final HSGP and EMPG awards fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 191, 191-92 (1993) (quoting 5 U.S.C. § 701).

In the allocation of funds context, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 193. "Of course," this discretion is not unbounded because "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* But, as long as the agency abides by the relevant statutory provisions, the courts may not "intrude" via arbitrary-and-capricious review. *Id.*

Here, Plaintiffs offer no evidence that Congress intended to limit FEMA's inherent discretion to set the period of performance for annual preparedness grants. They identify no statutory provision requiring HSGP or EMPG grants to have three-year periods of performance, or prohibiting FEMA from implementing a one-year period of performance for these *annual* grants. Nor do they identify a provision requiring the EMPG performance period to be

backdated. Indeed, the relevant EMPG and HSGP statutory provisions do not contain any discussion of period of performance. *See* 6 U.S.C. §§ 603–609, 762. Accordingly, Congress's appropriation of grant funds provides no standards "against which to judge the agency's exercise of discretion" in choosing how long to contract with particular grantees. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Similarly, no statute or regulation restricts FEMA's ability to condition the release of awarded EMPG funds on the provision of population information by States. Again, FEMA has broad discretion to set the terms and conditions in its grant awards to meet its policy goals in "what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192.

An agency's decision to incorporate new lawful grant terms, or to change grant terms from one year to the next, is a quintessential exercise of the agency's discretion. APA review is therefore unavailable for all counts because the Defendants' addition of lawful terms and conditions to final awards is committed to agency discretion by law. 5 U.S.C. § 701(a)(2).

## III.    Plaintiffs' Claims that the Population Verification Requirement Cannot Be Satisfied are Not Ripe.

Plaintiffs' claims that it is impossible for States to comply with the population verification requirement, Pls.' Mot. at 19, are premature. In assessing prudential ripeness, courts evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds in Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Perry Cap.* LLC, 864 F.3d at 832. The doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 807. It also "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 807-08.

Plaintiffs' claims about the population verification requirement's feasibility are not presently fit for judicial review because FEMA is drafting guidance for States about how to

Page 13    Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs'
            Motion for Summary Judgment

satisfy that provision. FEMA made the decision to include a population verification requirement in EMPG awards in mid-September and then issued amended awards with the term on September 30. *See* Ex. 1, Arnold Decl. ¶¶ 6-7. FEMA was in the process of developing guidance for states regarding the EMPG population verification requirement before the lapse in funding for the federal government on October 1, 2025. *Id.* ¶ 9. Following the recent restoration of appropriations, FEMA restarted work on the guidance and remains committed to addressing any questions or concerns that grantees may have about this provision. *Id.*

Prudential ripeness considerations counsel against the Court prematurely inserting itself into an abstract dispute that may never materialize. "The 'fitness' factor takes into account whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Nat'l Oilseed Processors Ass'n v. Occupational Safety & Health Admin.*, 769 F.3d 1173, 1182 (D.C. Cir. 2014). At this stage, where FEMA intends to issue forthcoming guidance to States about how to comply with the population verification provision, considerations of judicial restraint favor awaiting that development and a concrete dispute between the parties (should there be one). There is no need for the Court to rush to judgment about legality of this provision before FEMA has an opportunity to engage with the States and other stakeholders.

Further, Plaintiffs will suffer no cognizable hardship if the Court withholds review at this time to give the agency an opportunity to address the matter in the first instance. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior,* 538 U.S. 803, 811-12 (2003) (holding that plaintiff must "demonstrate that deferring judicial review will result in real hardship"); *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 389 (D.C. Cir. 2012) ("Considerations of hardship that might result from delaying review will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions."). Indeed, states are not required to verify their populations prior to accepting—and thereby securing—their final EMPG awards. *See* Ex. 6, Final Amended EMPG Awards at 30. The fact that states must provide FEMA with additional information about their

populations before having access to millions of dollars in grant funding that is predicated primarily on population data is both reasonable and does not impose an undue hardship, particularly where FEMA has committed to working with states to provide compliance guidance.

## IV.     The Population Verification Requirement is Lawful.

Even if the Court were to reach APA review of Plaintiffs' Population Verification claims (Counts I-IV), Plaintiffs' challenges to the population verification requirement fail. First, consistent with 13 U.S.C. § 183(a), FEMA considered U.S. Census data to allocate EMPG funding; and the collection of information from grant recipients is permissible when necessary to adhere to statutory commands outlined by Congress. Second, FEMA has explicit OMB approval to request demographic information from preparedness grant recipients, rendering Plaintiffs' Paperwork Reduction Act claim without merit. Third, FEMA's inclusion of the population verification term in EMPG final awards was a clear exercise of the agency's discretionary authority to outline lawful grant conditions. The condition is not—as Plaintiffs contend—a policy change requiring detailed explanation and consideration of reliance interests. Finally, inclusion of the condition was a carefully considered decision intended to ensure EMPG funds are allocated according to up-to-date State population numbers and, therefore, survives the deferential arbitrary and capricious standard of review.

