DANA NESSEL
Attorney General for the State of Michigan
NEIL GIOVANATTI (P82305)
ADAM DE BEAR (P80242)
DANIEL PING (P81482)
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
Email: GiovanattiN@michigan.gov
        deBearA@michigan.gov
        PingD@michigan.gov

*Attorneys for the State of Michigan*

[Additional counsel to appear on signature page]

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**EUGENE DIVISION**

| | |
|---|---|
| STATE OF MICHIGAN; STATE OF OREGON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF HAWAI'I; OFFICE OF THE GOVERNOR ex rel. ANDY BESHAR, in his official capacity as Governor of the Commonwealth of Kentucky; STATE OF MAINE; STATE OF MARYLAND; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF WISCONSIN, <br><br> *Plaintiffs*, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DAVID RICHARDSON, in his official capacity as Senior Official Performing the Duties of the Administrator of the Federal Emergency Management Agency; FEDERAL EMERGENCY MANAGEMENT AGENCY, <br><br> *Defendants*. | Case No. 6:25-cv-2053-AP <br><br> **PLAINTIFF STATES' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

Page

Table of Contents ............................................................................................................ i

Index of Authorities ...................................................................................................... iii

Introduction .................................................................................................................... 1

Argument ........................................................................................................................ 2

I.    Plaintiff States' claims are justiciable ................................................................. 2

   A.    The Tucker Act does not preclude this Court's exercise of jurisdiction over
         Plaintiff States' APA claims. ...................................................................... 2

         1.    Plaintiff States' claims are premised on Defendants' statutory
               violations. ......................................................................................... 3

         2.    Plaintiff States do not seek money damages or court-ordered payment
               of funds. ............................................................................................ 6

   B.    The Population Certification Hold and Performance Period Change are subject
         to judicial review under the APA ................................................................ 8

   C.    Plaintiff States' claims regarding the Population Certification Hold are ripe. ........... 11

II.   Defendants point to no statutory authority for the imposition of the Population
      Certification Hold. ............................................................................................ 14

III.  U.S. Census Bureau data is the exclusive source for population-based award
      allocations, rendering the Population Certification Hold contrary to law. ........................... 15

IV.   Defendants imposed the Population Certification Hold without observing the
      Paperwork Reduction Act's applicable procedures. ............................................. 18

V.    The Population Certification Hold and Performance Period Change are arbitrary
      and capricious. ................................................................................................... 20

A.  The Population Certification Hold and Performance Period Change are plainly changes in position..................................................................................... 20

B.  Plaintiffs held reasonable reliance interests that Defendants failed to consider when imposing the Population Certification Hold and Performance Period Change. ..................................................................................................... 21

C.  The Arnold Declaration is a post-hoc litigation affidavit that should not be considered ............................................................................................. 24

D.  The Arnold Declaration does not reflect reasoned decision-making in imposing the Population Certification Hold and Performance Period Change. ......... 26

E.  Defendants fail to respond to Plaintiffs' argument that the Performance Period Change is inconsistent with other grant programs. ....................................... 27

VI.  Vacatur and injunctive relief are appropriate. ................................................27

A.  The Court should vacate the Population Certification Hold and Performance Period Change and deny Defendants' requested remand. ........................... 27

B.  The Court should enter permanent injunctive relief to effectuate its judgment. ........ 29

1.  Defendants have not rebutted Plaintiffs' showings of irreparable harm................................................................................................ 29

2.  Defendants have not shown that any of the remaining injunction factors weigh in their favor. ........................................................ 30

VII.  Defendants' request for a stay should be denied. ...............................................32

Conclusion and Relief Requested ...............................................................33

# INDEX OF AUTHORITIES

Page

**Cases**

*Al Otro Lado v. Wolf,*
  952 F.3d 999 (9th Cir. 2020) ................................................................... 32

*Ariz. Dream Act Coal. v. Brewer,*
  757 F.3d 1053 (9th Cir. 2014) ................................................................. 31

*Asarco, Inc. v. EPA,*
  616 F.2d 1153 (9th Cir. 1980) ................................................................. 25

*Ass'n of Irritated Residents v. U.S. Env't Prot. Agency,*
  10 4th 937 (9th Cir. 2021) ....................................................................... 11

*Blanchette v. Conn. Gen. Ins. Corps.,*
  417 U.S. 102 (1974) ................................................................................ 13

*Boardman v. Pac. Seafood Grp.,*
  822 F.3d 1011 (9th Cir. 2016) ................................................................. 31

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) .................................................................................. 7

*Bunker Hill Co. v. EPA,*
  572 F.2d 1286 (9th Cir. 1977) ................................................................. 25

*Cal. Cmtys. Against Toxics v. EPA,*
  688 F.3d 989 (9th Cir. 2012) ................................................................... 28

*California v. U.S. Dep't of Transp.,* No. 25-cv-208,
  2025 WL 3072541 (D.R.I. Nov. 4, 2025) ............................................... 13

*Camp v. Pitts,*
  411 U.S. 138 (1973) ................................................................................ 25

*Chickasaw Nation v. United States,*
  534 U.S. 84 (2001) ............................................................................. 16, 17

*China Unicom (Ams.) Operations Ltd. v. FCC,*
  124 F.4th 1128 (9th Cir. 2024) ................................................................ 15

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ............................................................................................ 25

*City of Chicago v. Noem*, No. 25 CV 12765,
   2025 WL 3251222 (N.D. Ill. Nov. 21, 2025) ................................................ 10, 11

*Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
   137 F.4th 932 (9th Cir. 2025) .............................................................. 4, 5, 8, 32

*Cnty. of Santa Clara v. Noem*, No. 25-cv-08330,
   2025 WL 3251660 (N.D. Cal. Nov. 21, 2025) ............................................ 5, 7, 10

*Cody v. Cox*,
   509 F.3d 606 (D.C. Cir. 2007) ............................................................................ 9

*Colorado v. U.S. Dep't of Health & Hum. Servs.*,
   788 F. Supp. 3d 277 (D.R.I. 2025) ...................................................................... 5

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
   38 F.4th 1099 (D.C. Cir. 2022) ...................................................................... 3, 5

*Dep't of Homeland Security v. Regents of the Univ. of Calif.*,
   591 U.S. 1 (2020) ................................................................................... passim

*Department of Education v. California*,
   604 U.S. 650 (2025) ............................................................................................ 6

*Doe v. Noem*,
   778 F. Supp. 3d 1151 (W.D. Wash. 2025) ........................................................ 18

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .......................................................................................... 21

*Flaxman v. Ferguson*,
   151 F.4th 1178 (9th Cir. 2025) .................................................................. 11, 12

*Forest Serv. Emps. for Envt'l Ethics v. U.S. Forest Serv.*,
   796 F. App'x 390 (9th Cir. 2020) ...................................................................... 25

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ............................................................................................ 8

*Hernandez v. Williams, Zinman & Parham PC,*
    829 F.3d 1068 (9th Cir. 2016) ................................................................. 17

*Hilton v. Braunskill,*
    481 U.S. 770 (1987) ................................................................................ 32

*Illinois v. FEMA*, No. 25-206,
    2025 WL 2716277 (D.R.I. Sept. 24, 2025) ........................................ 10, 12

*Intl. Union, United Mine Workers of Am. v. Bagwell,*
    512 U.S. 821 (1994) ................................................................................ 31

*Jajati v. U.S. Customs & Border Prot.,*
    102 F.4th 1011 (9th Cir. 2024) ................................................................. 8

*Lands Council v. Powell,*
    395 F.3d 1019 (9th Cir. 2005) ................................................................. 24

*League of Cal. Cities v. FCC,*
    118 F.4th 995 (9th Cir. 2024) ................................................................. 21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ................................................................................ 14

*Libby Welding Co. v. United States,*
    444 F. Supp. 987 (D.D.C. 1977) ............................................................. 23

Lincoln v. Vigil,
    508 U.S. 182 (1993) ................................................................................ 10

*Local 814, Intern. Broth. of Teamsters v. NLRB,*
    546 F.2d 989 (D.C. Cir. 1976) ................................................................. 25

*Loper Bright Enterps. v. Raimondo,*
    603 U.S. 369 (2024) ........................................................................... 15, 18

*Lotus Vaping Techs., LLC v. FDA,*
    73 F.4th 657 (9th Cir. 2023) ................................................................... 26

*Maine Comm. Health Options v. United States,*
    590 U.S. 296 (2020) ................................................................................ 15

*Martin Luther King, Jr. Cnty. v. Turner,*
   785 F. Supp. 3d 863 (W.D. Wash. 2025) ................................................................ 3, 6

*Mayfield v. U.S. Dep't of Labor,*
   117 F.4th 611 (5th Cir. 2024) .................................................................................. 15

*Michigan v. EPA,*
   576 U.S. 743 (2020) ................................................................................................ 24

*Midwater Trawlers Coop. v. Dep't of Commerce,*
   383 F.3d 994 (9th Cir. 2004) .................................................................................. 24

*Mont. Wildlife Fed'n v. Haaland,*
   127 F.4th 1 (9th Cir. 2025) ................................................................................ 27, 28

*N. Star Alaska v. United States,*
   14 F.3d 36 (9th Cir. 1994) ........................................................................................ 3

*Nat'l Urban League v. Ross,*
   977 F.3d 698 (9th Cir. 2020) .................................................................................. 26

