IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

STATE OF MICHIGAN, STATE OF
OREGON, STATE OF ARIZONA, STATE
OF COLORADO, STATE OF HAWAII,
STATE OF MAINE, STATE OF MARYLAND,
STATE OF NEVADA, STATE OF NEW
MEXICO, STATE OF WISCONSIN, and OFFICE
OF THE GOVERNOR, ex rel. ANDY BESHAR,

               Plaintiffs,

     v.

KRISTI NOEM, UNITED STATES DEPARTMENT
OF HOMELAND SECURITY, DAVID
RICHARDSON, and FEDERAL EMERGENCY
MANAGEMENT AGENCY,

               Defendants.

Case No. 6:25-cv-02053-AP

**OPINION & ORDER**

POTTER, United States Magistrate Judge:

     For the past twenty years, the Federal Emergency Management Agency (FEMA), now an

agency of the Department of Homeland Security,[1] has worked to improve our nation's ability to

respond to threats and disasters. In that role, it administers grants for States that allow them to

plan for emergencies ranging from natural disasters to acts of terrorism. This year, as in past

years, FEMA published Notices of Funding Opportunity (NOFOs) for two grants; the NOFOs

---

[1] Defendants in this action are FEMA, the Department of Homeland Security, Kristi Noem, the
Secretary of Homeland Security, and David Richardson, the former Acting Head of FEMA.
Because Mr. Richardson resigned, he is automatically replaced by the current head of FEMA,
Karen Evans. Fed. R. Civ. P. 25(d).

PAGE 1 – OPINION & ORDER

contained the proposed terms for the grants which were consistent with FEMA's past practice over decades. States applied for the grants but were surprised to learn when they received their grant awards that the period of performance for the grants went from three years to one year and that the states would have a new responsibility of certifying their populations instead of using census data. Plaintiff States—Michigan, Oregon, Arizona, Colorado, Hawaiʻi, Maine, Maryland, Nevada, New Mexico, Wisconsin, and Kentucky—view those terms as unlawful and have yet to accept their grants despite significant need for the funds for emergency services. Plaintiffs now bring claims under the Administrative Procedures Act (APA), seeking to have the terms vacated. Compl., ECF No. 1.

The parties have moved for summary judgment. Pls.' Mot., ECF No. 30; Defs.' Cross-Mot., ECF No 49. All parties have consented to jurisdiction by a U.S. Magistrate Judge. ECF No. 52. Because Defendants' actions in changing the terms of the grants were arbitrary and capricious, Plaintiffs' Motion for Summary Judgment is GRANTED and Defendants' Cross-Motion for Summary Judgment is DENIED.

## BACKGROUND

### I.    FEMA GRANT PROGRAMS

The Federal Emergency Management Agency (FEMA) was created in 1979, by President Carter's Executive Order. History of FEMA, https://www.fema.gov/about/history (last visited December 23, 2025). Following the September 11, 2001, terrorist attacks and the passing of the USA PATRIOT Act, FEMA was incorporated into the Department of Homeland Security. *Id.* FEMA's mission is to help people before, during, and after disasters. How FEMA Works, https://www.fema.gov/about/how-fema-works (last visited December 23, 2025). As part of that mission, FEMA administers a number of grants established by Congress. *Id.* The grant programs

at issue here are the Emergency Management Performance Grant (EMPG) and the Homeland Security Grant Program (HSGP).

### A.     EMPG Grant

"The Emergency Management Performance Grant (EMPG) provides state, local, tribal and territorial emergency management agencies with the resources required for implementation of the National Preparedness System and works toward the National Preparedness Goal of a secure and resilient nation." Preparedness Grants, https://www.fema.gov/grants/preparedness (last visited December 23, 2025). "States and territories use EMPG funds to prepare for and respond to emergencies, which can include funding operations personnel who coordinate disaster response efforts, supporting emergency management training programs, conducting disaster response exercises, purchasing equipment and technology resources to support emergency management teams, and performing community outreach to educate residents on disaster preparedness and response." Compl. ¶ 32.

EMPG funds were initially appropriated in 2003; the program was codified at 6 U.S.C. § 762 in 2006. The allocation of EMPG funds is formulaic and according to statute. As a baseline amount, each state receives .75 percent of the appropriated funds.[2] 6 U.S.C. § 762(d)(1). The remaining funds are then divided amongst the states according to their population. As a general rule, each state must match the grant funds with their own state or local funds. 6 U.S.C. § 762(c).

The states develop programs or projects and then apply to FEMA to draw down their grant funds. AR Ex. 6, ECF No. 27. FEMA must approve each program or project before the states may access the money. Approvals can take months. Some states focus on state-wide

---

[2] And American Samoa, the Commonwealth of the Northern Mariana Islands, Guam, and the Virgin Islands each receive .25 percent of the total appropriated funds.

programs while other states send money to local areas that are particularly vulnerable and without resources. *See* Compl. ¶¶ 33-47. Many of the programs or projects are designed to extend over multiple years and depend on continued access to grant funds. Compl. ¶ 49. For more than a decade, these funds have also been backdated, meaning that many states had incurred significant expenses for ongoing programs even before the grant issued. Compl. ¶ 50.

