IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

STATE OF MICHIGAN; STATE OF )
OREGON; STATE OF ARIZONA; )
STATE OF COLORADO; STATE OF )
HAWAI'I; OFFICE OF THE )
GOVERNOR ex rel. ANDY BESHAR, )
in his official capacity as )
Governor of the Commonwealth )
of Kentucky; STATE OF MAINE; )
STATE OF MARYLAND; STATE OF )
NEVADA; STATE OF NEW MEXICO; )
STATE OF NORTH CAROLINA; STATE )
OF WISCONSIN, )
                                )
                Plaintiffs, )  Case No. 6:25-cv-02053-AP
                                )
                        v. )  December 17, 2025
KRISTI NOEM, in her official )
capacity as Secretary of the )
Department of Homeland )
Security; UNITED STATES )
DEPARTMENT OF HOMELAND )
SECURITY; DAVID RICHARDSON, in )
his official capacity as )
Senior Official Performing the )
Duties of the Administrator of )
the Federal Emergency )
Management Agency; FEDERAL )
EMERGENCY MANAGEMENT AGENCY, )
                                )
                    Defendants. )
_____)

ORAL ARGUMENT

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE AMY E. POTTER

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

```
COURT REPORTER:        Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                       United States District Courthouse
                       1000 SW Third Avenue, Room 301
                       Portland, OR 97204
                       (503)326-8191

                            * * *
```

TELEPHONIC or VIDEO APPEARANCES

FOR THE PLAINTIFF(S):

NEIL GIOVANATTI
Michigan Department of
Attorney General
525 W. Ottawa Street
PO Box 30758
Lansing, MI 48909

FOR THE PLAINTIFF(S):

ADAM DE BEAR
Michigan Department of
Attorney General
PO Box 30754
Lansing, MI 48909

FOR THE PLAINTIFF(S):

COBY HEALY HOWELL
DOJ-Enrd
Federal Oversight Unit
100 SW Market Street
Portland, OR 97201

FOR THE PLAINTIFF(S):

FINNUALA K. TESSIER
Colorado Department of Law
Public Safety
1300 Broadway
Suite 10th Floor
Denver, CO 80203

FOR THE DEFENDANT(S):

ALEXANDRA LEE YEATTS
DOJ-Civ
Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005

TRANSCRIPT OF PROCEEDINGS

(December 17, 2025)

(Via videoconference:)

DEPUTY COURTROOM CLERK:  The United States District Court for the District of Oregon is now in session. The Honorable Amy E. Potter presiding.  Now is the time set for Civil Case Number 25-02053, State of Michigan, et al., v. Noem, et al., for argument.

THE COURT:  Good morning, everyone.  Or, I guess, good afternoon for several of you.  I guess we'll start with having everyone who's on video introduce themselves, starting with the plaintiffs.

MR. GIOVANATTI:  Good morning, Your Honor. Neil Giovanatti, from the Michigan Department of Attorney General, on behalf of plaintiff states.

MR. DE BEAR:  Good morning, Your Honor. This is Assistant Attorney Adam De Bear, appearing on behalf of the State of Michigan, along with Mr. Giovanatti.

MR. HOWELL:  Good morning, Your Honor. Coby Howell, on behalf of the State of Oregon.

MS. TESSIER:  Good morning, Your Honor. Finnuala Tessier on behalf of the State of Colorado.

THE COURT:  Good morning.

MS. YEATTS:  Good morning, Your Honor. Alexandra Yeatts on behalf of the U.S. Government.

THE COURT:  All right.  Well, I've read all the briefs, but I'll go ahead and start with plaintiffs.

MR. GIOVANATTI:  Thank you, Your Honor.  Before the Court is one of several cases from across the country addressing efforts by the Trump Administration to sabotage FEMA in the emergency management and homeland security functions that it provides, all pursuant to the administration's stated goal of shifting these functions to the state.

This case deals with two grant programs that are specifically designed to assist the states in handling these functions.  The Emergency Management Performance Grant, EMPG, which provides the foundational funding for states and local emergency management teams, and the emergency -- the Homeland Security Grant Program, the HSGP, which assists states and localities to prepare for and respond to homeland security and terrorist events.

Today the states challenge two unprecedented terms in these grants to make the grants either unavailable entirely, in the case of the population certification hold, or practically impossible to use in their entirety in the case of the peer and performance change.

And as the end recipients of these grants funds are often law enforcement agencies, the challenged terms quite literally defund the police.  We've raised several APA

arguments -- all of which demonstrate the illegality of these terms, and I'm happy to address each argument as the Court sees fit; but, to start, I'll direct the Court to the most clear-cut basis for why these terms must be vacated.

Defendants provide zero evidence that they consider the states' reliance interests in imposing the challenged terms. Whether the Court considers the Arnold declaration or not and its failure to consider the states' reliance interests necessitates a finding that these terms are arbitrary and capricious.

Your Honor, the standard for considering reliance interests is well-established.  It's a black letter APA requirement for when you change your position as an agency. You must consider the reliance interests of those who may be affected.

Here, the states' reliance interests are rational. There's been 20-plus years of practice for these grants, and they've never contained a population certification hold or a term like it, and they've always included three-year periods of performance, backdated one year for the EMPG award.

Crucially here the NOFOs, the notices of funding opportunities, that -- for the 2025 awards, both of them included the standard three-year period of performance, backdated one year for the EMPG award, and neither of the NOFOs included the population certification hold.

Accordingly, Your Honor, it was quite a surprise to the plaintiff states when, at the end of September, FEMA issued the grant award that included a one-year period of performance and included the population certification hold in the EMPG award notice.

Defendants counter --

THE COURT:  So putting aside the population certification hold, which we can -- we'll talk about separately, but for the one-year versus the three-year period, if the funding notice -- the original, before application, had said it's only going to be one year and put everybody on notice, would that be a different situation, in your mind?

MR. GIOVANATTI:  It would certainly change the analysis, Your Honor, but the -- the -- we would still argue at that point -- obviously, we would be in a different factual situation -- that the history of the award would also generate the reliance interests for the states and their localities in that limitation of these awards.

Specifically, for the EMPG award and the one year backpay issue, there's many localities and some states that have actually spent significant portions of the EMPG award over the last fiscal year that they had expectation would be reimbursable under the 2025 EMPG award, that that is based on decades of history where that award has always been

retroactively -- the period of performance has already been retroactive, and FEMA knows this.

Right?  If you look at the memo approving the publication of the EPMG NOFO -- this is Docket 27-5 -- it specifically says, regarding the period of performance, that, quote, "The program is typically awarded with a retroactive period of performance dating back to the beginning of the respective fiscal year."

So FEMA is well aware that this was their common practice, and that, in and of itself, would be a reliance interest that could impact the -- the arbitrary and capricious analysis had the NOFO only included the one-year period of performance.

THE COURT:  Okay.

MR. GIOVANATTI:  Your Honor, I'm happy to answer your questions on any of these issues, of course, Your Honor.