### A.     The Population Verification Requirement is Consistent with Statutory Authority and in Observance of Procedures Required by Law.

Plaintiffs' challenge to the population verification requirement as contrary to law (Count II) requires the Court to read language into 13 U.S.C. § 183(a) that does not exist, and therefore, cannot succeed. Plaintiffs' challenge to the population verification condition as in excess of the agency's statutory authority (Count I) fails because the EMPG implementing statute requires EMPG funding to be distributed based on population, thereby implicitly permitting the collection of the most accurate state population information available. Moreover, FEMA's request for population data from States was made pursuant to an OMB-approved generic information collection request ("ICR"), thereby extinguishing Plaintiffs' objection that FEMA implemented

Page 15     Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs'
                Motion for Summary Judgment

the population verification requirement without observance of procedures required by the Paperwork Reduction Act (Count IV).

> **1.    Consistent with 13 U.S.C. § 183(a), Defendants Used Federal Census Data to Allocate EMPG Funding.**

The EMPG is a formula grant that requires each State to receive a baseline allocation of the fiscal year's appropriated EMPG funds, and the remaining funds to be apportioned according to each State's relative population. 6 U.S.C § 762(d)(2). Plaintiffs assert that 13 U.S.C. § 183(a) "'requires use of the current population estimate' produced by the Census Bureau for federal 'formula program funds'" like the EMPG grant. Pls.' Mot. at 27. Consistent with this assertion, Defendants used U.S. Census data to allocate FY 2025 EMPG funds. Ex. 1, Arnold Decl. ¶ 5. Yet, Plaintiffs insist that FEMA violated Section 183(a) by requiring States to provide additional population information before their EMPG funds can be drawn down. Pls.' Mot. at 27. In doing so, Plaintiffs are reading language into Section 183(a) that prohibits an agency from considering *additional* sources of population information, beyond U.S. Census Bureau data, when allocating formula grant funds based on population. *Id*. at 26 ("When a State's population is a factor in issuing grant awards, federal agencies must calculate such population using *only* U.S. Census Bureau data.") Plaintiffs are inserting into Section 183(a) language that requires an agency to *exclusively* rely on the most recent census data, but this limiting language does not appear anywhere in Section 183(a), nor, for that matter, in the EMPG statute, *see* 6 U.S.C. § 762, or anywhere else. The language of Section 183(a) is not restrictive, but permissive, and it is most naturally read consistent with FEMA's discretion to consider additional sources of information to assess state populations as part of its administration of the grant programs. Contrary to Plaintiffs' argument, the "statutory language suggesting exclusiveness is missing." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80-81 (2002).

Because census data was used to determine FY 2025 EMPG award amounts beyond the minimum baseline allocation, and State population verifications will simply be used to *supplement* the census data that FEMA considered to ensure the accuracy of the final allocations,

Ex. 1, Arnold Decl. ¶ 6, Defendants' request for population information from States is consistent with the mandates of 13 U.S.C. § 183(a).

### 2. The Population Verification Requirement is Permitted Under the Paperwork Reduction Act.

Plaintiffs outline the steps an agency must take in order to conduct "a collection of information" in compliance with the Paperwork Reduction Act, culminating in the agency's receipt of approval from OMB and a control number. Pls.' Mot. at 33. They assert that FEMA's request for the States to report their population as of September 30, 2025 constitutes a collection of information under the Act, therefore, Defendants were required to comply with the PRA before requesting population data from the States. *Id*. at 34. They further assert that FEMA "wholly failed to comply—or even attempt to comply—with any of the PRA's procedural requirements[,]" and "did not provide notice in the Federal Register before imposing the [Population Certification Hold]." Pls.' Mot. at 35. In reality, FEMA recognizes the population verification requirement is an information collection request, and complied with the PRA by obtaining OMB approval of a "Generic Information Collection Request" before requesting population data from states. *See* Ex. 9, OMB-Approved ICR.

FEMA's Office of Grants Administration ("OGA") was created to oversee the programmatic management, financial management, and administration of non-disaster grants. OGA previously sought and obtained clearance for the collection of generic information from applicants for FEMA's preparedness grant programs—which include HSGP and EMPG. First, FEMA published a 30-day notice of the proposed collection and a request for comments in the Federal Register on March 28, 2024, 89 Fed. Reg. 21532. The agency then submitted the proposed collection to OMB and published a 60-day notice of the proposed collection in the Federal Register on December 12, 2024, 88 Fed. Reg. 86141. FEMA then received approval for the collection from OMB's Office of Information and Regulatory Affairs ("OIRA").

FEMA's OMB-approved information collection request (OMB Control Number: 1660-NW172), attached as Exhibit 9, explicitly authorizes the collection of demographic information

from preparedness grant applicants in order to "comply with Federal laws and regulations." Ex. 10, FEMA Information Collection Request Supporting Statement at 2. Here, updated state population data—including adjustments for removed aliens—is a fundamental metric required to calculate EMPG allocations accurately and equitably. Thus, the requested population information falls within the universe of information FEMA is permitted to request from EMPG award recipients.