*National Institutes of Health v. American Public Health Association,*
   145 S. Ct. 2658 (2025) ......................................................................................... 7, 8

*Nken v. Holder,*
   556 U.S. 418 (2009) ................................................................................................ 32

*Or. Council for the Humans. v. U.S. DOGE Serv.,*
   794 F. Supp. 3d 840 (D. Or. 2025) .......................................................................... 5

*Orr v. Plumb,*
   884 F.3d 923 (9th Cir. 2018) .................................................................................. 27

*Packwood v. Senate Select Comm. on Ethics,*
   510 U.S. 1319 (1994) .............................................................................................. 32

*Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador,*
   122 F.4th 825 (9th Cir. 2024) ................................................................................ 11

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
   566 U.S. 639 (2012) ................................................................................................ 17

*Rimini St., Inc. v. Oracle USA, Inc.*,
    586 U.S. 334 (2019) ............................................................................................ 18

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ........................................................................... 30

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) .............................................................................................. 24

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*,
    968 F.3d 738 (9th Cir. 2020) ............................................................................. 12

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ........................................................................... 12

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................................................ 14

*Thakur v. Trump*,
    148 F.4th 1096 (9th Cir. 2025) ....................................................................... 3, 5

*Thakur v. Trump*,
    787 F. Supp. 3d 955 (N.D. Cali. 2025) .............................................................. 9

*Trout Unlimited v. Pirzadeh*,
    1 F.4th 738 (9th Cir. 2021) ............................................................................... 18

*United Aeronautical Corp. v. U.S. Air Force*,
    80 F.4th 1017 (9th Cir. 2023) .......................................................................... 2, 6

*United States v. Olafson*,
    213 F.3d 435 (9th Cir. 2000) ............................................................................. 16

*United States v. Texas*,
    599 U.S. 670 (2023) ............................................................................................ 27

*Washington v. U.S. Dep't of Educ.*, No. 25-7157,
    2025 WL 3486895 (9th Cir. Dec. 4, 2025) .................................................... 7, 10

*Washington v. U.S. Dep't of Health & Hum. Servs.*, No. 6:25-cv-01748,
    2025 WL 3002366 (D. Or. Oct. 27, 2025) ...................................................... 5, 7

*Webster v. Doe,*
  486 U.S. 592 (1988) .................................................................................................. 8

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
  586 U.S. 9 (2018) .................................................................................................. 8, 10

*Wheeler v. City of Santa Clara,*
  894 F.3d 1046 (9th Cir. 2018) .............................................................................. 16

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .................................................................................................. 30

**Statutes**

13 U.S.C. § 183 ............................................................................................... 14, 15

13 U.S.C. § 183(a) ........................................................................................... 9, 14

13 U.S.C. § 6(a) .................................................................................................... 17

13 U.S.C. § 6(b) .................................................................................................... 17

28 U.S.C. § 1491 ................................................................................................... 2

28 U.S.C. § 1491(a)(1) ...................................................................................... 2, 5

5 U.S.C. § 551 (13) .............................................................................................. 21

5 U.S.C. § 551(4) ................................................................................................. 21

5 U.S.C. § 701(a)(2) ............................................................................................. 8

5 U.S.C. § 704 ...................................................................................................... 21

5 U.S.C. § 706(2) ................................................................................................. 28

5 U.S.C. § 706(2)(A) ............................................................................................ 21

5 U.S.C. § 706(2)(D) ............................................................................................ 19

6 U.S.C § 762(d)(2) ........................................................................................ 15, 17

6 U.S.C. § 604(a) .................................................................................................. 9

6 U.S.C. § 605(a) .................................................................................................. 9

6 U.S.C. § 762 ...................................................................................................... 9

6 U.S.C. § 762(b) ................................................................................................. 9

6 U.S.C. §§ 603–609 ............................................................................................ 9

## INTRODUCTION

The Supreme Court has recognized that "the Government should turn square corners in dealing with the people." *Dep't of Homeland Security v. Regents of the Univ. of Calif.*, 591 U.S. 1, 24 (2020) (quotation omitted). Yet, time and again, the Trump Administration has sought to cut corners, sowing chaos through its haphazard approach to administrative law and attempts to skirt judicial review.

Defendants' cross-motion for summary judgment takes a page out of this playbook. Defendants raise dubious procedural arguments, stretch applicable law too far, ignore the reality of the facts underpinning this case, and rely solely on post hoc rationalizations for their actions that have no basis in the administrative record. For the reasons fully detailed below, each of Defendants' arguments fails.

"[P]articularly when so much is at stake"—in this case, nearly $300 million in formula grant funding to Plaintiff States, congressionally appropriated to assist States in preventing, preparing for, protecting against, and responding to emergencies and acts of terrorism—the federal government must comply with the law. *Id.* Simply put, "[t]his is not the case for cutting corners." *Id.* This Court should grant Plaintiff States' motion for summary judgment, deny Defendants' cross-motion for summary judgment, and order appropriate equitable relief.

ARGUMENT[1]

## I.    Plaintiff States' claims are justiciable.

Defendants raise three arguments challenging the justiciability of Plaintiff States' claims. *First*, they claim that this Court lacks subject matter jurisdiction because the Tucker Act vests exclusive jurisdiction in the Court of Federal Claims.  *Second*, they argue that the imposition of the Population Certification Hold (PCH) and Performance Period Change (PPC) were committed to agency discretion and are therefore unreviewable under the Administrative Procedure Act (APA).  And *third*, they assert that Plaintiff States' challenges to the PCH are not prudentially ripe. As detailed below, each challenge fails.

### A.    The Tucker Act does not preclude this Court's exercise of jurisdiction over Plaintiff States' APA claims.

Defendants raise a threshold jurisdictional challenge under the Tucker Act, 28 U.S.C. § 1491, arguing that this case sounds in contract and therefore belongs in the Court of Federal Claims.  (Doc. 49, pp. 17–20.)[2]  Not so.

The Tucker Act vests the Court of Federal Claims with exclusive jurisdiction over contract claims against the federal government seeking more than $10,000.  28 U.S.C. § 1491(a)(1). However, due to the limited remedial authority of the Court of Federal Claims, "a contract-based action falls within the scope of the Tucker Act only if the plaintiff seeks *money damages* for the breach of a government contract."  *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (emphasis in original).  To determine whether an APA claim is within the

---

[1] Plaintiff States incorporate by reference the factual background (Doc. 30, pp. 13–23.) and standard of review (*id.* at 23) in their memorandum of law in support of their motion for summary judgment.

[2] Throughout this brief, Plaintiff States cite the record by ECF Doc. number and pin-cite to the page numbers generated by ECF.

Court of Federal Claim's jurisdiction, courts consider "(1) the source of the rights upon which the plaintiff bases its claims and (2) the type of relief sought (or appropriate)." *Thakur v. Trump*, 148 F.4th 1096, 1103 (9th Cir. 2025) (citing *N. Star Alaska v. United States*, 14 F.3d 36, 37 (9th Cir. 1994)).

Defendants assert that this case is governed by the Tucker Act because it concerns grant terms and conditions, and its resolution would require the federal government to pay grant funds to Plaintiff States. (Doc. 49, p. 17.) However, as detailed below, Plaintiff States' APA claims arise from statute (not a contract or grant agreement), and Plaintiff States seek equitable relief (not money damages or the payment of grant funds). Therefore, Plaintiff States' APA claims are properly within this Court's jurisdiction.

### 1.     Plaintiff States' claims are premised on Defendants' statutory violations.

As Plaintiff States outlined in their opening brief, (see, e.g., Doc. 30, pp. 25–39), various statutes—not a grant agreement or other contract—provide the "source of the rights upon which" Plaintiff States base their claims. *Thakur*, 148 F.4th at 1103.

To determine the source of the rights, courts evaluate "(1) whether the 'asserted rights and the government's purported authority arise from statute,' (2) whether the 'rights exist apart from rights created under a contract,' and (3) whether the Plaintiff seeks to enforce a duty on the government that was created by contract 'to which the government is a party.'" *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 877 (W.D. Wash. 2025) (quoting *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022)). All three factors weigh against applying the Tucker Act here.

As an initial matter, and fatal to Defendants' Tucker Act defense, grant agreements containing the challenged terms do not yet exist for most Plaintiffs in this case as most Plaintiff States have not accepted the awards.[3] (Doc. 27-2 (Arnold Decl.), p. 2, ¶ 8; Doc. 31 (Sweeney Decl.), p. 4, ¶ 10; Doc. 32 (Dzbanko Decl.), p. 3, ¶ 9; Doc. 33 (Lavine Decl.), p. 3, ¶ 8; Doc. 34 (Haney Decl.), p. 4, ¶ 10; Doc. 36 (Pace Decl.), p. 3, ¶ 10; Doc. 38 (Keats Decl.), p. 4, ¶ 11; Doc. 39 (Rogers Decl.), p. 4, ¶ 10; Doc. 40 (Strickland Decl.), p. 4, ¶ 10; Doc. 43, Rye Decl., p. 4; Doc. 45 (McMahon Decl.), p. 4, ¶ 10; Doc. 46 (Engle Decl.), p. 4, ¶ 10.) *See Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 938 (9th Cir. 2025) (rejecting Tucker Act argument where no contract existed between a plaintiff and the government). Defendants attempt to manufacture a contractual source for Plaintiff States' claims by arguing that prior years' awards, which contained multi-year performance periods and did not contain a term similar to the PCH, form the sole basis of Plaintiffs' claims. (Doc. 49, pp. 18–19.) But Plaintiff States do not assert that Defendants breached a prior-year contract by imposing the PCH and PPC upon the 2025 awards. Rather, Plaintiff States point to prior-year grant agreements only to illustrate one way that both the PCH and PPC violate the APA's prohibition on arbitrary and capricious agency action: Each represents an unexplained departure from prior agency practice. In other words, the prior-year awards are not the source of Plaintiff States' claims; they are evidence of Defendants' unreasoned decision-making regarding the current, non-contractual awards.