For example, in Kentucky, EMPG funding is crucial to "the state's ability to prepare for, respond to, and recover from disasters." Gibson Decl. ¶ 17, ECF No. 37. Since 2020, Kentucky has experienced 15 major disasters, including severe storms, tornados, flooding, and the COVID-19 pandemic. *Id.* "Many of Kentucky's 120 counties would not have an effective emergency management program without the assistance of the EMPG funding due to the abject poverty particularly across the Appalachian region." *Id.*

In Arizona, EMPG grants fund approximately 50% of the state's emergency management functions and services. Lavine Decl. ¶ 13, ECF No. 33. Funds are used "at the state and local level to develop and maintain all-hazards emergency plans, support emergency management training programs, conduct disaster response exercises, fund emergency management personnel conducting these activities, provide equipment and technology resources, and perform community outreach to educate residents on disaster preparedness and response." *Id.*

In Hawai'i, EMPG grants fund the Hawai'i Emergency Management Agency's communications, facilities, and utilities. Mark Decl. ¶ 13, ECF No. 35. "EMPG funds support community outreach programs that prepare Hawai'i residents to be ready for a disaster." EMPG grants also fund Hawai'i's Public Information and Warning System. *Id.* EMPG funding is also used "to conduct preparedness trainings and exercises with the counties and other state agencies to prepare for disasters and coordinate disaster response." *Id.*

PAGE 4 – OPINION & ORDER

In North Carolina, EMPG funds were used to "enhance and sustain" the state's "preparedness and response operations during Tropical Strom Helene." Ray Decl. ¶ 19, ECF No. 44. The funds "supported the activation and deployment of trained emergency management personnel across state and local jurisdictions, enabling coordination of response efforts, shelter operations, and logistics management." *Id.* Equipment that had been purchased with EMPG funds "ensured operational continuity during widespread power outages and communications failures." *Id.*

In Maryland, "severe flash flooding caused more than $33 million in damages to small rural towns" in May 2025. Strickland Decl. ¶ 18, ECF No. 40. "EMPG-funded staff and assets proved critical in both the response and recovery stages of this disaster." *Id.* "[L]ives were saved thanks to the search-and-rescue resources that quickly surged to the area." *Id.*

### B.    HSGP Grants

The Homeland Security Grant Program provides "risk-based grants to assist state, local, tribal and territorial efforts in preventing, protecting against, mitigating, responding to and recovering from acts of terrorism and other threats." Preparedness Grants, https://www.fema.gov/grants/preparedness (last visited December 23, 2025). HSGP is divided into three different grants: the State Homeland Security Program (SHSP), the Urban Area Security Initiative (UASI), and Operation Stonegarden. *Id.* Each state receives at least one HSGP award, but not all states receive each subgrant. Compl. ¶ 57.

Like the EMPG grant, states design projects or programs and then apply to draw from their grant funds. AR Ex. 8. FEMA must approve all projects and programs. The primary difference is that these grants tend to fund law enforcement services while EMPG grants focus more on other emergency services.

1. *The SHSP Grant*

The SHSP provides "federal funding to States to build the necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism." Compl. ¶ 58. It was created by the USA PATRIOT Act in 2001 and is codified at 6 U.S.C. §§ 603, 605-609. These grants are also formulaic, based on a state's "relative threat, vulnerability, and consequences from acts of terrorism" 6 U.S.C. § 608(1). States "use SHSP funds for an array of counterterrorism and emergency preparedness purposes, including developing emergency response plans, conducting risk assessments, funding specialized training for first responders, and purchasing equipment for specialized teams, such as bomb squads and tactical units." Compl. ¶ 62.

For example, in Wisconsin, SHSP funds are used for equipment and training for SWAT teams, bomb squads, dive teams, and urban search and rescue teams. Engle Decl. ¶ 27, ECF No. 46. The funds are also used in "Wisconsin's two intelligence fusion centers, which are part of a national network established to detect, prevent, investigate, and respond to criminal and terrorist activity." *Id.* This allows "for threat information sharing among federal, state, local and tribal law enforcement, emergency management, fire service, public health, corrections, military, and private sector partners" throughout the state. *Id.*

In Michigan, SHSP funds also "support intelligence and information sharing." Sweeney Decl. ¶ 32, ECF No. 31. The Michigan Intelligence Operations Center (MIOC) relies on SHSP funding for two critical positions as well as for training for all intelligence analysts. *Id*. MIOC "was heavily involved in monitoring events taking place at the state capital due to an increase in civil unrest and protests during the COVID-19 pandemic." *Id.* MIOC was also responsible for "the planning, collecting, analyzing, sharing, and reviewing of intelligence information" during campaign visits during the 2024 presidential election. *Id.*

In Colorado, SHSP funds are "the sole source of funding for the 'All-Hazards Regions' program." Haney Decl. ¶ 29, ECF No. 34. This program focuses on preventing terrorism and funds are used for "planning, organizing, equipping, training, and exercising." *Id.*

In Hawaiʻi, SHSP funds have been used to "establish a Hawaiʻi Digital Forensic Laboratory to provide centralized resources, training, and standardized practices across the state and ensure that law enforcement agencies have access to cutting-edge technology and highly skilled personnel trained in handling digital evidence." Pace Decl. ¶ 13, ECF No. 36.

### 2. *UASI Grants*

The UASI grants are used "to enhance the security and resilience of [states'] high-risk urban areas by building, sustaining, and improving their capabilities to prevent, prepare for, and respond to acts of terrorism." Compl. ¶ 73. UASI funds were first appropriated in 2003, and the program is codified at 6 U.S.C. §§ 603-604, 606-609. Like SHSP, these grants are formulaic and based on the high-risk urban area's "relative threat, vulnerability, and consequences from acts of terrorism" 6 U.S.C. § 608(1). States "use UASI funds to strengthen security measures, secure critical and cyber infrastructure, equip responders, and support initiatives that help communities respond effectively to threats and emergencies." Compl. ¶ 77.