There's two counterarguments that the defendants raise in their brief.  Both of them are baseless, Your Honor.  The first is that somehow the addition of the population certification hold and the change of the period of performance both are not policy changes that would warrant a consideration of reliance interest under the applicable APA standards because they are not included in a policy memo. There's no legal citations to support that argument, and as

a practical matter, it is certainly a change in policy.

For 20 years and from the NOFO, it didn't have these terms, and it had a three-year period of performance, and at the end of -- and in the grant awards, it included the period of -- the one-year period of performance of the population certification hold. That is clearly definitionally a change from prior practice that would require consideration of the reliance interest.

Simply because that change was not articulated in a policy memo is irrelevant. There's no legal requirement that a change must be articulated in some sort of policy memo.

The second argument that defendants advance is that the reliance interests are somehow unreasonable. Frankly, Your Honor, that argument is absurd. There is, again, two decades of practice, and there was the NOFO that clearly created reliance interests for the states and localities that these grant agreements would not be changed relevant to the period of performance and relative to the addition of population certification hold.

The fact that the NOFO is not legally binding, which is the central argument that defendants advance, is -- again, is not relevant. It entirely misses the point of the reliance interest analysis.

The states can have a reliance interest on the NOFO

even if it's not legally binding. The states aren't trying to hold FEMA to the exact terms of the NOFO. We recognize that the defendants can change the terms from the NOFO to the final grant award, but they can only do so if they comply with their APA obligations. If they make those changes that are not in an arbitrary and capricious way, that they don't make changes that are -- exceed authority or are contrary to law, abusive discretion, et cetera, Your Honor.

So the fact that the NOFO is not legally binding does -- simply does not matter.

Accordingly, Your Honor, the evidence in this case that defendants did not consider the states' interests in any respect when making -- deciding to include the population certification term or when changing the period of performance for these grants -- that basis alone indicates that these terms violate the APA and must be vacated.

We've also raised several arguments related to the illegality of the population certification hold. Just, in brief, Your Honor -- and I can certainly answer your questions or go into further detail, as the Court requires, for any of these arguments, but the population certification hold exceeds the defendants' statutory authority.

The defendants have not identified a single statute that would authorize them to collect population data from

the states.  They haven't identified a statute that they can place on hold on these grants, based on such a collection effort.  They haven't identified a statute that would authorize them to reallocate already awarded grants, which the EMPG award has been allocated and has been awarded the population certification term.  Based on FEMA's explanation, they would take the data and then try to reallocate the awards.  There's no statutory authority that they've identified that would allow them to do that, and there's certainly no statutory authority that would allow the defendants to require states to certify both their population and that the reported population excludes individuals who have been removed by the Department of Homeland Security for immigration purposes.

Again, no statutory authority to support any of these obligations that defendants are trying to impose on the states.

Defendants, in their response brief, just simply point to the provision of the EMPG statute that requires them to allocate the EMPG grant based on population.  That single sentence statute puts an obligation on FEMA to allocate the funds based on population data.  It provides no affirmative authority to make any -- place any obligation on the states, Your Honor.

Accordingly, they've exceeded their statutory authority

in imposing the population certification hold.

We've also raised the "contrary to the law" claim related to the population certification hold. As we've articulated in extensive detail and the defendants' statutory interpretation makes clear that 13 U.S.C. 183(a), which provides the requirement on the Census Bureau to give other federal agencies population data and then requires those other federal agencies to use that population data when it is required -- when they are required to allocate grants based on population figures. That statute provides the exclusive population dataset that agencies can rely on when allocating grants that are allocated based on population figures.

The defendants -- they agree that they have to rely on the census data, pursuant to 13 U.S.C. 183(a), but they say, not only so we can first rely on the census data, then we can supplement that data with data collected from the states.

Again, that is -- that would negate the statute Section 183(a). That statute requires --

THE COURT: Are you aware -- sorry.

MR. GIOVANATTI: That's okay. Go ahead.

THE COURT: Are you aware of any situation where the Government has required a state to supplement -- whether in FEMA or any other context, supplement the census data.

MR. GIOVANATTI:  I'm not aware of anything, and there's been no such case or situation identified in the briefing.

As far as I'm aware, this is the first time a federal agency has tried to deviate from the Census Bureau population data in allocating grants that specifically require the allocation to be based on population rates.

And, Your Honor, that goes further to this "contrary to law" point.  There's no history here of any agency doing this.  Agencies have consistently interpreted their obligations under 13 U.S.C. 183(a) to require them to rely on the Census Bureau data.

So, again, for this reason, these population certification terms violate that provision and are contrary to law as a result.

Finally, Your Honor, we raised a claim under the popular -- the claim under the Paperwork Reduction Act, which is a procedural requirement on federal agencies who are seeking to collect information from other individuals. The defendants here concede that the Paperwork Reduction Act applies to their efforts to collect population data from the states.  They point to a 2024 generic OMB notice that they claim basically saves their attempt to collect information under the Paperwork Reduction Act.

That -- even if we were to consider that notice, which

that notice doesn't reference any type of population collection effort, like we're dealing with here -- even if the Court were to consider that 2024 OMB notice, the population certification hold does not reference that OMB notice, which is a statutory requirement that has to contain the control number from that OMB notice.  Population certification hold nor anywhere on the EMPG award is there a reference to that control number.

Likewise, the other foundational principles of the Paperwork Reduction Act are -- have -- are violated, in that they don't actually need this information.  They can rely on the U.S. Census Bureau data, as previously discussed, and collecting this information would be duplicative of information that FEMA already has access to, namely, the U.S. Census Bureau data and any type of data that they could gather from the Department of Homeland Security about the number of individuals who have been removed from the country pursuant to immigration laws.

Accordingly, Your Honor -- and I -- again, I'm happy to go into any further detail on any of these claims, but the Paperwork Reduction Act has also been violated, and that triggers a procedural violation of the APA under Section 702(a).

I'm happy to jump through additional arbitrary and capricious arguments, or I can jump to remedy, Your Honor.

THE COURT:  Actually, if you could just address the remedies that you guys -- that you all are seeking.

MR. GIOVANATTI:  Sure, Your Honor.  Yes.

So we're seeking declaratory relief, vacatur, and an injunction to effectuate the vacatur.

Vacatur is a default remedy in APA cases in the Ninth Circuit, and that's consistent with the set-aside language of the -- that's right in the APA.  So we'd ask that the Court vacate these terms.

We would also ask that the Court not remand the terms to FEMA for further consideration.  The population certification hold is, per se, unlawful.  It exceeds authority contrary to law.  There's no need for remand there.  It is -- there's no way they could try to resolve that.

On the populations -- or -- I'm sorry -- on the period of performance, a remand is also not appropriate.  The equities would warrant the Court giving finality to the states so that we know whether we need to -- can accept the awards by the December 31st deadline or not.

We're already three months into what defendants want to be a 12-year period of performance, and the states are advocating for a three-year period of performance.

So we're already substantially into the period of performance.  We need finality to move forward.  So the

timing here would counsel against any type of remand.