As to Plaintiffs' assertion that an information collection must not be duplicative of information collected through other avenues or otherwise reasonably accessible to the federal government, Pls.' Mot. at 24-25, the population Agreement Article requires a state to submit a calculation of the state's population as of September 30, 2025—a number that would account for all state population fluctuations up to that point. States have not been asked to produce this number on any other occasion, and this number is not information already in the possession of the federal government.

FEMA's OMB ICR authorization extinguishes entirely Plaintiffs' claim that Defendants did not comply with the Paperwork Reduction Act in requesting up-to-date population data from States.

### 3. The Population Verification Requirement is Consistent with the Commands of the EMPG Statute.

Plaintiffs assert that Defendants exceeded their statutory authority in requesting population information "because no statute [explicitly] authorizes Defendants to impose the Population Certification Hold as a prerequisite to receiving the EMPG funds," Pls.' Mot. at 26, and the EMPG statute does not explicitly "authorize[] FEMA to condition funding on States submitting population data," *id*. at 25. But, where, as here, Congress expressly directs that grant distributions be based on population, 6 U.S.C. § 762(d)(2), it naturally follows that FEMA has authority to collect and consider population data from a variety of sources, whether from the U.S. Census Bureau or the states themselves, to confirm distributions adhere to Congress' mandate.

**B. The Population Verification Condition Survives Arbitrary and Capricious Review.**

Plaintiffs' claim that FEMA's decision to include the population verification term in FY 2025 EMPG final awards was arbitrary and capricious (Count III) fails in several respects. First, FEMA's inclusion of the population verification requirement was not a change in agency policy or position requiring the agency to communicate its reasoning or consider reliance interests. Rather, the term was merely an exercise of FEMA's broad discretionary authority to set forth the terms in specific grants. Even if the Court entertains Plaintiffs' contention that the addition of a new term in the FY 2025 EMPG awards constitutes a changed agency position or policy, Plaintiffs' challenge is unsuccessful because (1) an agency need not consider unreasonable reliance interests, and (2) FEMA's decision to include the population verification requirement was carefully considered and intended to comply with the commands of the EMPG statute.

**1. The Population Verification Requirement is Not a Change in Policy.**

Plaintiffs repeatedly label the population verification condition as a departure from prior policy or change in position requiring FEMA to articulate its reasoning and consider states' reliance interests, *see* Pls.' Mot. at 18, 30, 32. Yet Plaintiffs do not point to any internal FEMA policy document or public-facing announcement stating that the agency will never condition the release of awarded EMPG funds on the production of relevant information by grantees. Such a policy does not exist. Practically speaking, it simply cannot be the case that an agency must explain its thinking in formal policy memoranda every time the agency exercises its discretion to include, in a final grant agreement, a lawful term or condition that was not present in past grant agreements under the same program. And, despite Plaintiffs' contentions, surely it cannot be the case that grant award documents themselves must contain an explanation of each changed or new term. *See id.* at 29 ("The awards themselves reflect no analysis of the States' interests and the harm a hold on EMPG funds would inflict."). Plaintiffs cite no authority for such a remarkable proposition, which would depart from years of settled practice.

**2. Plaintiffs' Reliance Interests are Unreasonable.**

Regardless, an agency need only consider and weigh a party's valid, reasonable reliance

interests—not "unreasonable" ones. *See Libby Welding Co. v. United States*, 444 F. Supp. 987, 992 (D.D.C. 1977), *aff'd*, 595 F.2d 887 (D.C. Cir. 1979). Here, Plaintiffs point to the FY 2025 EMPG NOFO and past EMPG awards as the basis of their "reasonable reliance" on a FEMA "policy" to not condition the receipt of awarded EMPG funds on a request for population information from grant recipients. *See* Pls.' Mot. at 28-29 ("This expectation was based on (1) the EMPG NOFO, which did not reflect any population data request or hold and provided expected 'target allocations' based on 'population-share' [and] (2) past EMPG grants, which have never included anything resembling the [population verification requirement[.]"). Plaintiffs assert that they did not anticipate the inclusion of the population verification term simply because it was not included in the FY 2025 EMPG NOFO, and past EMPG final awards did not contain a population data request. Pls.' *Id*. But, given FEMA's discretion to amend award terms consistent with relevant statute and the fact that new award decisions are made on an annual basis, any reliance by Plaintiffs on award terms identical to those of past awards was not reasonable. *Smilry v. Citibank*, 517 U.S. 735, 742 (1996) (requiring agencies to consider "legitimate reliance").

Plaintiffs' reliance on the FY 2025 EMPG NOFO—a document with no definitive legal effect—was similarly unreasonable. A NOFO is simply a document describing a potential funding opportunity the Government is making available and setting out the application process for eligible applicants. It does not determine rights or obligations to potential applicants. It does not create any legal entitlement to projected funding levels or guarantee unchanged terms and conditions. *Cf. Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1104 (9th Cir. 2007) (stating that even when "Congress has specified the specific project to which funds should be allocated, the [agency] does not take a final agency action until it completes its review of the grant application and decides to disburse the appropriated funds"). Only with the issuance of a final award does the Government make an offer to an applicant jurisdiction, who may then choose to decline the offer or accept the final award amount *and the attached terms and conditions* prior to the award acceptance deadline. *See Citizens Alert Regarding Env't v. EPA*, 102 F. App'x 167, 168 (D.C.