---

[3] Plaintiff State North Carolina inadvertently accepted the 2025 EMPG award containing the PCH, but subsequently submitted a reservation of rights allowing it to bring this action. (Doc. 48, pp. 3, 11, ¶¶ 10, 37.) Regardless, the Tucker Act does not apply to Plaintiff State North Carolina for the reasons detailed below.

Because no contract exists in this case, Plaintiff States' claims necessarily could not be "founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). For this reason alone, the Tucker Act does not apply.

But even if a contract existed in this matter, "'[t]he fact that there are underlying contractual relationships between the Plaintiff States and [the federal agency] does not automatically convert a claim asserting rights based on federal regulations into one which is, at its essence, a contract claim.'" *Washington v. U.S. Dep't of Health & Hum. Servs.*, No. 6:25-cv-01748, 2025 WL 3002366, at *6 (D. Or. Oct. 27, 2025) (Aiken, J.) (quoting *Colorado v. U.S. Dep't of Health & Hum. Servs.*, 788 F. Supp. 3d 277, 296 (D.R.I. 2025)). Contrary to Defendants' claims, (Doc. 49, pp. 17–19), "Plaintiff States do not assert rights that are rooted in the grants' underlying agreements; they assert rights that are rooted in statutory and constitutional authorities and that are *independent* of the grant agreements." *Id.*; *see also Cnty. of Santa Clara v. Noem*, No. 25-cv-08330, 2025 WL 3251660, at *28 (N.D. Cal. Nov. 21, 2025). And those rights "'existed prior to and apart from [any] rights created under [a] contract.'" *Thakur*, 148 F.4th at 1103 (quoting *Crowley Gov't Servs., Inc.*, 38 F.4th at 1107).

Instead, Plaintiff States assert that Defendants violated the APA because they (1) lack the legal authority to impose the PCH upon the EMPG award, a "non-discretionary grant[ ] that Congress authorized and funded," *id.*, (Counts I and II); (2) violated the law in imposing the PCH (Count IV); and (3) acted arbitrarily and capriciously by imposing the PCH or PPC (Counts III and V). *Id.* "Seeking to ensure compliance with statutory and regulatory commands[,]" as Plaintiff States do here, "is a matter beyond the scope of the Tucker Act's exclusive jurisdiction." *Cmty. Legal Servs. in E. Palo Alto*, 137 F.4th at 938; *see also Or. Council for the Humans. v. U.S. DOGE Serv.*, 794 F. Supp. 3d 840, 881 (D. Or. 2025).

### 2. Plaintiff States do not seek money damages or court-ordered payment of funds.

The relief Plaintiff States seek also does not fall within the scope of the Tucker Act. "If the relief sought is 'akin to the traditional remedies available for breach of contract (damages or specific performance),' the Tucker Act applies, and Plaintiffs' claims belong in the Court of Federal Claims." *Martin Luther King, Jr. Cnty.*, 785 F. Supp. 3d at 879 (quoting *United Aeronautical Corp.*, 80 F.4th at 1026). "If, however, the relief sought is not for money damages, then Plaintiffs' claims do not belong in the Court of Federal Claims[.]" *Id.*

Plaintiff States do not seek money damages. They seek only equitable relief authorized by the APA, including vacatur or set-aside of the illegal terms, an order compelling agency action unlawfully withheld, and a permanent injunction against any future implementation of the same or similar terms or conditions imposed without compliance with the APA. Unlike a money-damages award in a breach-of-contract case, granting this requested relief will not, by itself, result in the payment of money. Only Plaintiff States' eventual acceptance of the grant awards—absent their illegal terms—and drawing down on those awards to reimburse for allowable costs, will prompt that payment. *Id.* at 882 ("[W]hile it is true that a preliminary injunction may ultimately result in payment by the government to Plaintiffs, the injunction, itself, will not direct such payment.").

For this reason, Defendants' citation to the Supreme Court's stay order in *Department of Education v. California*, 604 U.S. 650 (2025), (see Doc. 49, p. 20), does not change the Tucker Act calculus. In *California*, the district court ordered the federal government to "pay out past-due grant obligations and to continue paying obligations as they accrue." 604 U.S. at 651. The Supreme Court construed that mandatory injunction as an "order [for] the payment of money[,]" which the district court likely lacked jurisdiction to impose under the APA. *Id.* Not so here. This same fact also frustrates Defendants' reliance on *National Institutes of Health v. American Public*

*Health Association*, 145 S. Ct. 2658 (2025) ("*NIH*"), (see Doc. 49, p. 20), which arose from a similarly styled district court order. *See Washington v. U.S. Dep't of Educ.*, No. 25-7157, 2025 WL 3486895, at *2 (9th Cir. Dec. 4, 2025) ("But in *California* and *NIH*, those plaintiffs explicitly sought, and the district court ordered, the immediate payment of past-due grant obligations and the continued payment of ongoing obligations based on midyear grant terminations."). Because Plaintiff States seek only equitable relief—not the payment of past-due obligations—*California* and *NIH* are inapposite. *See Cnty. of Santa Clara*, 2025 WL 3251660, at *27–28.

In any event, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). "Money damages" refer to "a sum of money used as compensatory relief" that is "given to the plaintiff to *substitute* for a suffered loss[.]" *Id.* at 895. In contrast, "specific remedies are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id.* (quotations omitted). Plaintiff States do not seek compensation for past harms; rather, they seek a remedy that will allow them to accept their 2025 EMPG and HSGP awards without the illegal terms. *See Washington*, 2025 WL 3002366, at *7 ("As in *Bowen*, Plaintiff States do not seek a retrospective remedy to substitute or compensate them for a suffered loss—they seek a prospective remedy, to enjoin Defendants from imposing new grant conditions."). Indeed, in *NIH*, five Justices reaffirmed that challenges to broader "policies related to grants" are properly brought in federal district court under the APA. 145 S. Ct. at 2661 (opinion of Barrett, J.) (distinguishing between "challenges to . . . grant terminations," which "belong[ed] in the Court of Federal Claims," and challenges to "policies related to grants," which belonged in federal district court); *id.* at 2663 (opinion of Roberts, C.J.) (reasoning, in an opinion joined by three other Justices, that the plaintiffs' challenge to grant-related policies set the

case apart from *Department of Education* and fell "well within the scope of the District Court's jurisdiction under the Administrative Procedure Act"); *see also id.* at 2671 (opinion of Jackson, J.) (noting that five Justices agreed that "district courts may still exercise jurisdiction over—and vacate—grant-related policies that contravene federal law").

In short, because Plaintiff States' APA claims are not disguised breach-of-contract claims, this Court—not the Court of Federal Claims—has subject-matter jurisdiction over this action.

### B. The Population Certification Hold and Performance Period Change are subject to judicial review under the APA.

Next, Defendants attempt to avoid judicial review of the PCH and PPC by claiming that their actions fit the narrow exception to APA review for "agency action committed to agency discretion by law," 5 U.S.C. § 701(a)(2). (Doc. 49, pp. 22–23.) This attempt likewise fails.

There is a "strong presumption in favor of judicial review of administrative action" under the APA. *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quotations omitted); *see also Jajati v. U.S. Customs & Border Prot.*, 102 F.4th 1011, 1016 (9th Cir. 2024). Although the presumption of judicial review can be overcome when an action is committed to agency discretion by law, this exception is read "quite narrowly." *Weyerhaeuser*, 586 U.S. at 23. "[A]gency action is 'committed to agency discretion by law' only 'in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply,' thereby leaving the court with 'no meaningful standard against which to judge the agency's exercise of discretion.'" *Jajati*, 102 F.4th at 1016 (quoting *Webster v. Doe*, 486 U.S. 592, 599 (1988) and *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). "Review is prohibited" under this exception "only where 'there is truly no law to apply.'" *Cmty. Legal Servs. in E. Palo Alto*, 137 F.4th at 942 (quoting *Jajati*, 102 F.4th at 1014). And the agency bears the burden of rebutting the presumption

that its action is judicially reviewable.  *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007); *see also*

*Thakur v. Trump*, 787 F. Supp. 3d 955, 987 (N.D. Cali. 2025), *stay denied*, 148 F.4th 1096 (9th

Cir. 2025).

Here, the statutes establishing the EMPG and HSGP grant provide a meaningful standard

against which this Court can judge Defendants' actions.  These statutes direct Defendants to

provide EMPG and HSGP funds to States and other government entities and outline several

parameters for the grants.  *See* 6 U.S.C. §§ 603–609, 762.  While the statutes do not explicitly

address a period of performance for the grants or outwardly prohibit Defendants from imposing a

hold pending the collection or certification of population data, they obligate Defendants to issue

the grants to assist the States in enhancing their emergency-management, disaster-relief, and

terrorism-prevention infrastructure.  *E.g.*, 6 U.S.C. §§ 604(a), 605(a), 762(b).  This obligation

alone provides a meaningful standard against which to assess Defendants' actions.  And, for the

PCH, 13 U.S.C. § 183(a) and the Paperwork Reduction Act (PRA) provide direction in assessing

the baseless imposition of this hold.