For example, in Oregon, UASI funds are used to "prevent, protect against, respond to, and recover from threats of terrorism" in the Portland Metro area. McMahon Decl. ¶ 30, ECF No. 45. The funds have been used to purchase "regional rescue vehicles, explosive containment vehicles, and other tactical gear for specialized law enforcement teams." McMahon Decl. ¶ 31. Funds are also used for specialized training for the Metropolitan Explosive Disposal Unit, hazmat teams, search and rescue personnel, and emergency responders. McMahon Decl. ¶ 32.

Funds have also been used to provide active assailant training for law enforcement, government agencies, schools, and the private sector. *Id.*

In Nevada, UASI funds are similarly used in the Las Vegas area to "prevent, protect against, respond to, and recover from threats of terrorism." Compston Decl. ¶ 25, ECF No. 41. The funds are used to "strengthen security measures, secure critical infrastructure and cyber infrastructure, equip responders, and support initiatives that help communities respond effectively to threats and emergencies." *Id.* UASI funds have been used to purchase license plate readers, UAS technology, ballistic vests, helmets, and other tactical gear from specialized law enforcement teams." Compston Decl. ¶ 26.

In Colorado, UASI grants have provided critical funding to a number of entities in the Denver area, including local governments and municipalities, emergency services, law enforcement, schools, UASI Regional Search and Rescue, and hospitals. Haney Decl. ¶ 32. The new Colorado Springs UASI will provide that same critical funding. Haney Decl. ¶ 33.

In Maryland, UASI funds supported the state, local, and national response to the January 29, 2025, "catastrophic collision over the Potomac River between American Airlines Flight 5342 and Priority Air Transport 25." Strickland Decl. ¶ 34. The Maryland Department of Emergency Management was able to initiate information sharing and facilitate a coordinated response because of the relationships nurtured through UASI funding. Strickland Decl. ¶ 35.

### 3. *Operation Stonegarden*

Operation Stonegarden "supports enhanced cooperation and coordination between Customs and Border Protection and federal, state, local, tribal, and territorial law enforcement agencies to strengthen border security." Compl. ¶ 84. These grants are for states that share a border with Mexico, Canada, or international waters; of the Plaintiff States, this includes

Arizona, Maine, Michigan, and New Mexico. Compl. ¶¶ 85-86. Funds are "allocated based on the risk to border security and the anticipated effectiveness of the proposed projects." Compl. ¶ 85.

For example, in New Mexico, Operation Stonegarden funds have been used to support "law enforcement overtime, fuel costs, communications equipment, and vehicle maintenance necessary for conducting border security operations, particularly along New Mexico's southern border with Mexico." Rye Decl. ¶ 33, ECF No. 43.

In Maine, Operation Stonegarden funds have been used "to support activities such as operational overtime for law enforcement and the purchase of license plate readers, marine vessels, police cruisers, snowmobiles, and all-terrain vehicles to assist with patrols in a variety of environments." Rogers Decl. ¶ 32, ECF No. 39.

## II.    PLAINTIFFS' ALLEGATIONS AND CLAIMS

The facts related to the notice and awards of the grants are undisputed.

### A.  The EMPG Grant Notice and Awards

On July 28, 2025, FEMA released a Notice of Funding Opportunity (NOFO) for the EMPG. AR Ex. 2. Award notices were sent to each state, including Plaintiff States, on September 27, 2025. AR Ex. 6. Amended award notices were sent to the states on September 30, 2025. AR Ex. 7. Awards for the Plaintiff states range from $3,180,010 for Maine and $8,558,068 for North Carolina. *Id.*

The 2025 EMPG NOFO advertised a period running from October 1, 2024, through September 30, 2027. AR Ex. 4. This was consistent with past practice; FEMA had typically used a backdated three-year period for EMPG awards. AR Ex. 4 ("this Program is typically awarded with a retroactive Period of Performance dating back to the beginning of the respective fiscal

year"). Under the award notices, however, funding was limited to a one-year period of
performance, from October 1, 2025, to September 30, 2025; notably it was also not backdated.
Plaintiffs refer to this as the Performance Period Change (PPC).

There was an additional change in the EMPG grants. The amended award notices did not
change the award amounts, but they did contain a funding hold provision, that Plaintiffs refer to
as the Population Certification Hold (PCH):

> **Funding Hold: Verification of State's Population**
>
> FEMA has placed a funding hold on this award, and the full amount of the award
> is on hold in the FEMA financial systems. The recipient is prohibited from
> obligating, expending, or drawing down the funds associated with the award. To
> release the funding hold, the [State Administering Agency] must provide a
> certification of the recipient state's population as of September 30, 2025. In so
> doing, the State will explain the methodology it used to determine its population
> and certify that its reported population does not include individuals that have been
> removed from the State pursuant to the immigration laws of the United States.
> FEMA will rescind the funding hold upon its review and approval of the State's
> methodology and population certification.