And then on the injunctive relief, Your Honor, again, we've articulated the standard in our briefing and why we need it. Basically, it's the same standard as a preliminary injunction where no success on the merits, irreparable harm, balance of equities, and the public interest. Irreparable harm -- we've -- obviously, success on the merits is the same as the merits arguments that we've already advanced. Irreparable harm -- the population certification hold has entirely frozen the EMPG grants; so anything funded through EMPG grants has reciprocally -- reciprocally has been frozen. And then for the period of performance change, we've talked about the backdating issue and how there's a year of funding where states -- where the states and localities have already expended funds expecting that they would be reimbursed through the 2025 award and now will be unable to do so. That's clear irreparable harm.

There's also a level of flexibility that is required for the states that the three-year period of performance provides. There's quite a bit of information in the declarations about the harms that the elimination of this flexibility would provide, coupled -- just examples for the Court, there's -- in certain circumstances the states need to use -- they need the flexibility to use the money to respond to specific events. So, for example, the Sweeney

declaration, which is from Michigan, provides that some of the Homeland Security Grant Program funds were used to fund additional law enforcement during mass protests related to the Gaza conflict in 2023.  They also were used for staffing for presidential candidate visits in 2024.  The Maryland declarations, District -- which is provided by Strickland -- Mr. Strickland, in that case -- or in that declaration he describes how some of the Homeland Security funds were used to support recovery efforts when that plane crashed into a helicopter next -- near D.C.  The Homeland Security funds -- they had to use a significant portion of their Homeland Security funds to address that situation.

So these are just examples of how the states need flexibility to use the funds to address the certain situations, which, obviously, having a greater timeline to do so would give them the flexibility to use the funds when an actual incident occurs.

There's also evidence in the record of multi-year efforts, which would go beyond a three-year period of performance.

The main declaration from the -- it's the Rogers declaration, provides a very detailed example of how Maine is -- a county in Maine is trying to develop a rescue task force to surge early medical intervention following incidents of mass violence.  The declaration articulates how

this is a multi-year project to develop this task force.

Year one is planning and procurement.  Year two is training.  And only by year three would the program actually be operational.  If we eliminate the three-year period of performance, that type of multi-year project could not move forward.

So these are just some examples of why the harm -- there is irreparable harm and an injunction is warranted, Your Honor.

I think the equities are pretty straightforward here. There's -- there's -- the case law is clear that the equities would support enforcing the law as it's meant to be written.  So, if we succeed on the merits, the equities would support issuing an injunction as well.

And, obviously, the nature of the funding here -- this is emergency management Homeland Security counterterrorism type funding.  That counsels into ensuring that the funds can be used effectively to support those operations.

Accordingly, Your Honor, we've asked for an injunction enjoining the population certification hold and any related term that FEMA may try to impose that basically provides for the same thing, but we've also asked for an injunction enjoining the defendants from rejecting drawdown requests during the three-year period of performance that's articulated in the NOFO.

So for those reasons, Your Honor, we request both declaratory, vacatur, and injunctive relief to effectuate the vacatur decision.

Your Honor, like I said, I'm happy to address the other arbitrary and capricious arguments or some of the defenses raised in the DOJ's brief; but, otherwise, I'm happy to pass the baton as well.

THE COURT: I just have one other question. I mean, it's obvious that I won't be the last word on this; so they have requested a stay, assuming that I ruled in your favor. And I recognize that you're opposed to it, but I also recognize it's likely to get stayed whether by me or by someone else. So at least giving them some period of time to figure out the next moves, but what would be critical in a stay or what language is needed to make sure the money doesn't move and get reallocated before the final decision is made?

MR. GIOVANATTI: So I don't know that there's necessarily concern with the money being moved to some other program, or something like that, in this particular case. I know that's been an issue in other cases.

THE COURT: Okay.

MR. GIOVANATTI: And to the extent the Court is considering issuing some sort of administrative stay, again, we are facing that December 31st deadline of whether or not

to accept the awards.  So, if the Court is going to rule relatively quickly, we would ask that that stay be quite short; and if the defendants' intention was to appeal, that they would proceed very quickly so we still have a resolution before the December 31 deadline.

THE COURT:  Okay.  All right.  Thank you.  I don't have any further questions.

For DOJ?

MS. YEATTS:  May it please the Court. Alexandra Yeatts on behalf of the United States.

Your Honor, here, where plaintiffs seek to modify the terms of their emergency preparedness grant agreement, based not on a statute or the Constitution but on the projected terms in 2025 NOFOs and on past grant agreements, their challenges belong in the Court of Federal Claims.

Further, plaintiffs' challenges are not subject to APA review because the Federal Government's decision on how to condition terms and for how long to contract with grantees or what information to seek from them are agency decisions committed to agency discretion by law.

Plaintiffs seek to amend the terms of their final awards to reflect their preferred period of performance despite that neither the HSGP or EMPG statutes mandate any period of performance.  In fact, neither statute speaks at all to period of performance or requires three years.

Plaintiffs further seek removal of a term --

THE COURT: So I don't understand their point to be that it is required. My understanding is that they relied on decades of past practice and the notice that told them that it was going to be a three-year. So it's not -- I don't -- they're not saying it's required. I know they didn't want to give up that you could change it if you noticed it in advance, but their problem is that you advertised it as three years. That's how it has been for decades, and then you changed it.

So what's the answer to that?

MS. YEATTS: First, Your Honor, if -- if we're turning to a discussion of reliance interest as to the three-year period of performance versus the one-year period of performance, the Government's response is three-fold.

First and foremost, the fact that plaintiffs repeatedly and just now point to the terms of the 2025 NOFOs as one of the key sources of reliance -- I think the Government makes clear in its briefing that a NOFO document holds no definitive legal effect.

So a NOFO document is a -- is a notice to potential grantees that they can apply for grant funds, and it outlines, you know, the type of grant allocation from Congress that's being offered and suggests applying.

Here, a NOFO document -- this NOFO document containing

or not containing either of these new terms is irrelevant. It's unreasonable to presume that the terms contained in a NOFO or, in fact, the final allocation -- sorry -- that monetary allocations contained in a NOFO are going to be identical in the final award.

Plaintiffs themselves, in their MSJ, acknowledge that they do not challenge the change in the monetary allocations from the 2025 HSGP NOFOs to the final awards, which undermines their suggestion that you need consistency entirely between NOFO and final award.

Further, the NOFOs here -- when it comes to period of performance, it's unreasonable to expect there to be no change in terms when right in front of the period of performance is the word "projected."

The 2025 HSGP and EMPG NOFOs both state that the three-year period of performance that they contain was projected -- was a projected period of performance.

Further, Your Honor, when we're talking about period of performance, it is entirely unreasonable to set aside the fact that -- and this really gets to your question -- that we're talking about two statutes that do not mention period of performance.  And to assume, then, that the agency doesn't have discretion to change period of performance from one year to the next, when there's no statutory, regulatory, constitutional basis for a three-year period -- to assume

that the -- that there's no agency discretion and that -- the awards from one year to the next will go on changing is unreasonable.