Cir. 2004) (holding that until the agency "completes its review and reaches a decision [on the grant award], there has been no final agency action . . . and the matter is not ripe for judicial review"); *Planned Parenthood v. Azar*, 316 F. Supp.3d 291, 300 (D.D.C. 2018) (concluding that a notice of funding opportunity that set out intermediate criteria by which applications would be evaluated was not final agency action because it announced only how "an agency decision will be made," and the plaintiffs challenged only "intermediate criteria by which applications will be evaluated") (emphasis omitted)), *vacated as moot*, 942 F.3d 512 (D.C. Cir. 2019); *see also* U.S.C. § 704 (explaining that "preliminary, procedural, or intermediate" agency actions are not directly reviewable, but may be reviewed on final agency action).

Plaintiffs do not, and cannot, cite to statute or precedent to support the proposition that a NOFO establishes a legal obligation on behalf of the agency to issue final grant awards with identical terms. Nor is there any authority supporting the proposition that final grant awards may not differ—even substantially—from NOFO projections, or the notion that an agency must explain changes between NOFO projections and final award amounts. Further, the short period of time between the issuance of the FY 2025 EMPG NOFO and the final EMPG awards undercuts any legitimate reliance interests. Plaintiffs do not identify any decisions they made in reliance on the terms and conditions of the NOFO that were disrupted by terms of the final award issued just two months later. Accordingly, this case bears no resemblance to the reliance interests at issue *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30-31 (2020). That case challenged the termination of a program that provided immigration benefits to a specific group of individuals brought to the United States as children, and the Court recognized the reliance interests of those beneficiaries. *See id.* at 31 (stating that recipients had "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance" on DACA). Here, the Plaintiff States do not have any comparable cognizable reliance interests in the way FEMA chooses to allocate its annual grant funding from one year to the next, or within the limited time between issuance of a NOFO and

final award. Whatever incidental effects FEMA's decisions might have on the States are not the kind of "serious reliance interests" that DHS was required to consider in exercising its discretion about how best to administer its grant programs. *See id.*

### 3. The Population Verification Requirement is Well-Reasoned.

In any event, FEMA's decision to include the population verification requirement satisfies the deferential arbitrary and capricious standard. Under the arbitrary and capricious standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action need only be "reasonable and reasonably explained," meaning that the agency has "reasonably considered the relevant issues and reasonably explained the [agency's] decision." *Id.*

Here, FEMA included the population verification requirement as a condition on the release of awarded EMPG funds to ensure allocations—which *were* calculated using the latest U.S. census data—were consistent with state populations as of September 30, 2025. Ex. 1, Arnold Decl. ¶¶ 5-6. An agency decision intended to ensure the Government is in possession of up-to-date state population numbers in order to abide by statutory provisions requiring grant money to be allocated according to population falls clearly within a "zone of reasonableness." This decision remains within that zone of reasonableness even though the Government has access to (and utilized) U.S. census data to allocate FY 2025 EMPG funds, as state-produced population verifications can account for swings in state population—including but not limited to removals[3]—that have yet to be represented in prior census data. Accordingly, the Court should

---

[3] To the extent Plaintiffs criticize Defendants' information request as inexplicably accounting only for "immigration-related population changes," Pls.' Mot. at 31, they misunderstand the

Page 22    Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs'
              Motion for Summary Judgment

reject Plaintiffs' arbitrary and capricious claim, Count III.

Plaintiffs criticize the Government's inclusion of a "'litigation affidavit' offering only post-hoc rationalizations" for Defendants' decision to include the population verification condition, Pls.' Mot. at 29-30, 33, and the one-year period of performance term, *id*. at 38, but "[t]he policy of the post hoc rationalization rule does not prohibit" Defendants from supplementing the administrative record with a declaration that outlines agency considerations. *See Local 814, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen v. N. L. R. B.*, 546 F.2d 989, 992 (D.C. Cir. 1976). "Moreover, the logic of the rule requires it." *Id*. As the Ninth Circuit has explained, "the rule barring consideration of *post hoc* agency rationalizations operates where an agency has provided a particular justification for a determination at the time the determination is made, but provides a different justification for that same determination when it is later reviewed by another body." *Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997). That is not the case here, where a declaration is offered to explain the rationale for the agency's decision. *See Forest Serv. Emps. for Env't Ethics v. United States Forest Serv.*, 796 F. App'x 390, 391 (9th Cir. 2020) (affirming district court's decision to consider agency "declarations after determining that the declarations were explanatory of the agency's decision—not mere post hoc rationalizations"). *Midwater Trawlers Coop. v. Dep't of Commerce*, 393 F.3d 994, 1008 (9th Cir. 2004) (upholding use of agency declarations that permitted the agency to "further explain" its decision).