Rather than engage with these meaningful standards, and ignoring the Supreme Court's

instruction that § 701(a)(2)'s "committed to agency discretion" exception must be read narrowly,

Defendants advocate for an overly broad reading of the exception that would swallow the rule.

Defendants contend that the statutes' failure to expressly prohibit the PCH, and their silence

regarding the period of performance, renders their decision to impose the PCH and PPC

unreviewable.  (Doc. 49, pp. 21–22.)

But if review under the APA is available only when a statute completely occupies the field

and deprives the agency of any and all discretion, arbitrary-and-capricious and abuse-of-discretion

review would never be authorized; all challenges would be subsumed within contrary-to-law or

excess-of-authority claims. *See Weyerhaeuser Co.*, 586 U.S. at 23 (acknowledging "tension between the prohibition of judicial review for actions committed to agency discretion and the command in § 706(2)(A)" and concluding that, under an overly broad application of § 701(a)(2), "[a] court could never determine that an agency abused its discretion if all matters committed to agency discretion were unreviewable").

Under the appropriately narrow reading of § 701(a)(2), the "committed to agency discretion" exception is reserved for those rare instances where the agency created the applicable program or grant out of whole cloth, without any statutory or regulatory structures. For example, in *Lincoln v. Vigil*, the Supreme Court held that an agency's allocation of a lump-sum appropriation was not reviewable under the APA because the appropriation was untethered to any statutory restrictions or direction. 508 U.S. 182, 192–93 (1993); *see also id.* at 190 (noting that "no statute or regulation even mention[ed]" the program in question). Other cases have recognized this distinction, distinguishing *Lincoln* where grants are "explicitly specified" in statute. *See, e.g.*, *Washington*, 2025 WL 3486895, at *2 (recognizing *Lincoln*'s application to instances "where the lump-sum appropriation covered all the agency's activities and established no specific programs").

Further, other courts have already held that Defendants' attempts to apply new conditions in FEMA grants, including new conditions within the EMPG and HSGP grants, constitute agency action subject to APA review. *See, e.g.*, *Illinois v. FEMA*, No. 25-cv-206, 2025 WL 2716277, at *10 (D.R.I. Sept. 24, 2025) (FEMA grant conditions are reviewable, including EMPG and HSGP); *Cnty. of Santa Clara*, 2025 WL 3251660, at *40–41 (same; collecting cases); *City of Chicago v. Noem*, No. 25 CV 12765, 2025 WL 3251222, at *5 (N.D. Ill. Nov. 21, 2025) (same). This Court should follow suit.

For these reasons, the PCH and PPC both constitute final agency action subject to judicial review under the APA.

### C.     Plaintiff States' claims regarding the Population Certification Hold are ripe.

Defendants' challenge to the prudential ripeness of Plaintiff States' PCH-related claims also falls flat.  (*See* Doc. 49, pp. 22–24.)  The dictates of prudential ripeness are satisfied here because the PCH is a definitive statement of Defendants' legal position that requires immediate compliance and causes direct and immediate harm to Plaintiff States.

Defendants do not assert that Plaintiff States have failed to plead a case or controversy under Article III; rather, they raise a "prudential ripeness" challenge, arguing that their alleged intent to promulgate undefined "guidance" related to the PCH at an unspecified later date renders Plaintiff States' claims related to the PCH premature.  (*Id.* at 22–23.)  "Unlike Article III ripeness, 'prudential considerations of ripeness are discretionary[,]'" and turn on two factors: "(1) 'the fitness of the issues for judicial decision,' and (2) 'the hardship to the parties of withholding court consideration.'"  *Flaxman v. Ferguson*, 151 F.4th 1178, 1188 (9th Cir. 2025) (quoting *Planned Parenthood Great Nw., Haw., Alas., Ind., Ky. v. Labrador*, 122 F.4th 825, 840 (9th Cir. 2024) and *Ass'n of Irritated Residents v. EPA*, 10 4th 937, 944 (9th Cir. 2021)).  Plaintiff States have satisfied both.

In terms of fitness for judicial decision, "pure legal questions that require little factual development are more likely to be ripe."  *Planned Parenthood Great Nw.*, 122 F.4th at 840 (quotations omitted).  "Relevant considerations include 'whether the administrative action is a definitive statement of an agency's position; whether the action has a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate compliance with its terms.'"  *Skyline Wesleyan Church v. Cal. Dep't of Managed*

*Health Care*, 968 F.3d 738, 752 (9th Cir. 2020) (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009)).

In this case, each of these factors demonstrates that Plaintiff States' PCH-related claims are fit for judicial decision. The claims raise legal questions—none of which requires further factual development—as to whether Defendants acted arbitrarily and capriciously, or in excess of or contrary to statutory authority in imposing the PCH. And for the same reasons that the PCH represents final agency action, (see Doc. 30, pp. 24–25), the PCH is a definitive statement of Defendants' position, imposes direct and immediate consequences upon Plaintiff States, has the status of law, and requires immediate compliance with its terms.

Because Plaintiff States' PCH-related claims are fit for judicial decision, this Court need not consider the hardship prong. *Flaxman*, 151 F.4th at 1189. But Plaintiff States nevertheless satisfy this prong: For the same reason that Plaintiff States have demonstrated irreparable harm in the permanent injunction context, they have demonstrated significant hardship if this Court withholds consideration of their PCH-related claims on prudential ripeness grounds. (*See, e.g.*, Doc. 30, p. 42.) Specifically, the EMPG award is completely frozen due to the PHC, (*id.*), and Plaintiff States face the immediate dilemma of choosing between accepting an unlawful condition or losing millions of dollars in emergency management funding. Defendants claim that Plaintiff States suffer no harm because they could accept the 2025 EMPG award without first verifying their populations, (Doc. 49, p. 23), but this ignores the reality of what "acceptance" means. If Plaintiff States accept the award, they will have agreed to comply with an unlawful term. And before drawing down on any funds, Plaintiff States would be obligated to satisfy that unlawful term. The PCH is thus working hardship upon Plaintiff States already. *E.g.*, *Illinois*, 2025 WL 2716277, at *9 ("Because the challenged conditions remain applicable to all FY 2025 grants,

Plaintiff States face a dilemma: either certify compliance with contested federal immigration policies or risk losing critical emergency and disaster relief funding. But the law does not require them to 'await the consummation of threatened injury to obtain preventative relief.'" (quoting *Blanchette v. Conn. Gen. Ins. Corps.*, 417 U.S. 102, 143 (1974))); *California v. U.S. Dep't of Transp.*, No. 25-cv-208, 2025 WL 3072541, at *7 (D.R.I. Nov. 4, 2025) ("[R]egarding hardship, the [challenged term] presents a direct and immediate dilemma to the states because it asks them to accede to an allegedly unlawful condition or else forego billions of dollars in federal funding." (quotation omitted)).

Defendants' argument that they intend to promulgate "guidance" for compliance with the PCH at some unidentified point in the future, (Doc. 49, p. 23), does not alter the conclusion. Plaintiff States have demonstrated that Defendants' imposition of the PCH was unlawful under the APA; future guidance on how to comply with an unlawful term cannot change the term's illegality. In other words, no matter what Defendants say in their "guidance," Plaintiff States' claims remain. Moreover, waiting for such guidance will further exacerbate the dilemma that Plaintiff States face as a result of the PCH: Not only is the extended award acceptance deadline just over two weeks away,[4] each day that passes without Plaintiff States' acceptance of, or the ability to draw down on, the 2025 EMPG award further reduces the already-limited period of performance.

---

[4] Notably, Defendants never indicated that guidance would be forthcoming before the initial November 24, 2025, acceptance deadline. Nor have they explained why it is taking so long to issue the promised guidance once the federal government shutdown ended. And, notably, Plaintiff States were first alerted to Defendants' intent to promulgate guidance through the Arnold Declaration—not through any direct communication from Defendants.

At bottom, far from encouraging dismissal, the doctrine of prudential ripeness only supports this Court's "virtually unflagging" obligation to exercise jurisdiction.[5] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014).

## II. Defendants point to no statutory authority for the imposition of the Population Certification Hold.

Defendants fail to identify any statute permitting them to hold EMPG grants pending states' production of population data. There simply is no such statute, and the PHC exceeds Defendants' authority. Defendants' interpretation of 13 U.S.C. § 183(a) and their contention that FEMA "has authority to collect and consider population data from a variety sources," (Doc. 49, p. 27), is not relevant to their authority to place a hold on the grants: Even if Defendant could collect and consider State-produced data in allocating the grants (they cannot), there is no statutory authority for Defendants to withhold the funds post-award based on a data collection effort. After all, Defendants already allocated *and awarded* the EMPG grants to Plaintiff States. And Defendants provide no authority to reallocate the grants based on State-produced data.

Likewise, Defendants' contention that 6 U.S.C. § 762(d)(2)'s population-based allocation requirement "naturally" provides FEMA with the "authority to collect and consider population data from a variety sources" is nonsensical. (Doc. 49, p. 27.) As addressed further below, 13 U.S.C. § 183 provides the exclusive source for population data when allocating population-based grants. But even if FEMA could consider other sources of population data (they cannot),

---

[5] The Supreme Court has questioned whether prudential ripeness has "continuing vitality[,]" as it is "' in some tension with . . . the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)). The questionable ongoing legitimacy of prudential ripeness provides further reason to disregard Defendants' challenge.