AR Ex. 7. This funding hold was not in the original award notice, nor was it in the July
NOFO. No prior EMPG grant has ever instituted a similar funding hold based on states
"confirming" their populations.[3]

### B. The HSPG Grant Notices and Award

On August 1, 2025, FEMA released a NOFO for the HSGP. AR Ex. 3. FEMA then
issued HSGP award notices on September 26, 2025. AR Ex. 8. Total award amounts for Plaintiff
states (including SHSP, UASI, and OPSG, as applicable) range from $5,722,750 for Maine to
$41,521,460 for Arizona.[4] *Id.*

---

[3] Further, Defendants cannot identify a single time when states have been asked to supplement
census data, for any reason whatsoever.

[4] Plaintiffs do not challenge the amount awarded under either grant program. *See* Compl. n. 9
("The amount of these awards differed from the amounts listed in the HSGP NOFO, with all of

Like the EMPG grant, the 2025 HSGP NOFO offered funding running from September 1, 2025, through August 31, 2028. AR Ex. 3 at 4. Again, that was a standard three-year period. *Id.* But under the award, funding was limited to the one-year period from October 1, 2025, to September 30, 2025 (the Performance Period Change (PPC)).

Faced with the change in terms, Plaintiffs declined to accept their awards by the original deadline and filed this suit. Defendants have extended the deadline for Plaintiff States to accept the awards to December 31, 2025. Stip. Prop. Sched. Order, ECF No. 18.

Plaintiffs bring claims under the Administrative Procedure Act, 5 U.S.C. § 706(2). Plaintiffs allege that the Population Certification Hold and the Performance Period Change are arbitrary and capricious. They also allege that the Population Certification Hold is in excess of statutory authority, contrary to law, and without observance of required procedure.

## DISCUSSION

## I.    JURISDICTION

As an initial matter, this Court must determine if it has jurisdiction to hear Plaintiffs' challenge to the new grant terms. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 430-31 (2007) (holding that a federal court must generally determine if it has jurisdiction before ruling on the merits of a case). Here, the Court finds it has jurisdiction.

---

the Plaintiff States receiving more funding than indicated in the NOFO. Other States received significantly less funding than indicated in the NOFO. In late September, Illinois and several other states filed suit in the District of Rhode Island contesting the reallocation of the 2025 HSGP awards. *See Illinois, et al. v. Noem, et al.*, No. 1:25-cv-00495 (D.R.I.). The court preliminarily reverted all HSGP awards to the amounts listed in the HSGP NOFO. (*Id.* at Docs. 14, 31.) Plaintiff States do not contest the allocation of the HSGP awards through this litigation.").

**A.  The Tucker Act Does Not Deprive this Court of Jurisdiction**

Defendants contend that Plaintiffs are simply bringing a contract claim and, as such, jurisdiction lies exclusively with the Court of Federal Claims. Defs.' Cross-Mot. 8-11.

Defendants are correct that, pursuant to the Tucker Act, "the Court of Federal Claims [has] jurisdiction over suits based on 'any express or implied contract with the United States.'" *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (quoting 28 U.S.C. § 1491(a)(1)); *see also United Aeronautical Corp. v. United States Air Force*, 80 F.4th 1017, 1027 (9th Cir. 2023) ("The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over breach-of-contract actions for money damages."). The APA, on the other hand, provides a limited waiver of sovereign immunity which allows district courts to hear challenges to "[a]gency action[s] made reviewable by statute and final agency action[s] for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. The APA does not waive immunity for claims seeking "money damages." *Dep't of Educ.*, 604 U.S. at 651.

Plaintiffs have clearly brought claims under the APA in their Complaint. But that is not dispositive. Courts "must look beyond the form of the pleadings to the substance of the claim" to determine if the suit is to be heard in district court or the Court of Federal Claims. *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007). The Ninth Circuit has cautioned that plaintiffs cannot " dress[] up a claim for money as one for equitable relief" to avoid the Tucker Act. *Id.*  The question is whether a money judgment—which is the only remedy the Court of Federal Claims can provide under the Tucker Act—provides an adequate remedy.[5] *Id.* at 1125.

---

[5] The Court of Federal Claims cannot grant equitable relief. *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988).

Here, a money judgment is not the remedy sought much less an adequate one. Indeed, Plaintiffs did not need to bring this suit to access the grant money. As Defendants made clear at oral argument, the grant money is available, and the United States wants the states to have access to the funds. The sole question is whether Plaintiffs must accept terms they believe are unlawful to access that money.

Despite this, Defendants focus on the fact that the result of a decision in Plaintiffs' favor would mean Plaintiffs would be able to access the grant funds on their terms. That does not turn this case into a case that is subject to the Tucker Act. *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). What the Tucker Act "'impliedly forbid[s]'" is an APA case that seeks equitable relief when the action is really a breach of contract case. That is not this case.

To determine whether the action is—at its core—a breach of contract case, courts look at "the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate). *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *United Aeronautical Corp.*, 80 F.4th at 1026.

Here, Plaintiffs' rights are statutory. Plaintiffs bring this action to assert their rights under the APA. *Cf. Thakur v. Trump*, 148 F.4th 1096, 1103 (9th Cir. 2025) ("Plaintiffs contend that the form termination notices, which did not state any reason specific to the recipient for termination of their grants, violated their right to be free from arbitrary and capricious agency action. The source of that right is statutory, and it 'existed prior to and apart from rights created under the contract.'") (internal citations omitted). Indeed, at this juncture there is not even a contract at issue; Plaintiff States have not yet accepted the terms of the award, so no contract exists.[6] *Cf.*

---

[6] Plaintiff North Carolina "inadvertently accepted the 2025 EMPG award containing the PCH." Pls.' Opp. 3. However, like the other Plaintiff States, North Carolina seeks to enforce their rights under the APA, not under any contract with Defendants.