Further, in --

THE COURT:  Even with the decades of practice that it would stay the same?

MS. YEATTS:  So, Your Honor, I think, just taking a step back, yes, the Government would like to -- I would like to outline for you our "committed to agency discretion" argument.

So regardless of --

THE COURT:  Go ahead.  Sorry.

MS. YEATTS:  Oh, thank you.

Regardless of the discussion of the content of the NOFOs, let's talk about, you know, the terms and conditions that are included in the EMPG and HSGP statute.  There's large room for Government discretion where there is no statutory directive to the contrary when it comes to either period of performance and making that one-year period of performance, and there is no statutory directive prohibiting the Government from considering population data outside of the U.S. census data.

Of course, in addition to U.S. census data, in recognition of Section 183, but where neither statute contains terms about period of performance or terms limiting

population allocations to U.S. census data, the Government holds discretion.  This is a classic instance of there being no meaning -- in terms of the population period, this is a -- the performance period, this is a classic instance of there being no meaningful standard against which to judge the agency's exercise of its discretion.

In terms of the population verification requirement, the EMPG statute requires one thing only.  There's one limiting factor here, and that is that the statute must allocate that -- the agency must allocate funds --

(Audio interruption.)

MS. YEATTS:  I'll proceed if you can hear me.

THE COURT:  Yes, I can.  I'm not sure what that was, but go ahead.

MS. YEATTS:  Right.  Okay.  So plaintiffs, in their opposition, state that the statutory limitations are a meaningful standard by which to judge FEMA's actions here -- is simply that FEMA's actions are limited to grant assistance to the states in enhanced preparedness efforts, and the Government agrees.

Beyond that, plaintiffs have not outlined any other terms within the statute, any other directives from Congress that mandate anything outside of Government discretion when it comes to the period of performance and Government discretion when it comes to population allocations.

Further, Your Honor, if we -- you know, let me know if you have further questions there, but if we could get back --

Go ahead.

THE COURT:  Well, just on the population allocation, do you have any examples, historically, where there's been an addition or a -- something that they had to supplement the census data?

MS. YEATTS:  I'm not personally aware, but that's also something that we did not look into.

THE COURT:  Okay.  Go ahead.

MS. YEATTS:  Okay.  So, in terms of the APA claims that plaintiffs bring, plaintiffs fail so show how the period of performance and the population verification terms are unlawful under the APA, and I would like to walk through the different APA claims brought against the population verification requirement.

So, first and foremost, the population verification requirement is consistent with the mandates of both the EMPG statute and 13 U.S.C. 183, and I'm more than happy to walk you through our thinking there.

I think that the first thing that needs to be addressed is the language of section -- of 13 U.S.C. Section 183(a) because there seems to be some significant disagreement between the parties.

In 183, there is no indication that U.S. census data needs to be the exclusive source of population -- the exclusive source of population data for statutes that base allocations on state populations.

Instead, the statute literally says that the U.S. Census Bureau, the Secretary of Commerce, must provide census data to the relevant agency for its use.

Here, the Government not once asserts that it is -- has not or will not use census data, that it will disregard census data somehow by also asking for data from the state. Rather, this is an additional data point that the Government has sought, in terms of the population verification requirement, in order to adhere to the EMPG statutes mandate.  Again, there's simply one, and that is the EMPG funds be allocated according to state population.

Further, Your Honor, plaintiffs -- and, very importantly, when we're talking about reliance interests, because this is one of the plaintiffs' main points of argument, in terms of the population verification requirement and reliance, here, plaintiffs do not once allege that they took steps in reliance on there not being some sort of data collection hold on the EMPG grants.

In fact, they repeatedly contend that they didn't anticipate a population verification requirement.  But the Supreme Court has made clear, mere expectation that an

agency will act as it has in the past without taking any affirmative steps without any detriment, any concrete steps taken on behalf of plaintiffs, that that's not a serious reliance interest.

And the Supreme Court hasn't defined "serious" in front of the phrase "reliance interest," but in *Regents* they've made -- they gave us examples of what constitutes a serious reliance interest.

So, for example, in reliance on the existence of DACA, the plaintiffs in that case -- the Supreme Court recognized their serious reliance interests in the form of enrolling in degree programs, embarking on careers, starting businesses, purchasing homes, getting married.

Plaintiffs allege no reliance -- no steps -- no concrete steps taken on the -- in terms of the population verification requirement not being present in the EMPG statute.

The only -- the only reliance we see -- the only thing -- the only allegation they make is that they were not expecting this -- this term.

Of course, it's important to explain that FEMA has provided a satisfactory explanation for the inclusion of this term.

Again, the Government contends that including the population verification requirement condition in the EMPG

final awards was an exercise of agency discretion and shouldn't be subject to arbitrary and capricious review.

But if it is, then here, FEMA has offered a satisfactory explanation for its decision, and the explanation given is that the requested numbers would account for swings in state population due to any number of factors.  Okay?

And I think it's very important to walk through the contents, literally, of the population verification requirement.

So all that the requirement asks states to do is, one, provide an overall population number; two, outline the methodology that the state used in order to reach that population number; and, three, discuss whether or not -- discuss -- certify that the state, in coming up this -- that number, took into account aliens who have been removed.

THE COURT:  How are they to get this information?

Like, isn't the census the place were you get -- the states get the population, and isn't the Federal Government the agency that would know who had been removed?

MS. YEATTS:  So I think that this kind of gets to plaintiffs' point about, actually, the Paperwork Reduction Act, which I'll explain in just a second, but in terms of their argument that the Government is in possession of this information already and it would be duplicative or the

Government is the sole source of this information -- again, looking at what is being requested under the hold, what is being requested is the state's population as of September 30, 2025, and that is not information that is in the possession of the Federal Government or information that states have been asked to produce in the past.

They -- I think there's an added focus -- there tends to be an emphasis on the fact that they need to certify that their overall population number includes removed aliens. That is not a request to provide a number of aliens who have been removed from your state.  It's simply an added certification that this is the latest number.

In terms of your question about, you know, administerability and how a state would do this, the state -- the states are going to be provided with direction from FEMA.  FEMA has been actively writing guidance outlining how to comply with this term, and this really gets to our ripe -- our prudential ripeness argument, which is simply that there may be no concrete dispute very shortly.

When FEMA issues guidance -- and, by the way, it's important to note FEMA is eager to distribute these EMPG funds.  So they are both motivated to work with states to implement this new term and are actively working on guidance that was paused forcibly by the shutdown, but the goal here is for FEMA to work with states, as it has in the past with

different terms and different conditions, to implement them.

And so before FEMA is given a chance to do this and to talk back and forth with states, it's -- it's premature to allege that it's impossible for a state to meet the population verification requirement.

I think also, Your Honor --

THE COURT:  Don't they need to accept the grants by the 31st?  So you're not giving them a lot of time to figure out, I mean, frankly, whether they can do it -- putting aside, you know, their general argument that it's just -- even if they thought they could comply and it wasn't -- you are not really giving them any notice or ability to do that, are you?