Although, in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419-420 (1971), "the Court acknowledged the danger of some post hoc rationalization, it nevertheless specifically approved the procedure of requesting an administrative body to provide additional explanation for an inadequately articulated decision." *Local 814*, 546 F.2d at 991-92. "The 'post

---

request. The population Agreement Article requires a state to submit a calculation of the state's population as of September 30, 2025. This number would reflect population fluctuations due to any number of factors, including, but not limited, to removals. *Separately*, states are directed to certify that the reported population number does not include aliens who have been removed from the state.

hoc rationalization' rule is not a time barrier which freezes an agency's exercise of its judgment after an initial decision has been made and bars it from further articulation of its reasoning. It is a rule directed at reviewing courts which forbids judges to uphold agency action on the basis of rationales offered by anyone other than the proper decisionmakers." *Id*. Here, the Arnold Declaration, attached as Exhibit 1, is an articulation of the agency's reasoning that outlines the rationale behind the decisions to include the population verification condition and the one-year period of performance term. The declaration is a rationale offered by "proper" agency officials in a position to speak to FEMA's considerations *at the time* of FEMA's decisions to include the contested terms.

## V.    The Period of Performance Term Survives Arbitrary and Capricious Review.

The Court should also reject Plaintiffs' claim that FEMA's decision to include a one-year period of performance in the FY 2025 final awards was arbitrary and capricious (Count V). First, the decision to include a one-year performance period for HSGP and EMPG awards (and therefore necessarily eliminate backdating of the EMPG awards) was a discretionary decision to outline grant terms, not subject to arbitrary and capricious review. And, even if the Court finds including a shorter performance period than that of years past constitutes a change in policy requiring a reasoned explanation and consideration of *reasonable* reliance interests, Plaintiffs' challenge is unsuccessful because FEMA's decision to limit the performance period was well-reasoned.

### A.  The Period of Performance Term is Not a Change in Policy.

Plaintiffs' insistence on an explanation for Defendants' decision to limit the period of performance for FY 2025 HSGP and EMPG grants, Pls.' Mot. at 36, is misguided. FEMA's decision was not a change in policy, but a lawful exercise of the agency's discretion to outline grant terms whose inclusion is nowhere prohibited by statute. Indeed, no FEMA policy document commits the agency to a three-year performance period for annual HSGP and EMPG awards. And an agency is simply not required to explain every grant term change from one year

to the next—let alone inside the latest grant award letters, *see* Pls.' Mot. at 37 ("the EMPG and HSGP awards did not acknowledge or explain the PPC").

**B.  Plaintiffs' Reliance Interests are Unreasonable.**

Plaintiffs assert that they anticipated a three-year performance period based on the substance of the FY 2025 NOFOs and "years of previous practice," Pls.' Mot. at 36. This argument fails for the same reasons as Plaintiffs' period of performance reliance claims. *See supra* at (IV)(B)(2). An agency need not consider unreasonable reliance interests, *see Libby Welding Co.*, 444 F. Supp. at 992, and establishing expectations based on past grant agreements and the content of a preliminary NOFO document is unreasonable. Given FEMA's discretion to amend award terms consistent with the HSGP and EMPG statutes—neither of which speak to performance period at all—any expectations by Plaintiffs of identical performance periods from year to year was unreasonable. As outlined in detail above, it is entirely unreasonable for grantees to rely on the terms (or allocations) outlined in a NOFO as final. And Plaintiffs have not shown how they relied on the NOFOs to make *and implement* planning decisions that were upset by the final award terms issued just a few months later.

**C.  The One-Year Period of Performance Term is Well-Reasoned.**

Regardless, FEMA's decision to include a one-year period of performance in the FY 2025 final awards was carefully considered and survives the deferential arbitrary and capricious standard. As set forth above, "[j]udicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423. Agency action need only be "reasonable and reasonably explained," meaning that the agency has "reasonably considered the relevant issues and reasonably explained the [agency's] decision." *Id*. Here, FEMA's decision to institute a one-year period of performance for HSGP and EMPG grants was permissible under the relevant statutes, and was based on the larger goals of reducing administrative complexity and encouraging increased oversight over state emergency preparedness projects and their regular

alignment with emerging threats. Ex. 1, Arnold Decl. ¶ 12. For decades, States across the country have relied on federal funding provided through the EMPG and the HSGP to staff, train, and equip first responder organizations. As a result, states have limited their own investment in emergency preparedness. DHS and FEMA adjusted the period of performance for FY 2025 HSGP and EMPG grants to align with the President's vision to begin shifting responsibility and authority back to the States. *Id*.

The shorter period of performance allows for: (1) improved accountability and oversight—a one year performance period allows FEMA to more closely monitor grant recipients and ensure funds are being used effectively and in alignment with program goals; (2) accelerated project completion—a one-year performance period encourages grant recipients to expedite their projects and deliver results more quickly, which is particularly important for emergency management initiatives that address urgent needs; (3) alignment with annual budget cycles—a one-year performance period aligns with annual federal budget cycles, simplifying financial planning and reporting for both FEMA and grant recipients; (4) flexibility in funding allocation—a one-year performance periods enable FEMA to reassess priorities and reallocate funds more frequently to address emerging threats or changing circumstances; and (5) streamlined grant management—managing grants on an annual basis can reduce administrative complexity and allow FEMA to adapt program requirements or priorities more dynamically. *Id*.