§ 762(d)(2) solely mandates FEMA allocate the award based on population—it provides no affirmative authority to collect data from the States, and no authority to demand States certify their reported data excludes aliens who have been removed. Thus, it does not "naturally follow[]" that Congress granted FEMA such authority *sub silentio* in 6 U.S.C § 762(d)(2).

The imposition of the PHC thus exceeds Defendants' statutory authority.

### III.    U.S. Census Bureau data is the exclusive source for population-based award allocations, rendering the Population Certification Hold contrary to law.

Defendants concede that 13 U.S.C. § 183 requires them to use population data held by the U.S. Census Bureau to allocate the EMPG awards—at least as a starting point. (Doc. 49, p. 25.) But Defendants insist they are permitted to "*supplement* the census data . . . to ensure the accuracy of the final allocations," which authority is premised on their belief that language "suggesting exclusiveness is missing" from § 183. (*Id.*) Defendants are incorrect.[6] Well-trod principles of statutory interpretation prove that § 183 establishes the Census Bureau as agencies' exclusive source for population data when allocating population-based grants.

Section 183 requires that the Secretary of Commerce "shall transmit" its data "for use" by the agency. This mandatory directive comprises a duty on the Secretary to "transmit" the data and a reciprocal duty on Defendants to "use" the data. *See Maine Comm. Health Options v. United States*, 590 U.S. 296, 310 (2020) (observing that statute's use of "shall" connotes mandatory directive). If Congress did not intend to impose a reciprocal duty on Defendants to actually *use*

---

[6] Courts review agency interpretations of statutes de novo, exercising their own "independent judgment in deciding whether [the] agency has acted within its statutory authority." *China Unicom (Ams.) Operations Ltd. v. FCC*, 124 F.4th 1128, 1143 (9th Cir. 2024) (quoting *Loper Bright Enterps. v. Raimondo*, 603 U.S. 369 (2024)). "Doing so requires using 'all relevant interpretive tools' to determine the 'best' reading of a statute; a merely 'permissible' reading is not enough." *Mayfield v. U.S. Dep't of Labor*, 117 F.4th 611, 617 (5th Cir. 2024) (quoting *Loper Bright*, 603 U.S. at 400).

this data, the phrase "for use by the appropriate departments and agencies" would be meaningless surplusage. *See Chickasaw Nation v. United States*, 534 U.S. 84, 93 (2001) (describing rule against surplusage); *accord United States v. Olafson*, 213 F.3d 435, 441 (9th Cir. 2000) (observing "the law does not require the doing of a futile act"). Defendants appear to agree. (Doc. 49, p. 25.)

Defendants say, while they did use the data, nothing in any relevant statute prohibits them from using *more* data as a "*supplement.*" (Doc. 49, p. 25.) But the very concept of "supplementing" one set of population figures with a different set of population figures is incoherent: Any use of State-provided population data would not *supplement* Census Bureau data; it would *replace* it. In other words, if FEMA uses State-supplied data to reallocate EMPG awards, it necessarily must *reject* Census data, in violation of § 183(a).

Other interpretive canons confirm that § 183 mandates the use of U.S. Census Bureau data in allocating the EMPG and HSGP awards. Applying the canon of *Expressio Unius est Exclusio Alterius* (*i.e.*, the expression of one thing implies the exclusion of others) to § 183 demonstrates that there are two, and only two, sets of population figures that an agency may use. *See Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1054 (9th Cir. 2018) ("[W]hen a statute designates certain . . . manners of operation, all omissions should be understood as exclusions." (quotation omitted)). Under § 183(a)'s default rule, agencies needing population data are directed to "the data most recently produced and published" by the Census Bureau if it needs population data to determine the amount of a benefit. Section 183(b) creates the lone exception to this rule, which applies when a statute requires use of "data obtained in the most recent decennial census."

Congress provided no third option. Yet a third option—State-supplied population data—is what Defendants seek to employ through the PCH.[7]

Related, Defendants' interpretation of § 183(a) renders § 183(b) meaningless. *See Chickasaw Nation*, 534 U.S. at 93. Again, § 183(b) is an exception to § 183(a) that applies when the subject-specific statute requires reliance on decennial census data. If Defendants are correct, and § 183(a)'s reference to an agency's "use" of population data leaves the agency generally free to source and rely on additional data, no specific exception for statutes mandating a different source of data than that outlined in § 183(a) would be necessary. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (explaining general/specific canon of statutory construction, where a "specific provision is construed as an exception to the general one"). Thus, § 183(b)'s exception has meaning only if § 183(a) requires agencies to actually *use* non-decennial Census Bureau data in making population-based grant award allocations. Under this reading, § 183(b) exists to resolve conflicts between (1) any statute requiring an agency to use decennial census data and (2) § 183(a)'s default requirement to use "the data most recently produced and published" by the Census Bureau.

The general/specific canon, as well as this Court's duty to read two related statutes *in pari materia*, also supplies the correct definition for the term "population," which is undefined in the EMPG statute, 6 U.S.C. § 762(d)(2). *See RadLAX Gateway Hotel*, 566 U.S. at 645 (stating that general/specific canon "has full application" even without conflict between two statutes); *Doe v.*

---

[7] Notably, Congress considered that the *Secretary of Commerce* might desire more information to discharge his or her duties in establishing accurate population counts. 13 U.S.C. § 6(a). The Secretary of Commerce may even acquire pertinent records from the States. *Id.* § 6(b). This shows "Congress knew how" to authorize an agency to go looking for data from the States, creating an inference that such authorization is lacking in 6 U.S.C § 762(d)(2). *See, e.g.*, *Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1077 (9th Cir. 2016).

*Noem*, 778 F. Supp. 3d 1151, 1162 (W.D. Wash. 2025) (importing definition from related statute to interpret undefined term); *see also Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 340 (2019) (holding that subject-specific statute permitting award of "costs," without more, cannot authorize any costs outside six categories listed in "general 'costs' statute").  Section 183 effectively defines what "population" means in the context of federal benefit administration:  "[T]he data" that the U.S. Census Bureau "most recently produced and published."  It is appropriate to refer to that definition when interpreting 6 U.S.C. § 762(d)(2), a subject-specific federal benefit statute in which "population" is undefined.

Finally, Defendants have no response to their past practice of using exclusively Census Bureau data untainted (or unreplaced) by unreliable State-proffered data.  *E.g.*, *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 757 (9th Cir. 2021) (deeming interpretation of regulatory regime supportable by its consistency with agency's past practice).  In the same vein, an agency's interpretation of a statute is at its least persuasive when it does not invoke the agency's expertise. *Loper Bright*, 603 U.S. at 401–02.  Defendants have no expertise in complying or analyzing population data, and that is doubly significant when their foray into data collection conflicts with the expertise of the U.S. Census Bureau.  (See Doc. 30, p. 18 (citing Commerce Department statements in Federal Register).)

Accordingly, Defendants' imposition of the PCH is contrary to 13 U.S.C. § 183(a).

## IV.    Defendants imposed the Population Certification Hold without observing the Paperwork Reduction Act's applicable procedures.

Defendants concede that the PRA applies to the PCH, but they claim that FEMA satisfied each of the PRA's requirements prior to imposing the term.  (Doc. 49, pp. 13–14, 26–27.)  As Plaintiff States anticipated, Defendants point to only the "Generic Clearance for FEMA's

Preparedness Program" in support of this argument.  (*Id.* at 26; Doc. 27-13; Doc. 27-14.)  But the OMB Control Number for the "Generic Clearance" does not appear anywhere within the 2025 EMPG award, violating a basic tenet of the PRA, *see* 44 U.S.C. § 3507(a)(3) (requiring that an agency display the OMB Control Number on a collection of information), and evidencing that FEMA did not truly rely on the "Generic Clearance" to cover the information requested through the PCH at the time the PCH was imposed.  Defendants' post-hoc attempts to circumvent the PRA should be disregarded.

Even if the Generic Clearance is considered, Defendants do not meaningfully address any of Plaintiff States' arguments as to why it is insufficient in the context of the PCH.  (See Doc. 30, pp. 34–35.)  For instance, while Defendants surmise that "updated state population data—including adjustments for removed aliens—is a fundamental metric to calculate EMPG allocations accurately and equitably[,]" (Doc. 49, p. 27), they ignore that the true "fundamental metric" is set by statute:  Defendants must utilize U.S. Census Bureau data in allocating population-based grant awards.  (*See* Part III, *supra*; Doc. 30, pp. 26–27.)  And though Defendants assert that they have never asked Plaintiff States "to produce this number on any other occasion, and this number is not information already in the possession of the federal government[,]" (Doc. 49, p. 27), they disregard the fact that a subset of the requested information—the number of removals under federal immigration law—is *exclusively* within the province of Defendant DHS, and State population information is as accessible to Defendants as it is to the States:  Again, States primarily rely upon U.S. Census Bureau data and estimates in determining their populations.  (Doc. 1, p. 3, ¶ 6.)  The Generic Clearance simply does not save Defendants' failure to comply with the PRA in imposing the PCH, and Defendants accordingly acted "without observance of procedure required by law[,]" in violation of the APA.  5 U.S.C. § 706(2)(D).