*Cmty. Legal Servs. In E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 137 F.4th 932, 938 (9th Cir. 2025) (noting that, by the plain text of the statute, there must be a contract between the plaintiff and the government "to maintain a cause of action pursuant to the Tucker Act that is based on a contract").

But even if the unaccepted grants could be considered contracts, the relief Plaintiffs seek is primarily declaratory and injunctive in nature. *Cf. Thakur*, 148 F.4th at 1104 ("Plaintiffs sought—and the district court awarded—vacatur of the termination notices and reinstatement of the terminated grants. These well-established APA remedies are not contractual in nature."). While Plaintiffs ask that the Court "bar[] Defendants from rejecting Plaintiff States' drawdown requests for funds [during the three-year period]," the money that flows from such a ruling "is a mere by-product of that court's primary function of reviewing the [agency's] interpretation of federal law." *Bowen*, 487 U.S. at 910.

This Court follows the lead of many other courts across the country faced with the question of whether the Tucker Act applies to challenges to grant terms and concludes it has jurisdiction over Plaintiffs' APA claims. *Cnty. of Santa Clara v. Noem*, No. 25-CV-08330-WHO, 2025 WL 3251660, at *28 (N.D. Cal. Nov. 21, 2025) ("District courts 'have found with near or total uniformity that [they] have jurisdiction over claims such as these.'" (collecting cases)).

**B.  The PCH AND PPC are Subject the Judicial Review Under the APA**

Defendants also argue that that the Population Certification Hold and the Performance Period Change are not subject to judicial review under the APA because they are committed to agency discretion by law. Again, this Court disagrees.

The APA's limited waiver of sovereign immunity does not apply when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). However, this exception is read "quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so

that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Lincoln v. Vigil,* 508 U.S. 182, 191 (1993)). This narrow reading is necessary to give effect to the APA's requirement that courts "hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. "A court could never determine that an agency abused its discretion if all matters committed to agency discretion were unreviewable." *Weyerhauser Co.*, 586 U.S. at 23.

Here, the Court has a meaningful standard against which to judge the agency's exercise of discretion. The statues that establish the EMPG and the HSGP obligate Defendants to issue the grants to assist states in emergency management, disaster relief, and terrorism prevention. And the statutes provide guidelines for how the funds are to be allocated. It is against that backdrop that this Court must examine the new grant terms and how they were implemented. Again, like other courts around the country, this Court finds that "the grants at issue here are governed by statutory and regulatory frameworks that provide judicially manageable standards for review." *Illinois v. Fed. Emergency Mgmt. Agency*, No. 25-CV-206-WES, 2025 WL 2716277, at *10 (D.R.I. Sept. 24, 2025); *see also Cnty. of Santa Clara*, 2025 WL 3251660, at *40-41 (collecting cases).

### C. Plaintiffs' Challenges to the PCH are Ripe for Review

Finally, Defendants argue that Plaintiffs' claims regarding the Population Certification Hold are not ripe and request that this Court decline to review the PCH at this juncture. Defs. Cross-Mot. 13-15.

To avoid review at this stage, Defendants invoke the doctrine of prudential ripeness, a discretionary doctrine that allows courts to defer ruling until additional facts develop. *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1142 (9th Cir. 2000). "Prudential ripeness turns on two considerations: (1) 'the fitness of the issues for judicial decision,' and (2) 'the hardship to the parties of withholding court consideration.'" *Flaxman v. Ferguson*, 151 F.4th 1178, 1188 (9th Cir. 2025) (quoting *Ass'n of Irritated Residents v. U.S. Env't Prot. Agency*, 10 F.4th 937, 944 (9th Cir. 2021)).

To determine fitness for judicial decision, courts consider "whether the administrative action is a definitive statement of an agency's position; whether the action has a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate compliance with its terms." *Skyline Wesleyan Church v. California Dep't of Managed Health Care*, 968 F.3d 738, 752 (9th Cir. 2020). Based on this test, the PCH is ripe for judicial review.

The PCH is a clear statement of FEMA's position; to obtain the grants, the States must agree that they will certify their populations consistent with the PCH. At this point, though, the States have no idea how they will be asked to do that because FEMA has failed to issue any guidance. But even if FEMA had issued guidance, Plaintiff States contend compliance will be impossible because they do not maintain the requested population date. Compl. ¶ 110. Indeed, according to Plaintiffs, it is Defendant DHS that has access to this data.

Defendants use their own lack of guidance to contend that any claim that compliance is impossible is premature. Under Defendants' reasoning, Plaintiffs should simply accept the grants with the PCH terms and raise a challenge only if compliance is, in fact impossible. Defs.' Cross-Mot. 14-15. But that ignores the fact that regardless of how the PCH is calculated, Plaintiffs

allege that the term is unlawful. Nothing requires Plaintiffs to accept a grant award with unlawful terms. *California v. United States Dep't of Transportation*, No. 25-CV-208-JJM-PAS, 2025 WL 3072541, at *7 (D.R.I. Nov. 4, 2025) ("where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat") (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007)).

At this juncture, with the deadline for accepting grants looming, if the Court declines to rule on the PCH condition, Plaintiffs will face a Hobson's choice: accept the grant subject to a term they feel is unlawful or decline to accept. Asking this Court to force this scenario on Plaintiffs because Defendants have not yet developed any guidance on the PCH would result in clear harm to Plaintiffs. And Defendants have not made any showing that the purported guidance will moot Plaintiffs' core claim—that the PCH is arbitrary and capricious and contrary to law. This case is ripe for decision.