If you have a --

MS. YEATTS:  I think as a point of clarity, Your Honor -- and please let me know if I'm misunderstanding your question -- but states do not need to provide the three prongs of the -- you know, to meet the population verification requirement before accepting the terms of the award, and maybe that's not what you're --

THE COURT:  Well, how can they accept an award when they don't know, frankly, if they're going to get all the money or what they're going to have to do or whether they will ever be able to comply?  They can't start taking the money on the 31st with this hanging out there and, you

know, later find out, "Whoops.  We can't do this," or, you know, "We weren't entitled to this money because so many people in our population changed."  Don't they need to know, going into the acceptance of the award, how it's going to be calculated?

MS. YEATTS:  I think as a matter of just process, to kind of walk this through, even if the state accepts an award now, that -- without knowing, you know, the full content of what it requires to meet the population verification requirement, accepting that award causes them no harm.

And so you can accept your award under the terms outlined in the final award agreement, as is, of course -- you know, it's every state's option not to accept the award if they dislike the terms, but the award can be accepted with the population verification requirement in there and the three-year -- the one-year period of performance in there, and it would not be to their detriment to later find out, you know, the population verification requirement requires plaintiff states to take steps A, B, and C.

And I do want to speak to the Paperwork Reduction Act issue.

So plaintiffs allege that the term was included without the observance of procedures required by law.  This is their Count 4.  And as a point of clarity, FEMA has explicit OMB

approval to request demographic information from preparedness grant recipients in order to effectuate federal law.

And the Government acknowledges that that wording is broad.  In fact, the name -- you know, the title of the information collection request is -- is a generic ICR, but I think, most importantly, of course, FEMA administrators and FEMA as an agency is permitted and always collects information, demographic and other, from applicants -- grant applicants, and even from recipients of grants, a final award.

So this is not something unusual to be requesting information from states who have applied for a grant or even received a final grant.

And as to plaintiffs' discussion, they brought up in their opposition and now today of a clerical omission that the population verification requirement agreement article in the final EMPG award doesn't contain the OMB control number in reference to that information collection request. Plaintiffs fail to identify any prejudice from that minor clerical omission, and any such error, you know, omission of that number, is harmless.  It has no bearing on the substance of the challenged action.

The Supreme Court has made clear that the at APA does incorporate the harmless error rule.  And in an APA claim,

there -- you cannot succeed on an APA claim unless it shows -- the plaintiffs show that they've suffered some sort of harm from the error that they're complaining of -- the procedural error that they're complaining of, and that's *FDA v. Wages and White Lion Investment*, a 2025 Supreme Court decision; and then, you know, there's Supreme Court precedent for Section 706 of the APA requiring courts to take due account of the rule of prejudicial error.

States have not been asked, again, to produce this number elsewhere. And despite contentions otherwise, the Federal Government is not in possession, through U.S. census data, of the state population on the date September 30, 2025.

And most importantly, this term was included to ensure compliance with the EMPG statute and its mandate that these funds be allocated based on population.

And today --

THE COURT: How in the past -- so is it your position that in the past, when there wasn't this certification requirement, that grants were not in compliance with the statute?

MS. YEATTS: I don't think, Your Honor, that there's any suggestion by the Government that there was lack of compliance in the past. I think the focus here is on accuracy. The term was included to promote accuracy, and

there really can't be anyone out there who says that an extra data point is going to make these numbers less accurate.  But, no, there's no suggestion that, you know, since there was noncompliance in the past, by simple reliance on census data, there's merely suggestion that the -- adhering to the statute -- the Government can adhere to the statute even better through this additional data point.

And then, in terms of -- this was brought up today and in the papers.  The Government points to the EMPG statute itself as authorizing this.

So, yes, the EMPG statute does not contain the words "And the Government may request state population data from states," but the EMPG statute does contain Congress's express direction that it be based on population in 6 U.S.C. 762(d)(2), and what naturally follows is that the Government has discretion, of course, in compliance with 13 U.S.C. 183 (a) to both use census data provided by the census and to consult a variety of sources in terms of population.

Your Honor, if you're okay, I would like to also turn to a discussion of the period of performance.

THE COURT:  Sure.  Go ahead.

MS. YEATTS:  Okay.  So in terms of the period of performance and plaintiffs' challenge to a one-year period of performance versus a three-year preferred performance,

again, the Government believes that there is full discretion on behalf of FEMA to outline a period of performance as they see fit because the relevant statutes here do not discuss in any way period of performance, neither EMPG nor HSGP.

However, even if suggested to arbitrary and capricious review, the period of performance being one year survives that deferential review for three reasons:  First, limiting fiscal year 2025 HSGP and EMPG grants to one year was a carefully considered decision.  It's intended, first and foremost, to reduce administrative complexity and to encourage increased oversight over state emergency preparedness projects.  And what's important here is we're in the realm of preparedness and emergency and threats.  We're in the world of threats.  HSGP funding is very closely tied to risk of terrorism and consequences of terrorism.

And so aligning, creating a one-year period of performance permits the agency to revisit, to ask states, "Here are the latest threats.  What are your latest threats? How are you going to respond to them on an annual basis rather than only every three years?"

And there were additional -- there was additional reasoning provided, such as closer alignment with annual federal budget cycles, but I think that, first, you know, keeping in tune with the emerging threats here, checking back in, and making sure projects match those is really a

number -- that's sufficient in itself to withstand the satisfactory explanation requirement under arbitrary and capricious review.

Secondly, though, Your Honor, plaintiffs claim reliance interests again, and I don't want to repeat myself, but it -- are without a reasonable basis.

When you're talking about a statute that gives the Government full discretion to outline period of performance as it sees fit, to then point to past awards and say you couldn't have anticipated that, when you have a statute that doesn't mandate any sort of period, that it would change from one year to the next and that that term would remain identical is not reasonable. There's no statutory basis, not once identified by plaintiffs, for their claim as the period of performance.

Second, Your Honor, I do want to walk through this. I did say this earlier, but presuming that the -- you know, a term inside of a NOFO document will go unchanging is simply unreasonable. We have -- I brought this up, but I want to make sure I say it slowly and once more. Plaintiffs themselves do not challenge that their final monetary allocations changed from NOFO to final award, and I really think that that undermines the argument that a NOFO means unchanging terms in the final award.

You know, it was stated earlier, during argument, that

plaintiffs are not asking for the Government -- to hold the Government to enforce the terms of the NOFO, but this is -- it's exactly what they're asking, and they have explicitly asked for this on page 30 of their -- yeah, on page 30 of their MSJ. They specifically ask for the Government to be required to reinstate the NOFO terms when it comes to period of performance.