As to Plaintiffs' assertion that FEMA's "failure to backdate" the FY 2025 EMPG awards "functionally skips twelve months of funding," Pls.' Mot. at 22, the performance period for FY 2024 EMPG awards is October 1, 2023 through September 30, 2026. States have not gone without EMPG funding for any period of time. And, while Plaintiffs assert that there is no explanation in the administrative record for not backdating the FY 2025 EMPG awards, Pls.' Mot. at 22, FEMA's decision to limit the performance period to one year necessarily means the awards will not be backdated. No further explanation is needed.

Accordingly, the Court should accordingly reject Plaintiffs' arbitrary and capricious

claim, Count V.

## VI. Vacatur and Injunctive Relief are Not Appropriate Remedies Under the APA, and Any Relief Should be Narrowly Tailored to Plaintiff States.

Plaintiffs' request—that the Court issue declaratory relief, vacate the Population Certification Hold and Performance Period Change, and enter a permanent injunction against future implementation or enforcement of the challenged agency actions, Pls.' Mot. at 39—is a request for an over-broad equitable remedy that exceeds any harm to the Plaintiffs States.

### A. Vacatur is Not Appropriate Under the APA.

Although the Ninth Circuit has held that vacatur "is the default remedy under the APA," *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025), Defendants respectfully submit that the APA does not permit vacatur of agency action. *See United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring) (The APA "does not say anything about 'vacating' agency action ('wholesale' or otherwise)."). The history and structure of the APA do not support that the "set aside" language in Section 706(2) is synonymous to "vacate," but rather that "set aside" should be understood to mean that a court should "disregard" the action taken by the agency in determining the outcome of a case. *Id.* ("Routinely, a court will disregard offensive provisions like these and proceed to decide the parties' dispute without respect to them.").

Even if Section 706 could be read to authorize vacatur of agency action, "a district court should think twice—and perhaps twice again—before granting such sweeping relief." *Id.* at 702 (citations and internal quotation marks omitted). "Traditionally, when a federal court finds a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff. If the court's remedial order affects nonparties, it does so only incidentally." *Texas*, 599 U.S. at 693 (Gorsuch, J., concurring); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("[N]either declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs."). "This tracks the founding-era understanding that courts 'render a judgment or decree upon the right of the litigant[s].'" *Texas*, 599 U.S. at 693 (Gorsuch, J., concurring)

Page 27    Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs'
              Motion for Summary Judgment

(quoting *Rhode Island v. Mass.*, 37 U.S. 657 (1838)). This notion "ensures that federal courts respect the limits of their Article III authority to decide cases and controversies and avoid trenching on the power of the elected branches to shape legal rights and duties more broadly." *Id.* at 693–94.

To grant universal relief under the auspices of vacatur "strains our separation of powers. It exaggerates the role of the Judiciary in our constitutional order, allowing individual judges to act more like a legislature by decreeing the rights and duties of people nationwide." *Id.* at 703. Accordingly, any equitable remedy applied in the nature of vacatur should apply only to the named parties. *See California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (remedies "ordinarily operate with respect to specific parties" rather than "on legal rules in the abstract") (citations and internal quotation marks omitted); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (observing that the "general rule" is that equitable relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs") (citations omitted).

To the extent the Court is inclined to vacate the population verification condition for EMPG grants, or the one-year period of performance term for HSGP and EMPG grants, this relief should be limited to the amendment of Plaintiff States' award agreements, not universal vacatur as to every grantee. Where, as here, party-specific remedies are capable of providing Plaintiffs with complete relief, any broader relief would contradict constitutional and equitable limitations on this Court's remedial authority. *See Trump v. CASA, Inc.*, 606 U.S. 831, 841-50 (2025); *Gill v. Whitford*, 585 U.S. 48, 72–73 (2018).

### B. Should the Court Find Further Explanation of Either Contested Term is Necessary, Remand Without Vacatur is the Only Appropriate Remedy.

If the Court rules that FEMA's decision to include the population verification requirement or the one-year period of performance was arbitrary and capricious, the Court should remand to the agency without vacatur, so the agency has the opportunity to more thoroughly explain its rationale and reassess the challenged terms.

"Remand without vacatur" is an administrative law remedy that allows courts reviewing

agency actions to leave the action in place while the agency fixes the defect. *See Humane Soc'y v. Locke,* 626 F.3d 1040, 1053 n. 7 (9th Cir.2010) (stating that a court may remand without vacatur to allow the agency action to remain in force until the action can be considered or replaced); *Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392, 1405 (9th Cir.1995) ( "[W]hen equity demands, the regulation can be left in place while the agency follows the necessary procedures."); *W. Oil and Gas Ass'n v. EPA,* 633 F.2d 803, 813 (9th Cir.1980) ("[G]uided by authorities that recognize that a reviewing court has discretion to shape an equitable remedy, we leave the challenged designations in effect."). Remand without vacatur may be justified "[w]hen an agency may be able readily to cure a defect in its explanation of a decision." *Heartland Reg'l Med. Ctr. v. Sebelius,* 566 F.3d 193, 198 (D.C.Cir.2009).