## V.    The Population Certification Hold and Performance Period Change are arbitrary and capricious.

The PCH and PPC are arbitrary and capricious for several reasons articulated in Plaintiff States' moving brief.  (Doc. 30, pp. 27–33, 36–39.)  Defendants' arguments to the contrary—that the PCH and PPC are not policy changes, that Plaintiff States' reliance interests were unreasonable, and that the Arnold Declaration suffices to demonstrate that Defendants made well-reasoned decisions—are unavailing.

### A.    The Population Certification Hold and Performance Period Change are plainly changes in position.

To start, Defendants contend that the PCH and PPC are not changes in position such that they would be subject to arbitrary and capricious review.  (See Doc. 49, pp. 28, 34.)  This argument conflates reviewability with the appropriate arbitrary-and-capricious standard; but, in any event, it is factually incorrect and legally unsupportable.

Factually, the PCH and PPC are undisputedly changes from the 2025 EMPG and HSGP NOFOs, which did not contain a PCH or any similar term and outlined standard three-year periods of performance (backdated for EMPG).  (Doc. 27-3.)  They also diverge from decades of past grants, none of which included a PCH, and all of which contained a multi-year period of performance (backdated for EMPG).  (Doc. 27-3; Doc. 27-4; Doc. 31 (Sweeney Decl.), p. 14, 16, 19, ¶¶ 47, 54–55, 66; Doc. 33 (Lavine Decl.), p. 6, ¶ 19; Doc. 34 (Haney Decl.), pp. 14, 18, ¶¶ 44–45, 56; Doc. 36 (Pace Decl.), p. 9, ¶ 24; Doc. 43 (Rye Decl.), p. 12, ¶ 37; Doc. 45 (McMahon Decl.), p. 12, ¶ 38; Doc. 46 (Engle Decl.), p. 11, ¶ 32; Doc. 48 (Ray Decl.), p. 11, ¶ 39.)

Legally, Defendants provide no authority to support their claims that, for an agency decision to comprise a change in position susceptible to arbitrary-and-capricious review, the agency's prior position must be written into a "policy document," and no such law exists.  (Doc.

49, pp. 28, 33.)  *See* 5 U.S.C. § 551(4), (13) (definition of "agency action" subject to review under the APA includes agency "rule[s]," which is defined to include many kinds of "statement[s] of general or particular applicability and future effect").  Additionally, and contrary to Defendants arguments, Plaintiffs do not contend that "formal policy memoranda" are required "every time" an agency adds a term to a grant agreement.  (*Id.* at 28.)  Rather, under the APA, the decision to add terms and conditions to a grant agreement must not be arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A).

Notably, Defendants do not contest that the inclusion of the PCH in the EMPG grant awards or the PPC in the EMPG and HSGP grant awards constitutes final agency actions.  Thus, even if the PCH and PPC were not changes in position, they would still be subject to APA review as a final agency action.  5 U.S.C. § 704.  The fact that they *are* changes in position merely makes the arbitrary-and-capricious review more acute, requiring the agency to "display awareness that it is changing position," show that there are "good reasons for the new policy," and consider any "serious reliance interests" engendered by the status quo.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Regents*, 591 U.S. at 30; *League of Cal. Cities v. FCC*, 118 F.4th 995, 1014 (9th Cir. 2024).  Defendants cannot escape arbitrary and capricious review under the APA.

**B.    Plaintiffs held reasonable reliance interests that Defendants failed to consider when imposing the Population Certification Hold and Performance Period Change.**

In their cross-motion, Defendants do not contend they considered Plaintiff States' reliance interests before imposing the PCH in the EMPG grant awards and changing the periods of performance in the EMPG and HSGP awards.  *See Fox Television Stations, Inc.*, 556 U.S. at 515.  Nor could they, as the administrative record makes clear Defendants did not consider the States' interests in any respect.  (See Doc. 27-2 (Arnold Decl.), pp. 2–3 (¶¶ 6, 12).)  With no facts to show

consideration of Plaintiff States' interests, Defendants seek to sidestep this obligation by contending they did not need to consider the States' reliance interests because those interests were "unreasonable." (Doc. 49, pp. 28–30, 34.) This argument is baseless.

With respect to the PCH, the 2025 EMPG NOFO did not include any reference to that term. (Doc. 27-3.) And, for the previous two decades, EMPG awards never included any term even remotely similar to the PCH. (Doc. 31 (Sweeney Decl.), p. 14, ¶ 47; Doc. 33 (Lavine Decl.), p. 6, ¶ 19; Doc. 40 (Strickland Decl.), p. 12, ¶ 39; Doc. 43 (Rye Decl.), p. 12, ¶ 37; Doc. 45 (McMahon Decl.), p. 12, ¶ 38; Doc. 46 (Engle Decl.), p. 11, ¶ 32.) The original 2025 EMPG awards likewise did not include the PCH. (See Doc. 1-4.) It is difficult to imagine circumstances that could induce a more definite expectation that the 2025 EMPG award would not include the PCH. Given Defendants' actions, Plaintiff States' reliance on the NOFOs and history of the grant programs was reasonable.

The same is true for the PPC. The 2025 EMPG NOFO provided a three-year period of performance, backdated to run from October 1, 2024, through September 30, 2027. (Doc. 27-3.) And the 2025 HSGP NOFO provided a three-year period of performance. (Doc. 27-4.) Both grants also historically included multi-year periods of performance, with the EMPG award backdated by one year. (Doc. 31 (Sweeney Decl.), pp. 16, 19, ¶¶ 54–55, 66; Doc. 32 (Dzbanko Decl.), p. 9, ¶ 30; Doc. 34 (Haney Decl.), pp. 14, 18, ¶¶ 44–45, 56; Doc. 35 (Mark Decl.), p. 7, ¶¶ 25–26; Doc. 36 (Pace Decl.), p. 9, ¶ 24.) The States' declarations make clear that they relied on the periods of performance reflected in the NOFOs and the history of these awards. (E.g., Doc. 31 (Sweeney Decl.), p. 18, ¶ 62; Doc. 37 (Gibson Decl.), p. 9, ¶ 33; Doc. 41 (Compston Decl.), p. 10, ¶¶ 33–34; Doc. 45 (McMahon Decl.), p. 16, ¶ 52.)

Defendants suggest reliance on the NOFO is misplaced because an agency can change terms in the final grant agreement.  (Doc. 49, pp. 29, 34.)  While it is true that an agency *can* change the terms of a grant between the NOFO and the award, this ability does not negate the well-founded reliance generated by the NOFO; nor does it relieve the agency of the APA's requirement that such changes in the final award not be arbitrary and capricious.  Taken at face value, Defendants' argument suggests grant applicants can never rely on a NOFO.  This proposition is absurd:  How could an applicant apply for grant if it should garner no reliance on the terms of the NOFO?

Demonstrating the absurdity of their "reasonable reliance" argument, Defendants rest the entirety of that argument on a single paragraph in a 1977 decision out of the United States District Court for the District of Columbia.  (See Doc. 49, pp. 29, 34 (citing *Libby Welding Co. v. United States*, 444 F. Supp. 987, 992 (D.D.C. 1977).)  But *Libby* is both nonbinding and distinguishable.  There, the court evaluated whether a plaintiff could reasonably rely on a discretionary term in an "invitation for bids" that provided the government the option to waive a costly equipment-testing requirement.  *Libby*, 444 F. Supp. at 992.  The court found that it was unreasonable for the plaintiff to presume that the government would grant the waiver after the bid was awarded, reasoning that the government held sole discretion and consistently had declined to issue the waiver in the past.  *Id.* at 992–93 & n.16.

There is nothing analogous to *Libby* here.  The final EMPG awards in this case contained a term that Plaintiff States could never have anticipated as it was not contained in the NOFO.  And the EMPG and HSGP awards likewise contained entirely unexpected periods of performance.  Unlike the plaintiff in *Libby*, Plaintiff States made no unreasonable assumptions.  Rather, Plaintiff States relied on decades of practice—a factor absent from *Libby*.  Thus, *Libby* provides no support

for Defendants.  Plaintiffs States reasonably relied on the 2025 EMPG and HSGP NOFOs and the history of these programs.

At bottom, Defendants' complete failure to consider the States' reliance interests—interests that Defendants themselves induced through the NOFO and decades of practice—renders the PHC and PPC arbitrary and capricious.

### C.    The Arnold Declaration is a post-hoc litigation affidavit that should not be considered.

Defendants' arguments that their decisions to impose the PCH and PPC were not arbitrary and capricious rest entirely on the Arnold Declaration, (Doc. 49, pp. 31–34), which should be disregarded as a post-hoc litigation affidavit.

"It is a 'foundational principle of administrative law' that judicial review of agency action is limited 'to the grounds that the agency invoked when it took the action[,]'" as reflected in the administrative record.  *Regents*, 591 U.S. 1, 20 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2020)).  An administrative record consists exclusively of documents "in existence at the time of the decision."  *Lands Council v. Powell*, 395 F.3d 1019, 1029–30 (9th Cir. 2005) (quotation omitted); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which *the record discloses* that its action was based." (emphasis added)).  Affidavits prepared after the fact, for litigation, do not fit this bill.