## II.    THE PCH AND PPC VIOLATE THE APA

The Administrative Procedure Act both sets forth the procedure agencies must follow when they take certain action as well as provides for limited judicial review of those decisions. *see* 5 U.S.C. §§ 701-706. Courts reviewing agency actions must "hold unlawful and set aside" actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or are unconstitutional, violate a statute, or fail to follow the required procedures. 5 U.S.C. § 706(2)(A)-(D). While the APA requires courts to be deferential to agency policymaking and factfinding, no such deference is owed to agency legal conclusions. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).

Plaintiffs contend that Defendants' decision to implement the PCH and the PPC was arbitrary and capricious. Specifically, they contend that the PCH and PPC amount to a change in

policy that ignored the Plaintiff States reliance interests and was not well-reasoned. Plaintiffs

further contend that the PCH exceeds the agency's statutory authorization and is contrary to law.

### A.     The PCH and PPC are Arbitrary and Capricious

An agency's action is "arbitrary and capricious" when "it is not 'reasonable and

reasonably explained.'" *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (*quoting FCC v.

Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court reviewing an agency's action

does not "substitute its judgment for that of the agency." *Id.* Instead, a court "must ensure,

among other things, that the agency has offered 'a satisfactory explanation for its action[,]

including a rational connection between the facts found and the choice made.'" *Id.*

### 1. *The PCH and PPC are Changes in Policy that Did Not Account for Plaintiffs' Reasonable Reliance Interests.*

At the outset, Defendants argue that the PCH and PPC are not changes in policy and, as a

result, they are not required "to articulate their reasoning or consider states' reliance interests."

Defs.' Cross Mot. 19 ("it simply cannot be the case that an agency must explain its thinking in

formal policy memoranda every time the agency exercises its discretion to include, in a final

grant agreement, a lawful term or condition that was not present in past grant agreements"); *see

also id.* at 24-25. Defendants seek to prove these are not policies by pointing to Plaintiffs' failure

to point to a policy that says FEMA will "never condition the release of awarded EMPG fund on

the production of relevant information by grantees" or a policy "committ[ing] the agency to a

three-year performance period" for the grants. *Id.* at 19, 24. But Defendants offer no authority for

their position that such a policy is required. And even if it were, the changes in these grant

conditions are clearly final agency actions subject to review under the APA. 5 U.S.C. § 704.

It is certainly true when the agency action is a change in policy "the level of justification

is more exacting than if the agency had not acted in the first place." *San Francisco Unified Sch.*

*Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 752 (N.D. Cal. 2025) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-42, (1983)).

 A new policy that contradicts prior policy is not on its own arbitrary and capricious, but a "[s]udden and unexplained change, or change that does not take account of legitimate reliance on prior interpretation, may be 'arbitrary, capricious [or] an abuse of discretion.'" *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) (internal citations omitted). When making a policy change like this, FEMA was required to "'assess whether there were reliance interests' in the prior rule, determine whether those interests 'were significant,' and weigh them 'against competing policy concerns.'" *Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 980 (9th Cir. 2023) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020)).

 Faced with this, Defendants contend that even if they were required to consider Plaintiffs' reliance, Plaintiffs' reliance interests were not reasonable. That position is not reasonable. For 22 years, Defendants have been providing these grants with a two- or three-year performance period; EMPG grants have been backdated for more than a decade. And the NOFOs for this year's grants advertised the three-year term also with the EMPG backdated. The PCH, by contrast, has never before been a requirement for grants nor have it been in the NOFO. Defendants are correct that they are not bound by past practice or the terms in the NOFOs. But that is not the question. The question is whether it was reasonable for Plaintiffs to rely on those things when they applied for this year's grants. It was.

 This abrupt change in policy is particularly harmful to local emergency management. In Oregon, for example, Oregon Emergency Management passes through approximately 80% of EMPG funding to counties, cities, and tribes. McMahon Decl. ¶ 14. OEM used the funding from

the 2024 EMPG award to cover the expenses local emergency managers incurred from July 1, 2024 to June 30, 2025. McMahon Decl. ¶ 52. Without the backdating, OEM cannot reimburse any expenses that local emergency managers incurred from July 1, 2025 to September 30, 2025. *Id.*

Here, there is no evidence Defendants even acknowledged that Plaintiffs relied on the prior policies much less considered whether those interests were significant as compared to the policy concerns. Absent such a justification, the changes are arbitrary and capricious.

2. *Defendants Also Fail to Show the Decision was Well-Reasoned.*

But even if this were not a change in policy and Defendants need not consider the reliance interests, they were still required to show their decisions were well-reasoned. To establish this, Defendants point to a three-page declaration by David Arnold, the Senior Official Performing the Duties of the Deputy Administrator for Resilience at the Federal Emergency Management Agency, dated November 19, 2025. AR Ex. 1 (Arnold Decl.). Defendants provide no contemporaneous memoranda or other indication of the reasoning at the time the decision was made. Plaintiffs argue that this declaration is post-hoc rationalization of the policy change and as such, cannot justify the changes here.

"It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Regents*, 591 U.S. at 20. In explaining its decisions, the agency may elaborate on the reasons but cannot provide new reasons. *Id.* at 21. Defendants maintain that the Arnold Declaration "is a rationale offered by 'proper' agency officials in a position to speak to FEMA's considerations at the time of FEMA's decisions to include the contested terms." Defs.' Cross-Mot. 24. Even giving

Defendants the benefit of the doubt here, the Court finds the reasoning for each change to be lacking.