So what they're requesting is for the Government to be bound by a document that is nonfinal agency action that contains projected and non-focus, serious steps taken in reliance on the one-year -- I'm sorry -- on the three-year periods of performance or -- and/or the backdating of the EMPG awards. Their performance claims they do, as I just outlined, point to past terms, and they point to the fiscal year 2025 NOFOs and the fact that those contain three-year periods of performance terms, but they don't speak to taking any concrete steps in reliance on either of those sources, whether we call this a longstanding three-year period of performance policy or we point to the NOFOs and the three-year period of performance outlined there, plaintiffs don't allege anywhere, not once, that they took serious or concrete steps in reliance on the -- that three-year period of performance term this year.

THE COURT: But didn't they spend some of the money expecting the backdating and didn't -- I -- I think it

was Maine, but I'll be corrected -- you know, established a program that requires it to be over periods of time?  Aren't those steps that they have taken in reliance on how these grants are typically handled?

MS. YEATTS:  Yes, Your Honor.  So this was actually my -- the second part of what I would like to say is in terms of they're pointing to the three-year period itself.  They -- they outlined three years of projects and submitted those to FEMA, but they did not -- they have not alleged -- they have not taken steps to implement those three-year projects.

Now, backdating is the -- and let's be very clear: HSGP is forward-looking three years.  They outline three years of projects, submit it to FEMA.  Beyond that planning step, plaintiffs don't allege that they have taken actions to implement those plans because, of course, as is required every year, FEMA has to approve the projects that they propose and says wait for the approval before taking steps to implement the projects.

Now, as to EMPG and the backdating, first and foremost, I think it's important to acknowledge with a one-year period of performance comes the fact that EMPG grants won't be backdated by a year.

But in terms of backdating, I think it's easiest to kind of put this in layman's terms.  It was unreasonable for

plaintiff states to spend money that they didn't have. It's sort of a basic principle of spending money. Now, you cannot spend money that you don't have and then claim it's anything other than a self-created injury.

I also think, when we're in the realm of talking about backdating, talking about periods of performance, and talking about what plaintiffs tend to call a gap in funding where they've also deemed it, you know, skipped funding for 12 month -- I don't think anyone's papers made this clear enough, but I would like to provide clarity now. The EMPG fiscal year 2024 award provided funding through September of 2026. The states are presently being reimbursed under the fiscal year 2024 EMPG awards.

The fiscal year 2024 HSGP award -- again, never any backdating there -- provided funding through August of 2027. So states are receiving HSGP funds under the fiscal year 2024 award and can receive reimbursement for spending.

I think it's incredibly important to understand that states are activity receiving both EMPG and HSGP money. There is no gap. They are not going without. Their preparedness programs continue.

And then, I think, you know -- I don't -- there's a minor argument made in plaintiffs' opposition, but the fact that there are other grants that maintain three- or four-year periods of performance under FEMA is irrelevant.

The duration of other grants is different, just like HSGP historically not being backdated and EMPG being backdated.  The two grants at issue here have different terms.

Now, Your Honor, please let me know if you have any further questions there before I move on to relief.

THE COURT:  No.  Go ahead.

MS. YEATTS:  Okay.  So the relief problems here are -- it's complicated.  I want to make sure we walk through them carefully.

THE COURT:  Hold on just a minute.

MS. YEATTS:  Sure.

THE COURT:  I'm just making sure.  Okay.  Go ahead.

There was just a little bit of static on our end, and let's see if it's fixed.

MS. YEATTS:  Let me know.  So --

THE COURT:  Why don't you mute me.  Now I can't hear you probably.

DEPUTY COURTROOM CLERK:  Ms. Yeatts, can you try again, please?

MS. YEATTS:  Is it me?

THE COURT:  You are staticky.  I can hear you. I'm more worried about whether the court reporter can hear you.

You can try disconnecting.

So that is not helping.  Do you want to -- can you disconnect and reconnect?

MS. YEATTS:  Yeah.  I can also try calling in. Let me just try it again.  Okay.  I have no idea.  Nothing has changed here.

(Pause-in-proceedings.)

MS. YEATTS:  How is now?

THE COURT:  That's better.  Much better.

MS. YEATTS:  Okay.  Thanks.  Sorry about that.

THE COURT:  No problem.  Go ahead.

MS. YEATTS:  All right.  So as to relief, vacatur of the challenged terms is not appropriate under the APA. That's the Government's position, but we do understand the Ninth Circuit's position on vacatur.  So I think the most important thing to focus on is vacatur would not be the best option under the unique circumstances presented here.

Vacating the one-year period of performance would most clearly leave the term -- leave the fiscal year 2024 -- 2025 HSGP and EMPG final awards without a performance period.  Of course, this would not be in anyone's best interest.  As I've stated earlier, FEMA has every interest in distributing these funds; and, of course, plaintiffs have every interest in receiving these funds.

What the Government suggests is that, if this Court

is -- is looking -- if this Court finds that what is missing here is sufficient explanation for the agency's inclusion of either of the contested terms, then the appropriate relief is to remand to the agency absent vacatur. And there's several reasons that the Government feels that this would be the best course of action for all parties involved.

First, vacatur was -- remand without vacatur provides the Federal Government the opportunity to more thoroughly explain its rationale. That would include an explanation of how the Government considered reasonable reliance interests. It's also an opportunity for the Federal Government to reassess challenged terms. So remand without vacatur provides the test -- the relevant test here that the Ninth Circuit has adopted from the D.C. Circuit's *Allied-Signal* test. It's how serious were the agency's errors?

Again, if the Court finds that the errors lie in the Government's explanation being insufficient for its inclusion of either of these terms -- of course, the terms do not rise and fall together -- then there is a significant possibility that FEMA can further explain its rationale and outline its thinking and to the satisfaction of the Court.

And the second prong of the *Allied-Signal* test is how disruptive would vacatur be?

I've already outlined that, for the one-year period of performance, it would leave the grant -- the final grant

award without a period of performance, which would cause confusion, major disruption, prevent plaintiffs from receiving their money, prevent the Government from knowing what to do with the money; but, further, vacating the population verification requirement would frustrate the underlying goals of the EMPG statute as the Government has outlined.

In terms of the --

THE COURT:  What about the -- what about the -- I mean, again, we're looking at a date of December 31st to accept.

Under your proposal of remand, how would -- how would we deal with that date?

MS. YEATTS:  Well, of course, Your Honor, the Court could remand with instructions to FEMA.  So that could come into play here.  And I think that could potentially solve that issue.

In terms of the injunctive relief that plaintiffs request -- I kind of touched on this earlier.  And, again, the population verification requirement and the period of performance terms do not rise and fall together.

But in terms of injunctive relief, plaintiffs' discussion of irreparable harm really fails to demonstrate how receiving award letters with unanticipated or disliked terms and conditions while continuing to receive HSGP and

EMPG preparedness grant funding entitle them to the injunctive relief that they seek.

I've outlined how for the population verification requirement it would be premature to assume that they're going to be unable to meet that requirement and receive those funds. I've outlined clearly that, in terms of the period of performance term, there has been no gap in funding. They continue to receive EMPG funds through September of 2026 and HSGP funds under last year's award through August of 2027.