In deciding whether vacatur of either or both of the challenged terms is warranted, the Court must apply the two-prong standard outlined by the D.C. Circuit and adopted by the Ninth Circuit. Under this standard, "[w]hether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys. Against Toxics v. Envt'l Prot. Agency,* 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,* 988 F.2d 146, 150–51 (D.C.Cir.1993)). "There is no rule requiring either the proponent or opponent of vacatur to prevail on both factors." *Shands Jacksonville Med. Ctr. v. Burwell,* 139 F. Supp. 3d 240, 270 (D.D.C. 2015).

Even if the first factor weighed in favor of vacatur here, that factor would not be dispositive. *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 404 (1993). Instead, "resolution of the question turns on the Court's assessment of the overall equities and practicality of the alternatives," *id.*, and courts have often remanded without vacatur notwithstanding the seriousness of the agency's deficiencies. *See Citrus HMA, LLC v. Becerra,* No. 20cv707, 2022 WL 1062990, at *10 (D.D.C. Apr. 8, 2022) (remanding without vacatur based on the second *Allied-Signal* factor); *Am. Great Lakes Ports Ass'n v. Zukunft,* 301 F. Supp. 3d 99, 105 (D.D.C.

2018), *aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020) (remanding without vacatur even though the first *Allied-Signal* factor favored vacatur); *see also N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008) (expressing preference for a "simple remand" (without vacatur) in a case in which the agency had been found to have violated a statute); *Global Van Lines, Inc. v. I.C.C.*, 804 F.2d 1293, 1305 n. 95 (D.C. Cir. 1986) ("We agree with the Commission that when an agency committing an error of law has discretion to determine in the first instance how it should be rectified, the proper course is to remand the case for further agency consideration in harmony with the court's holding.") (citing cases).

Here, vacating the period of performance term would have incredibly disruptive consequences for all parties. Vacating the one-year performance term would leave the awards without any defined performance window. Both Plaintiffs and FEMA would be without any guidance as to duration by which the funds must be utilized. There is no equitable basis for the Court to leave the challenged grant awards in such an open-ended posture that would likely lead to confusion by all parties. To the extent the Court finds that the term has not been reasonably explained, it should leave the one-year period of performance in place pending further explanation from the agency. Vacating the term altogether would have disruptive consequences that would be both inequitable and impractical.

## C. Injunctive Relief is Inappropriate.

Plaintiffs also ask this Court to enter permanent injunctive relief to "effectuate the vacatur of the [Performance Period Change] and [Population Certification Hold]," Pls.' Mot. at 41, 43, but Plaintiffs fail to demonstrate how receiving award offers with unanticipated terms and conditions constitutes irreparable harm necessitating the issuance of a permanent injunction. And, where there is no statutory or constitutional basis for the Court to mandate the inclusion of a three-year performance period, the mandatory injunction Plaintiffs seek is inappropriate.

### 1. Plaintiffs Have Failed to Establish Irreparable Harm.

The issuance of a permanent injunction requires a plaintiff to demonstrate: "(1) that it has

suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the [parties], a remedy in equity is warranted; and (4) that the public interest will not be disserved by a permanent injunction." *Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136, 148 (1st Cir. 2008) (quoting *eBay Inc v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006)). Irreparable harm is "the essential prerequisite for equitable relief." *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (quotation omitted); *see also Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[T]he basis of injunctive relief in the federal courts has always been irreparable harm.").

Here, Plaintiffs assert that FEMA's decision to implement a one-year period of performance for HSGP and EMPG grants results in irreparable harm in the form of Plaintiff States being forced to spend EMPG and HSGP funds in "mere months," Pls.' Mot. at 42. But states are simply being required to plan their preparedness budgets on an annual basis—spending *annual* allocations *annually*—and any state that qualifies for preparedness funding according to Section 608(a) will receive additional preparedness funding in fiscal year 2026. More fundamentally, it is always the case that "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). If a party makes the voluntary choice to forego those funds, any resulting economic harm is self-inflicted and cannot constitute an irreparable injury attributable to the federal government.

Next, Plaintiffs suggest that FEMA's decision to include the population verification requirement for FY 2025 EMPG awards irreparably harms Plaintiffs States by freezing EMPG funds with States having "no plausible means of complying with this requirement," giving States "no choice but to reduce state and local emergency management capacity." Pls.' Mot. at 42. But, as outlined above, Plaintiff States' assumption that they will be unable to comply with the population verification requirement or that compliance will take many months is premature and,

Page 31    Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs'
           Motion for Summary Judgment

indeed, speculative until they receive forthcoming guidance about how to satisfy the requirement from FEMA. *See* Arnold Decl. ¶ 9.