While the Ninth Circuit has "permitted an agency to supplement an inadequate administrative record where it has found that the existing record is insufficient to explain the agency's decision[,]" *Midwater Trawlers Coop. v. Dep't of Commerce*, 383 F.3d 994, 1007 (9th Cir. 2004), the Supreme Court has recently cautioned that supplementation has "important limitations."  *Regents*, 591 U.S. at 21; *see also Lands Council*, 395 F.3d at 1030 (noting exceptions

to record-only limitation "are narrowly construed and applied"). Specifically, an agency may supplement the administrative record only when "an agency's initial explanation 'indicates the determinative reason for the final action taken.'" *Regents*, 591 U.S. at 21 (quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973)); *see also Asarco, Inc. v. EPA*, 616 F.2d 1153, 1159 (9th Cir. 1980) (indicating that, even if courts require an explanation to understand the agency's decision-making, ultimately the decision still must be "sustainable on the administrative record"). Even then, the agency may only "elaborate . . . on that reason (or reasons) but may not provide new ones"—and such elaboration " 'must be viewed critically' to ensure that the [agency decision] is not upheld on the basis of impermissible '*post hoc* rationalization.'" *Regents*, 591 U.S. at 21; (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)); *e.g.*, *Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1292 (9th Cir. 1977) (upholding district court's reference to "augmenting materials" because they "were merely explanatory of the original record" and contained "[n]o new rationalization").

In arguing that this Court should consider the Arnold Declaration, Defendants do not explain how the Arnold Declaration satisfies the "important limitations" that *Regents* recognized. Nor could they. Indeed, had Defendants analyzed the Arnold Declaration under *Regents*, they would have recognized that it falls cleanly within the contours of a prohibited post-hoc litigation affidavit because it is untethered to a reason contained in the administrative record.[8] *Lotus Vaping*

---

[8] The cases that Defendants cite confirm that supplementation is appropriate only where the administrative record itself offers at least some reason for an agency decision. *E.g.*, *Local 814, Intern. Broth. of Teamsters v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976) ("Thus the rule applies to rationalizations *offered for the first time in litigation affidavits*[.]" (emphasis added)) (citation omitted); *Forest Serv. Emps. for Env't'l Ethics v. U.S. Forest Serv.*, 796 F. App'x 390, 392 (9th Cir. 2020) ("Although these references in the administrative record are curt, they suggest that the [agencies] considered and rejected the use of private lands. As a result, these statements in the record belie [plaintiff's] claim that the supplemental declarations at issue in this case . . . are merely post hoc rationalizations.").

*Techs., LLC v. FDA*, 73 F.4th 657, 668 (9th Cir. 2023) ("[A]n agency 'must defend its actions based on the reasons it gave when it acted,' not with post hoc rationalizations." (quoting *Regents*, 591 U.S. at 24)).

In fact, the administrative record contains *no indication* that Defendants were contemplating the PCH or PPC prior to their imposition. Thus, the administrative record reflects no reason for the PCH or PPC upon which the Arnold Declaration could elaborate. Instead, the administrative record paints a consistent picture: As in past years—until an unexplained about-face at the eleventh hour—Defendants planned to issue the 2025 EMPG and HSGP awards with a three-year performance period, backdated by one year for the EMPG award, and without any requirement that States provide or certify population information prior to accessing funding. (See, e.g., Doc. 27-3; Doc. 27-4; Doc. 27-5; Doc. 29-1.) "Given this consistent picture painted by the administrative record," this court should be "unpersuaded" by the Arnold Declaration. *Nat'l Urban League v. Ross*, 977 F.3d 698, 703 (9th Cir. 2020).

In short, the Arnold Declaration does not "elaborate on" Defendants' reason for imposing the PCH—it "provide[s] new ones." *Regents*, 591 U.S. at 21. Therefore, this Court should disregard it as an inappropriate post-hoc litigation affidavit.

### D.     The Arnold Declaration does not reflect reasoned decision-making in imposing the Population Certification Hold and Performance Period Change.

If it is considered, the Arnold Declaration nevertheless does not demonstrate that Defendants' decisions to impose the PCH and PPC were well-reasoned. As Plaintiff States fully detailed in their memorandum of law in support of their motion for summary judgment, the Arnold Declaration does not offer a rational explanation for imposing the PCH and PPC. (Doc. 30, pp. 29–33, 37–39.) Defendants' arguments to the contrary simply repeat the post-hoc reasons asserted

in the Arnold Declaration and already addressed in Plaintiffs' motion.  (*Id.*)  Plainly put, Defendants' repeated explanation does not move the needle; therefore, Plaintiff States rest on their prior arguments.  (*Id.*)

### E.    Defendants fail to respond to Plaintiffs' argument that the Performance Period Change is inconsistent with other grant programs.

Finally, Defendants failed to respond to Plaintiffs' argument that the PPC is arbitrary and capricious because it is inconsistent with Defendants' treatment of other 2025 FEMA mitigation grants that contain three- and even four- year periods of performance.  (Doc. 30, p. 39.) Defendants' failure to respond forfeits any defense.  *See Orr v. Plumb*, 884 F.3d 923, 932 (9th Cir. 2018).

## VI.    Vacatur and injunctive relief are appropriate.

Defendants assert that both vacatur and injunctive relief are legally and factually improper. In so doing, they misconstrue Plaintiff States' theory, fail to rebut Plaintiff States' showings of harm and the balance of the equities, and invoke only inapplicable or distinguishable authorities.

### A.    The Court should vacate the Population Certification Hold and Performance Period Change and deny Defendants' requested remand.

As Defendants concede, this Court is bound by precedent establishing that vacatur is the presumptive remedy here.  (Doc. 49, p. 36 (citing *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025).)  Defendants assert, however, that this long line of precedent is wrongly decided.  Relying on a single concurring opinion that questions, but reaches no final conclusion on, the availability of vacatur, Defendants say that "the APA does not permit vacatur of agency action."  (*Id.* (citing *United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring)).).) But precedent is unambiguous:  Vacatur is not just authorized, but presumptively appropriate.

*Mont. Wildlife Fed'n*, 127 F.4th at 50; *see* 5 U.S.C. § 706(2) (authorizing courts to "hold unlawful and set aside agency action").

In the event this Court holds either the PPC or PCH to be arbitrary and capricious, Defendants ask for a remand for an opportunity, without vacatur, to more thoroughly explain the rationales for their decisions. (Doc. 49, pp. 37–38.)  As addressed in Plaintiffs' motion (Doc. 30, pp. 40–41), the Court should deny this request for several reasons.

First, and most important, is the timing.  Plaintiff States must accept the awards in just over two weeks' time.  And even if that deadline could be moved, the time in which to plan for and execute funded projects is shrinking; meanwhile, emergency management functions at the local level have been thrown into disarray. (Doc. 30, pp. 22–23.)  Equity demands that no remand be permitted.  *See Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012).

Regardless, remand would be futile twice over.  Defendants already submitted the Arnold Declaration, which they insist "is offered to explain the rationale for [their] decision"—the very purpose of the requested remand.  (Doc. 30, p. 23.)  They make no offer of proof as to what else a remand might reveal.  And it is impossible for Defendants to justify the PCH and PPC on remand in light of Plaintiff States' well-established reliance interests.  *See Mont. Wildlife Fed'n*, 127 F.4th at 51 (denying remand because "[t]here is no serious possibility that the government will be able to substantiate its decision . . . on remand").

Defendants also argue that "[v]acating the one-year performance term would leave the awards without any defined performance window."  (Doc. 49, p. 39.)  But vacatur should revert the period of performance to the periods articulated in the NOFOs, the previous status quo.  And vacatur could be accompanied by an injunction, as addressed below, removing any doubt as to the applicable periods of performance.

**B.** **The Court should enter permanent injunctive relief to effectuate its judgment.**

    **1.** **Defendants have not rebutted Plaintiffs' showings of irreparable harm.**

In opposing Plaintiffs' request for an injunction, Defendants dispute that the PPC caused, and continues to cause, irreparable harm to Plaintiffs. (Doc. 49, p. 31.) However, Defendants identify only a one of the myriad harms they have inflicted on Plaintiffs: that States must spend their grant funds in "mere months." (*Id.*) But Defendants do not even respond to their cherry-picked harm; rather, they say only that "states are simply being required to plan their preparedness budgets on an annual basis—spending *annual* allocations *annually*." (*Id.*) This thought-rhyme, masquerading as argument, is irrelevant; it does not acknowledge the practicalities of emergency-preparedness planning, *i.e.*, the multi-tiered approval process that eats up most of a one-year performance period. (See Doc. 30, p. 22.) As FEMA knows, its own project-approval process takes about six months from award receipt. (E.g., Doc. 31 (Sweeney Decl.), p. 20, ¶ 67.)

Defendants' myopic argument shows their fundamental misunderstanding of Plaintiffs' complaint. Plaintiffs do not contend FEMA can *never* shorten the period of performance. They argue that the abrupt, capricious change to decades of past practice has caused irreparable harm. Linking an "annual" award to an "annual" performance period does not reflect that Plaintiffs' interests were considered, and it does nothing to negate or undercut Plaintiffs' harms. Related, even considering the Arnold Declaration, Defendants fail even to mention—let alone weigh—the disruption the PPC causes to effective emergency management.