        *a.  The PCH*

According to Defendants, "FEMA chose to implement the population verification requirement to confirm FEMA's calculations of state populations and ensure the accuracy of the final allocation of the EMPG funding, taking into account the number of illegal aliens who have been removed from the country since the collection of the most recent federal census data." Arnold Decl. ¶ 6. This bare-bones explanation fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Defendant fails to explain why confirmation of population would be necessary or why accounting solely for those who have been removed—and not those, for example, who have moved between states—would lead to a more accurate apportionment than the use of data from the census bureau as required by law. *Burlington Truck Lines, Inc.*, 371 U.S. at 167 ("There are no findings and no analysis here to justify the choice made.").

Plaintiffs also argue that in seeking the population data, FEMA is "rel[ying] on factors which Congress has not intended it to consider." *Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 43 (1983). Congress clearly intended for agencies to rely on the most recent data from the Census Bureau in allocating these grants. *See* 13 U.S.C. § 183(a). By asking for additional data to "confirm" these populations, FEMA appears to intend to rely on additional data. And if Defendants do not intend to rely on this data, then the decision to condition grants on providing it seems even more poorly reasoned.

        *b.  The PPC*

With respect to the Performance Period Change, Defendants provide the following

reasoning:

> On September 17, 2025, DHS and FEMA decided to change the period of performance from three years to one year for HSGP and EMPG grants. FEMA decided to make the change for several reasons to align with the President's vision of shifting responsibility and authority for preparedness back to the states. This change allows for:

> - Improved Accountability and Oversight: A shorter period of performance allows FEMA to more closely monitor grant recipients and ensure funds are being used effectively and in alignment with program goals;

> - Accelerated Project Completion: A one-year period encourages grant recipients to expedite their projects and deliver results more quickly, which is particularly important for emergency management initiatives that address urgent needs;

> - Alignment with Annual Budget Cycles: A one-year performance period aligns with annual federal budget cycles, simplifying financial planning and reporting for both FEMA and grant recipients;

> - Flexibility in Funding Allocation: Shorter performance periods enable FEMA to reassess priorities and reallocate funds more frequently to address emerging threats or changing circumstances;

> - Streamlined Grant Management: Managing grants on a yearly basis can reduce administrative complexity and allow FEMA to adapt program requirements or priorities more dynamically.

Arnold Decl. ¶ 12.

While the Court cannot substitute its judgment for that of the agency, the change in

performance period, especially without backdating, makes it functionally impossible for Plaintiff

States to use the funding that is allocated by statute. According to Plaintiffs, "Defendants'

decision to reduce the period of performance for both the 2025 EMPG and 2025 HSGP awards

makes the grant awards largely unusable in Plaintiff States and frustrates Plaintiff States' ability

to achieve the purposes of the EMPG and HSGP grants." Compl. ¶ 114. "States and local law

enforcement agencies structured their budgets for the 2025 EMPG award and the 2025 HSGP

award around anticipated three-year funding streams. Without the three-year period to expend grant funding, portions of Plaintiff States' 2025 EMPG and HSGP awards will go unused, reducing emergency preparedness and law enforcement efficacy." Compl. ¶ 117. Additionally, because the EMPG award is no longer backdated, "[s]everal Plaintiff States and local subgrantees will be unable to seek reimbursement for expenses already incurred—despite operating under the reasonable belief that the expenses could be reimbursed with the 2025 EMPG funds." Compl. ¶ 118. Defendants' counter that they want more oversight as the States use the money. That already exists because FEMA must approve the projects. This is not reasoned decision-making.

### B.     The PCH Also Exceeds Statutory Authority and Is Contrary to Law

Additionally, Plaintiff States argue that the Population Certification Hold violates the APA because it exceeds statutory authority, is contrary to law, and is implemented without observance of procedure required by law. Pl.'s Mot. 16-28.

Agency decisions also violate the APA when they exceed statutory authority or are contrary to law. 5 U.S.C. § 706(2). The PCH does both.

The authorizing statute for the EMPG requires that FEMA "make grants to States to assist State, local, and tribal governments in preparing for all hazards." 6 U.S.C. § 762(b). The amount of the grants is statutorily apportioned among the states and territories of the United States. 6 U.S.C. § 762(d). There is nothing in the EMPG statute, or any other statute, that authorizes Defendants to condition these statutory grants upon providing population information. That is because for benefits that are appropriated by population, agencies must use the most recent population data provided by the U.S. Census Bureau. 13 U.S.C. § 183(a).

Defendants argue that "State population verifications will simply be used to *supplement* the census data that FEMA considered." Defs.' Cross-Mot. 16. Defendants argue that 183(a) should be read as permissive, to give FEMA "discretion to consider additional sources of information to assess state populations." *Id.* This is nonsensical. Defendants are asking the Plaintiff States to certify a population number that is not based on census data; subtracting the number of people removed from the state does not supplement the census numbers, it changes it. The statute in no way authorizes FEMA to consider additional sources of population data. And if the agency uses the "population certification" data to calculate the apportionment of grant funds, they are then not using the most recent census bureau data, as required by law. [7]

## III.    THE REMEDY

Plaintiffs ask the Court to hold unlawful and vacate the Population Certification Hold and the Performance Period Change. Compl. 32.