And, of course, plaintiffs will receive -- you know, eligible plaintiffs -- which every state is eligible under the EMPG statute and HSGP is a little bit more shaky in terms of this, but will receive funding next year.

It's simply the elimination of duplicate or overlapping funding that is the result of the period of performance claim -- a period of performance term.

Additionally, I talked about how, in terms of backdating -- we're talking about self-inflicted harm. When states choose to spend money that is not guaranteed to them and when not in their possession, we understand that that is not -- that spending was not the result of any contract with the Federal Government or any guarantee of money via contract with the Federal Government.

And then, of course, any discussion of harm needs to

take into account the harm the Federal Government faces if, A, they're prevented from ensuring compliance with the EMPG statute; and, B, if the Federal Government is forced to contract with states or any -- any sort of grantee for longer than desired, despite that there's no legal requirement in statute regulation or Constitution to do so.

Plaintiffs ask the Court to mandate the inclusion of the three-year period of performance term from the NOFOs. That's their language.  Not mine.  This would require the Government to contract with states for longer than desired, simply due to their preference to the states' preferences, not due to any mandate outlined by Congress.

Additionally, you know, this runs counter to Ninth Circuit precedent that states that mandatory injunctions are disfavored absent very serious damage and facts and law clearly favoring plaintiffs.

Further, plaintiffs request restoration of the HSGP and EMPG NOFO period of performance, and as I've already stated, a NOFO document is non-final.  Plaintiffs do not contest this.  Plaintiffs do not challenge changed allocations from NOFO to final award, but they're insistent here that the Court order that the NOFO terms are final, that the period of performance terms to be final in the absence of the population requirement, and the NOFOs to be final.

And joining the population verification requirement

would inhibit FEMA's ability to effectuate the mandates of the EMPG statute enacted by Congress, requiring funds to be allocated according to population; and, of course, any time the Government is hindered from effectuating statutory mandates, the Government itself suffers irreparable harm. That's *CASA*. And this would weigh against public interest.

Any injunctive relief as to either term should be limited to plaintiff states' awards, as plaintiff states agree in their briefing. Of course, universal relief that goes beyond remedying plaintiffs' concrete harms isn't permitted under *CASA*. And any relief, as you touched on earlier, should be stayed pending appeal.

It's especially important, in this instance where we're talking about the release of money under a one-year period of performance, and, you know, disagreement over -- on appeals that would need to occur and disagreement over whether or not states can spend beyond that one-year term.

THE COURT: If there was a stay, could the stay include extending the period to accept the grants past December 31st?

MS. YEATTS: My understanding, Your Honor, is that FEMA had worked on a case-by-case basis to extend -- I'm sorry, did you say to extend the period of performance or to extend the acceptance date?

THE COURT: I meant acceptance date. If I said

performance, that was a mistake.  But, yeah, the acceptance date.

MS. YEATTS:  I couldn't hear.

Yeah.  So FEMA, the Federal Government, has already stipulated with plaintiffs to move the acceptance date from November to December.  I can't make, personally, any representations as to their willingness to do so again, but I -- you know, once before, the Government has been willing to to alter the acceptance date.

THE COURT:  Okay.  I don't have any further questions.  If you have anything --

MS. YEATTS:  No.  Thank you, Your Honor.

THE COURT:  Okay.  Mr. Giovanatti, I will give you the last word.

One thing I would like you to talk about is this whole issue about the continuing funds and how, as a result of that, you haven't, per the Government, shown, you know, harm.

One other thing I want to do -- oh, and just this sentiment that, if it was vacated, that somehow that would leave it with no -- no period of performance.

You can respond to the other arguments too.  Those were just two things I definitely wanted to make sure you responded to.

MR. GIOVANATTI:  Sure, Your Honor.

I guess, just to start, I think it bears noting, for context purposes, that we're dealing with hundreds of millions of dollars of grants to address emergency management, counterterrorism, Homeland Security issues here, and the arguments presented by the defendants, both in the briefing and today, are evasion, overreading of statutes, post hoc explanations. This is the -- this is not the type of area where we should be, as the Supreme Court said, rounding what should be square corners, Your Honor.

I think a good example of that is the agency discretion and the Tucker Act argument. I know both of these issues have been thoroughly briefed, but both of those arguments have been addressed by several courts across the country over the past several months, and there is a consistent finding against the Federal Government's overreading of the Tucker Act and of Section 701(a)(2).

Just, you know, even in this district, on October 27th, Judge Aiken dispelled these arguments in *Washington v. HHS*. On November 10th, Judge Kasubhai --

THE COURT: Kasubhai?

MR. GIOVANATTI: I'm probably pronouncing that wrong.

-- dispelled these arguments in *New York v. Department of Energy*.

There's a case in the Northern District of California

from November 21 that we cited in our brief.  It's the *County of Santa Clara v. Noem*, and it actually deals with these grants, among other FEMA grants, and it dispels with these two arguments and lists, like, a dozen-plus cases from across the country that address these arguments, and it is made clear that the Federal Government is attempting to overuse these terms.  They do not apply here just as they hadn't in the other cases, Your Honor.

Addressing some of the specific issues that opposing counsel raised today, and I'll start with the reliance interest issues.

Counsel reemphasizes that the NOFOs hold, you know, no legal effect.  And, again, we don't disagree with that fact; however, they certainly can provide a basis for a reliance interest, and that's the argument we're suggesting here.

The other -- also, because counsel emphasized that she said it's lowly and wants more, the fact that we did not challenge the reallocation of the HSGP award from the NOFO to the final award -- we wouldn't have standing to do that Your Honor.  We gained money from the NOFO to the final award.  So I'm not sure how we can possibly challenge something where we wouldn't have standing to do so.

The argument that there was no detriment to detrimental reliance -- the standard under the APA is that there is reliance interests that are considered.  Again, defendants

are reading in this detrimental argument, and also the backdating issue makes very clear that there was actually detrimental reliance.  No awards have historically backdated EMPG awards by one year.  The money has already been spent.  It's already out the door, and we expect to be reimbursed for those expenses.

In addition, we have budgeted their -- have set their budget based on the expectation of a three-year period of performance, and also there are not that many multi-year projects that are in the works that would be impacted by the -- that would be -- that were created based on a reliance interest and that will be impacted as a result of FEMA's decision here.

As to the continued awards, understanding that there is some overlap between the year -- various year awards, the backdating example provides a very good example of why that -- there isn't actually funding available as is emphasized in the declarations provided by the states.  The money is used -- the fact that the EMPG money is used typically in the backdated period.  So, for example, the money that would have been for the fiscal year 25 award was spent between October 1, 2024, through September 30, 2025.

So it's already out the door, and there isn't any money left from the 2024 grant or the 2023 grant.  So there isn't some sort of continuation of previous awards that would be

able to cover the funds that now are not available from this backdated period.

So there is -- so understanding that there is -- there may be some instances where there was money left over from previous fiscal years, that doesn't negate the fact that in some instances there isn't, and we are now facing a complete loss of funds.