Accordingly, Plaintiffs have failed to establish irreparable harm that could support the entry of any injunction.

### 2. The Balance of the Equities and the Public Interest Tip in Defendants' Favor.

An injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "[t]hese factors merge when the Government is the opposing party"). Plaintiffs ask the Court to "issue permanent injunctive relief barring implementation of the PCH in Plaintiff States' 2025 EMPG grants." Pls.' Mot. at 44. But, "any time [the Government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *CASA,* 606 U.S. at 861 (2025) (internal quotation marks and citation omitted). Here, the order Plaintiffs seek would prevent the Government from fulfilling its statutory mandate to ensure EMPG funds are distributed to states based on their current populations.

As to the performance period term, Plaintiffs seek a court order compelling the Government to contract with states for a particular period of time. Notably, Plaintiffs seek mandatory injunctive relief, asking the Court to "reform the awards for both the EMPG and HSGP to restore the performance period *from the NOFOs*," Pls.' Mot. at 44 (emphasis added). But a mandatory injunction ordering a responsible party to take action "goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980)). "In general, mandatory injunctions 'are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.'" *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022) (quoting *Anderson*, 612 F.2d at 1115). A "district court should deny such relief 'unless the facts and law clearly favor the moving party.'" *Anderson*, 612 F.2d at 1144 (quoting *Stanley v. Univ. of S. Cal.*,

13 F.3d 1313, 1320 (9th Cir. 1994)). A court cannot mandate via injunction the inclusion of terms in a government contract where there is no statutory or constitutional basis to do so. Plaintiffs provide no authority for this extraordinary proposition. Here, where the EMPG and HSPG statutes are silent as to period of performance, *see* 6 U.S.C. §§ 603–609, § 762, the Court cannot compel FEMA to contract with states for any particular period of time—let alone based on a non-final NOFO document.

In light of the harm DHS would face if it were prevented from ensuring compliance with federal laws and forced to contract for longer than desired despite no legal requirement to do so, the balance of equities and public interest tip in favor of the Government.

### 3. Any Injunctive Relief Should be Limited to Plaintiff States.

The Supreme Court has long recognized that "equitable relief must be limited to the inadequacy that produced [the] injury in fact" and "[a]ny remedy a judge authorizes must not be more burdensome [to the defendant] than necessary to redress the complaining parties." *Texas*, 599 U.S. at 702 (Gorsuch, J., concurring) (cleaned up). As the Supreme Court recently explained in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), there is no basis in equity for a universal injunction that goes beyond remedying the harms incurred by the plaintiffs who have brought the lawsuit.

To the extent the Court is inclined to grant injunctive relief, this relief should be narrowly tailored to Plaintiff States. *See CASA*, 606 U.S. at 851. Any order enjoining the one-year period of performance for HSGP and EMPG grants, or the population verification requirement for EMPG grants, should apply only as to Plaintiff States' awards. Indeed, Plaintiffs only ask the Court to "issue permanent injunctive relief barring implementation of the PCH *in Plaintiff States'* 2025 EMPG grants" and "permanently enjoin Defendants from rejecting *Plaintiff States'* drawdown requests" for funds from their FY 2025 EMPG awards and FY 2025 HSGP awards "due to the Performance Period Change." Pls.' Mot. at 44 (emphasis added).

## VII.    Any Relief Should be Stayed Pending Appeal.

If the Court grants any relief, it should stay that relief pending any appeal authorized by the Solicitor General. *See* Fed. R. App. P. 8(a). For the reasons explained above, Defendants have, at a minimum, satisfied the requirements for a stay pending appeal. *See Nken*, 556 U.S. at 434 (describing the standard for obtaining such a stay and noting the "substantial overlap" between that standard and "the factors governing preliminary injunctions"). A stay pending appeal is particularly warranted in this case given the irreparable harm to the federal government if the disputed funds are dispersed to Plaintiff States under their preferred terms and conditions prior to an opportunity for the Government to seek appellate review. In particular, Plaintiffs have given no indication that they would abide by a one-year period of performance in the event the federal government were to ultimately prevail in this case. Accordingly, the Court should maintain the status quo of the preliminary injunction during the pendency of any appeal before any permanent injunction takes effect.

## CONCLUSION

For all the reasons discussed herein, the Court should deny Plaintiffs' Motion, grant Defendants' Cross-Motion, and enter summary judgment in Defendants' favor.


Dated: December 8, 2025                         Respectfully submitted,

                                                BRETT A. SHUMATE
                                                Assistant Attorney General
                                                Civil Division

                                                ERIC J. HAMILTON
                                                Deputy Assistant Attorney General
                                                Civil Division, Federal Programs Branch

                                                ANDREW WARDEN
                                                Assistant Branch Director
                                                Federal Programs Branch

Page 34    Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs'
           Motion for Summary Judgment

/s/ *Alexandra L. Yeatts*
ALEXANDRA L. YEATTS (CA Bar No. 358762)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Telephone: (202) 353-5677
Email: Alexandra.Yeatts@usdoj.gov

*Attorneys for Defendants*