Plaintiffs' harm is by no means limited to the balance of this year's awards, either. Plaintiffs have exhaustively explained how the parties' past practice created reliance on the three-year period of performance. Multi-year performance periods enable States to rely on unexpended

funds to bridge the gap between fiscal years. (E.g., Doc. 31 (Sweeny Decl.), pp. 17–18 (¶ 61).) Staffing positions that rely on annual federal funding therefore cannot be maintained. (Doc. 30, p. 21.) Defendants induced Plaintiff States and subgrantees to invest in multi-year projects, which investments will now be wasted, and the change will result in States and localities reducing or eliminating their emergency management capacity. (*Id.* at 21–22, 42.) Furthermore, Plaintiffs' subgrantees already have expended funds based on their reasonable expectation that EMPG funds would be backdated as they always have been. (*Id.* at 22–23, 42.)

Defendants' response to the harm caused by the PCH is likewise off the mark. They argue only that Plaintiffs' *premise*—that they cannot comply with the PCH, thus indefinitely holding the EMPG grants—is invalid. (Doc. 49, pp. 40–41.) But Plaintiffs demonstrated they cannot comply (Doc. 30, pp. 19–20); and Defendants' promise of guidance at some unknown future date provides no evidentiary rebuttal. And, regardless of any future guidance, the irreparable harms caused by the PCH has already occurred (and continues to occur). (*Id.* at 42.)

### 2. Defendants have not shown that any of the remaining injunction factors weigh in their favor.

Defendants offer only a threadbare discussion of the remaining factors informing whether to grant a permanent injunction. They do not address, let alone overcome, Plaintiffs' discussion of the equities. This is unsurprising, as Defendants cannot suffer harm "from an injunction that merely ends an unlawful practice," *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013), and the public interest weighs heavily against "jeopardizing national security." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 33 (2008).

Regarding the PCH, Defendants assert that "the order Plaintiffs seek would *prevent* the Government from fulfilling its statutory mandate to ensure EMPG funds are distributed to states

based on their current populations." (Doc. 30, p. 41 (emphasis added).) But, as addressed above, Defendants must rely on the Census data already available to FEMA and already utilized to allocate the awards. Moreover, Defendants have never claimed U.S. Census data is inaccurate, or even that they suspect the data might be somehow infirm. Nothing in the record gives credence to the idea that relying on the Census data would "prevent" Defendants from complying with 6 U.S.C. § 762(d)(2).

Regarding the PPC, Defendants again do not argue that the requested injunction tips the equities in their favor. Instead, they attack this Court's authority, saying Plaintiffs provided no basis for this Court to issue the requested "mandatory injunction." (Doc. 49, pp. 41–42.)

Besides being nonresponsive, this argument is unavailing. An injunction focuses on restoring the status quo, which refers to "the last uncontested status which preceded the pending controversy." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (quotation omitted). Occasionally, an injunction "can be phrased either in mandatory or prohibitory terms," such as "do not strike" versus "continue working." *Intl. Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 835 (1994). But "injunctions that prohibit [agency] enforcement of a new law or policy . . . [are] prohibitory," not mandatory. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014). Thus, an injunction requiring Defendants not to depart from the periods of performance set forth in the EMPG and HSGP NOFOs is not a mandatory injunction. And, even if it was, the facts and law so clearly support Plaintiff States that such injunction is appropriate here.

Because the Defendants have not rebutted Plaintiffs' showings establishing that an injunction is appropriate, this Court should enter an injunction effectuating the vacatur of the PCH and PPC.

**VII.    Defendants' request for a stay should be denied.**

Finally, this Court should deny Defendants' request for a stay pending appeal.  (Doc. 49, p. 43.)  The party seeking a stay bears an "especially heavy burden" in establishing that a stay pending appeal is justified.  *Packwood v. Senate Select Comm. on Ethics*, 510 U.S. 1319, 1320 (1994) (Rehnquist, C.J., in chambers); *see also Nken v. Holder*, 556 U.S. 418, 433–34 (2009).  To justify a stay, Defendants must convince this Court that a stay is justified based on four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Nken,* 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)) (cleaned up).  "'The first two factors . . . are the most critical,' and the court will address the last two factors only once the applicant has satisfied the first two factors."  *Cmty. Legal Servs. in E. Palo Alto*, 137 F.4th at 937 (quoting *Nken*, 556 U.S. at 434–35).

Rather than meet their burden for the first factor, Defendants merely incorporate their summary-judgment arguments by reference.  (Doc. 46, p. 43.)  For the reasons stated above, however, those arguments fail and therefore do not support a stay pending appeal.

Defendants also do not satisfy their burden to show that they will suffer irreparable harm. "The minimum threshold showing for a stay pending appeal requires that irreparable injury is likely to occur during the period before the appeal is likely to be decided."  *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020).  Defendants contend that they will be irreparably harmed because "Plaintiffs have given no indication that they would abide by a one-year period of performance" if Defendants ultimately prevailed.  But Plaintiffs do not suggest they would not comply if they lose this case—just that most of the funds would lapse due to the PPC.  Moreover, any appeal—particularly a stay application to the Ninth Circuit—would likely be resolved well

before the purported one-year period of performance lapses in September 2026. Accordingly, no irreparable harm would befall Defendants without a stay, and this Court should deny the stay request.

## CONCLUSION AND RELIEF REQUESTED

For the forgoing reasons, and for the reasons outlined in their memorandum of law in support of their motion for summary judgment, Plaintiffs States respectfully request that the Court deny Defendants' cross motion for summary judgment, grant their motion for summary judgment, and award the relief set forth in Plaintiffs' motion (see Doc. 30, p. 44.).


Dated: December 12, 2025

Respectfully submitted,

DANA NESSEL                                DAN RAYFIELD
Attorney General of Michigan               Attorney General for State of Oregon

By: *s/ Neil Giovanatti*                    *s/ Coby Howell*
NEIL GIOVANATTI (P82305)                   COBY HOWELL #25434
ADAM R. DE BEAR (P80242)                   LEANNE HARTMANN #T25070201,
DANIEL J. PING (P81482)                    Mass. BBO #667852
*Assistant Attorneys General*              BRIAN MARSHALL #196129
Michigan Department of Attorney General    Senior Assistant Attorneys General
525 W. Ottawa                              100 SW Market Street
Lansing, MI 48909                          Portland, OR 97201
(517) 335-7603                             971-673-1880
GiovanattiN@michigan.gov                   Coby.Howell@doj.oregon.gov
deBearA@michigan.gov                       Leanne.Hartmann@doj.oregon.gov
PingD@michigan.gov                         Brian.S.Marshall@doj.oregon.gov

*Attorneys for the State of Michigan*      *Counsel for Plaintiff State of Oregon*

KRISTIN K. MAYES
Attorney General of Arizona

By: *s/ Joshua G. Nomkin*
JOSHUA G. NOMKIN
Office of the Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Nomkin@azag.gov

*Attorney for the State of Arizona*

ANNE E. LOPEZ
Attorney General for the State of Hawai'i

By: *s/ Kaliko'onālani D. Fernandes*
DAVID D. DAY
Special Assistant to the Attorney General
KALIKO'ONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaii*

AARON M. FREY
Attorney General for the State of Maine

By: *s/ John E. Belisle*
JOHN E. BELISLE
Assistant Attorney General
Office of Maine Attorney General
6 State House Station
Augusta, Maine 04333-006
(207) 626-8800
john.belisle@maine.gov

*Attorney for the State of Maine*

PHILIP J. WEISER
Attorney General for the State of Colorado

By: *s/ Sarah H. Weiss*
SARAH H. WEISS
FINNUALA K. TESSIER
Senior Assistant Attorneys General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Sarah.Weiss@coag.gov

*Attorneys for the State of Colorado*

S. TRAVIS MAYO
General Counsel Office of the Governor of
Kentucky

By: *s/ S. Travis Mayo*
S. TRAVIS MAYO
General Counsel
TAYLOR PAYNE
Chief Deputy General Counsel
LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Attorneys for Plaintiff Office of the Governor
ex rel. Andy Beshear, in his official capacity as
Governor of the Commonwealth of Kentucky*

ANTHONY G. BROWN
Attorney General for the State of Maryland

By: *s/ James C. Luh*
JAMES C. LUH
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6411
jluh@oag.state.md.us

*Attorney for the State of Maryland*

AARON D. FORD
Attorney General of Nevada

By: *s/ K. Brunetti Ireland*
K. BRUNETTI IRELAND
Chief of Special Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Attorney for the State of Nevada*


JEFF JACKSON
Attorney General of North Carolina

LAURA HOWARD
Chief Deputy Attorney General

By: *s/ Daniel T. Wilkes*
DANIEL T. WILKES
Assistant Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6415
dwilkes@ncdoj.gov

*Attorney for State of North Carolina*

RAUL TORREZ
Attorney General of the State of New Mexico

By: *s/ Lauren Perry*
Lauren Perry
Assistant Attorney General
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 270-4332
lperry@nmdoj.gov

*Attorneys for the State of New Mexico*


JOSHUA L. KAUL
Attorney General of Wisconsin

By: *s/ Frances Reynolds Colbert*
FRANCES REYNOLDS COLBERT
Assistant Attorney General
State Bar #1050435
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-9226
(608) 294-2907 (Fax)
frances.colbert@wisdoj.gov

*Attorney for State of Wisconsin*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,806 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s/ Neil Giovanatti
Neil Giovanatti (P82305)
Attorney for Plaintiff State of Michigan

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2025, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

/s/ Neil Giovanatti
Neil Giovanatti (P82305)
Attorney for Plaintiff State of Michigan