Defendants argue that vacatur is not appropriate under the APA. Defs.' Cross-Mot. 27 (citing *United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring)). However, as Defendants acknowledge, the Ninth Circuit continues to hold that "[w]here a court holds an

---

[7] Plaintiffs also argue that that the PCH violates the Paperwork Reduction Act. 44 U.S.C. § 3501 et seq. "By conditioning the release of EMPG funds on Plaintiff States' reporting and certification of their populations on September 30, 2025, Defendants are engaging in a 'collection of information.'" Compl. ¶ 144. Before engaging in a collection of information, an agency must follow certain procedures. *See* 44 U.S.C. § 3506(c). Plaintiffs argue that Defendants did not. Pls.' Mot. 24-26. Defendants argue that the population verification is permitted under the Paperwork Reduction Act. Defs.' Cross-Mot. 17-18. Defendants obtained OMB approval of a "Generic Information Collection Request," which "explicitly authorizes collection of demographic information from preparedness grant applicants in order to 'comply with Federal laws and regulations.'" Defs.' Cross-Mot. 17-18. Defendants also maintain that the information sought is not duplicative as "a calculation of the state's population as of September 30, 2025 . . . is not information already in the possession of the federal government." Defs.' Cross-Mot. 18. Given that there seems to be some dispute on this issue and the Court has already concluded the PCH violates the APA, the Court declines to rule on this issue.

agency action unlawful, vacatur and remand is the default remedy under the APA." *Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025).

The Court holds that the Population Certification Hold is unlawful under 5 U.S.C. § 706(2) because it exceeds Defendants' statutory authority, is contrary to law, and is arbitrary and capricious. The Court also holds that the Performance Period Change for the 2025 EMPG and HSGP grant awards is unlawful under 5 U.S.C. § 706(2) because it is arbitrary and capricious. These terms are vacated from Plaintiff States' 2025 EMPG and HSGP award notices.

Plaintiffs also ask that the Court grant permanent injunctive relief. Compl. 32.

The APA expressly authorizes prohibitive and mandatory injunctive relief. 5 U.S.C. § 703. Injunctive relief is appropriate when a plaintiff has demonstrated (1) "actual success on the merits"; (2) irreparable injury; (3) "remedies available at law are inadequate"; (4) the balance of hardships justifies equitable relief; and (5) "the public interest would not be disserved by a permanent injunction." *Indep. Training & Apprenticeship Program v. California Dep't of Indus. Rels.*, 730 F.3d 1024, 1032 (9th Cir. 2013).

Plaintiffs have demonstrated success on the merits. Because the Court holds that the Population Certification Hold and the Performance Period Change are unlawful, Plaintiffs have also shown irreparable injury and that remedies at law are inadequate. *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("once the court reached the conclusion that the rule was indeed illegal (i.e., not merely that the plaintiffs had a reasonable probability of success on the merits, as would be necessary for a preliminary injunction), there was no separate need to show irreparable injury, as that is merely one possible 'basis for showing the inadequacy of the legal remedy.'") (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2944, at 94 (2d ed.1995)).

The balance of equities also favors injunctive relief. Because Plaintiffs have no way of complying with the Population Certification Hold, Plaintiff States' EMPG funds are frozen, forcing states to reduce state and local emergency management capacity. Because the Performance Period Change leaves states mere months to spend EMPG and HSGP funds—only after FEMA approves states' programs or projects—Plaintiff States face lapses in funding, risking emergency management and homeland security capacities. Further, the decision to not backdate EMPG awards means that many states and localities would not be reimbursed for emergency management expenses already incurred. None of this appears consistent with Congressional intent or FEMA's mission. By contrast, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

Finally, an injunction is also in the public interest. As discussed in detail above, EMPG and HSGP funds are critical to ensure that states can prepare for and respond to emergencies and threats of terrorism. The public interest weighs against "jeopardizing national security." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 33 (2008).

Defendants are enjoined from implementing the Population Certification Hold in the 2025 EMPG awards for Plaintiff States. Defendants are enjoined from rejecting Plaintiff States' drawdown requests for funds from their 2025 EMPG awards for expenses incurred between October 1, 2024, and September 30, 2027, by the Plaintiff State grantee or a subgrantee. Defendants are also enjoined from rejecting Plaintiff States' drawdown requests for funds from their 2025 HSGP awards for expenses incurred between October 1, 2025, and September 30, 2028, by the Plaintiff State grantee or a subgrantee.

## IV.     REQUEST FOR A STAY

Defendants requested a stay if the Court ruled in Plaintiffs' favor. A stay pending appeal "is not a matter of right" but "instead 'an exercise of judicial discretion.'" *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926). Courts consider (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434.

For the same reasons that injunctive relief is appropriate in this case, a stay is not appropriate. Where Defendants have repeatedly stated their intention to provide the grant funds to Plaintiffs, a stay would only serve to delay the flow of much needed funds to states that need to prepare for emergencies. Given that no one disputes that the Plaintiff States are entitled to the grant funds, further delaying the ability of the Plaintiff States to draw on those funds would only place core emergency services in this country at risk.

## <u>CONCLUSION</u>

For these reasons, Plaintiffs' Motion for Summary Judgment (ECF No. 30) is GRANTED and Defendants' Cross-Motion for Summary Judgment (ECF No. 49) is DENIED.

IT IS SO ORDERED.

DATED this 23rd Day of December, 2025.

 /s/Amy E. Potter
AMY E. POTTER
United States Magistrate Judge