The other thing is the states budget a lot of this funding to kind of cover -- one fiscal year would cover the next or one -- you know, so they kind of have budgeted to -- for future periods based on these periods of performance. If suddenly that budgeting process is thrown into complete disarray, there will ultimately be a gap somewhere down the line.

It's kind of impossible to say with certainty now because we're going to -- we're in a little bit of a different world here, depending on what the ultimate period of performance is for these grants.

So the reliance interest by the states are -- are well-founded.  They are based on 20 years of practice, and based on the NOFOs.  And the defendants' arguments that they are unreasonable simply holds no water, Your Honor.

One point on the interpretation of 13 U.S.C. 183(a) of the use of Census Bureau data -- opposing counsel emphasized today that the population certification term would just

create an additional data point, and I think the comment was made that an extra data point would not make the numbers less compliant.

Yes, they would make them less compliant.  These are numbers.  It's not like you can have several different numbers and somehow come up with one consistent number.  It's either the Census Bureau data or it's the number that is collected through the population certification hold.

This isn't some sort of, like, multi-factor consideration where it isn't a definitive thing like a number that could be considered in that regard.

So the position that they're going to supplement census data means they are actually going to replace the census data, which they must rely on pursuant to that statute.

The final point, Your Honor, about vacatur, the period of performance -- we have requested that the Court vacate the period of performance, and we do not believe remand is appropriate here, given the -- under the standards, under the serious violations that have occurred here, and given the equities of the timing.

As the Court has emphasized, we have the December 31st deadline.  But even putting aside the December 31st deadline, three months into the grant period, we need a decision on this -- a definitive decision on this as soon as possible, Your Honor, so that, if we are able to proceed --

or, rather, if we're forced to proceed with a one-year period of performance, things have to start happening immediately.  There are many requirements for FEMA to approve specific projects.  Often, those approvals take up to six months.  Some projects take even longer than that. So we're looking at a -- realistically, the period of performance would just be a few months at the end of the fiscal year.

So we need certainty on this as soon as possible.

To the point that vacating the period of performance would leave the grants with no period of performance, you know, we trust that the Court would be able to fashion the relief to resolve that issue.  We are not asking for a mandatory injunction asking where FEMA would be required to go back, reissue the awards with the appropriate injunction or with the appropriate three-year period of performance. They certainly could and should do that to make it a lot cleaner for the states and for moving forward.

But if the Court was to issue an injunction that prohibited FEMA from rejecting any drawdown requests that occurred over the next three years, for the fiscal year '25 grants, that would, more or less, put a period of performance of three years in place without actually requiring a term to be added to an agreement.

So that would be our requested relief, Your Honor, and

that would resolve any of the issues raised by opposing counsel today, in terms of the vacatur.

THE COURT:  I have one question.  I think the Government said, "Well, there's no harm."  I focused on the December 31st date, and I think her position was you can just accept it and wait and see what happens and that's not really a significant date.  Why, in your position, can't you just accept it and wait to see what happens with this litigation, given the uncertainties?

MR. GIOVANATTI:  Yes, Your Honor.  It's certainly not the position of the states to typically accept awards with terms that they believe to be illegal.  That puts us in a bind where I'm certain what we would get at that point is our acceptance being thrown in our face as some sort of waiver of rights or something to that effect.

So we're not in a position to accept a grant that includes illegal terms.

There's some case law in the District of Rhode Island on this specific issue.  I don't have it readily, off the top of my head, but there's a similar case involving Department of Homeland Security's inclusion --

Oh, we lost Ms. Yeatts.

THE COURT:  Yeah.  So I want you to stop.  Thank you for pointing that out.

Is she still on?  Can you tell?

Oh, there she is.  Okay.  Go ahead and finish.

Thank you.

MS. YEATTS:  Sorry, Your Honor.

MR. GIOVANATTI:  Yeah, again, Your Honor, I don't have the case citations, off the top of my head, but there's two decisions out of the District of Rhode Island.  One involves the Department of Homeland Security grants where they tried to impose an immigration cooperation term and then a second case involving similar imposition of an immigration cooperation term in Department of Transportation grants, and there the Court emphasized the harm to the states if they were to accept the grant that included an illegal term.

So, yes, we're not in a position to accept the grants that include illegal terms at this point.

And, again, given the circumstances that we're being presented with, we need a decision as soon as possible.  We would not actually advocate for extending the acceptance deadline.  Our strong preference would be to have a definitive decision well before that date.

THE COURT:  I appreciate that, but as I said, I don't think I'm the last word, and we are going into kind of a difficult period.  I don't want to put on someone else's desk right around the holidays a rush for a stay.  So even a -- maybe a limited period to just give everybody just a

little bit of time might be more appropriate, but I certainly have to consider that.

MR. GIOVANATTI:  One point on that, Your Honor.  I don't know that we should necessarily assume that the defendants would appeal a decision here, and I don't -- perhaps opposing counsel can advise us right now, but in at least two other cases that I'm personally involved with involving grant terms, they did not appeal the decision, or at least they didn't seek an emergency stay before an acceptance deadline was forthcoming; so I don't know that we should necessarily assume that such a stay request would be coming.

And then I would -- I would also emphasize that there's no dispute here that ultimately these awards will go forward -- these grants will go forward, and ultimately funding will flow from the Federal Government to the states under the terms of whatever the ultimate grant award will be.  So, while we need clarity as to the specific period of performance and we need clarity whether we need to comply with the population certification hold, it's not clear to me what possible harm the Government would have by not seeking an emergency stay.  They are going to eventually be giving us money through these grants.

So, if they can just not focus on these particular terms or at least allow the regular appellate process to

play out to contest the award, they are not really in a difficult position.

THE COURT:  Okay.  Thank you for that clarification.

I don't have any further questions.  I really appreciate everyone's argument.  I know this is very time-sensitive, and so we will work to get this out as quickly as possible.

MR. GIOVANATTI:  Thank you, Your Honor.

THE COURT:  Thank you, all.

DEPUTY COURTROOM CLERK:  This court is adjourned.

(Hearing concluded at 10:19 AM.)

C E R T I F I C A T E

State of Michigan, et al. v. Kristi Noem, et al.

6:25-cv-02053-AP

Oral Argument

December 17, 2025

I certify, by signing below, that the foregoing is a true and correct transcript, to the best of my ability, of the video conference proceedings heard via video conference, taken by stenographic means.  Due to the audio-visual connection, parties appearing via speakerphone or cell phone or wearing masks due to coronavirus, speakers overlapping when speaking, speakers not identifying themselves before they speak, fast speakers, the speaker's failure to enunciate, background noises and/or other technical difficulties that occur during video conference proceedings, this certification is limited by the above-mentioned reasons and any technological difficulties of such proceedings occurring over the video conference at the United States District Court of Oregon in the above-entitled cause.

A transcript without an original signature, conformed signature, or digitally signed signature is not certified.


/s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
_____
Official Court Reporter      Signature Date: 12/22/2025
Oregon CSR No. 98-0346  CSR Expiration Date:  9/30/2026